'19 - CV - 01896

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

for the

District of Colorado ☑

2019 JUL -1 AM 11: 24

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Hon. Ann Gail Meinster, Eric Motter, Cynthia Schippert, Eric J. Kelly, Andrew Louizeaux | ) ) ) ) ) | |

*Defendant(s)*

## ~~CRIMINAL~~ *CIVIL* COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____May, 1, 2018_____ in the county of _____Jefferson_____ in the _____1st_____ District of _____Colorado_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 241;18 U.S.C. § 242; 18 U.S.C. § 1589; 18 U.S.C. § 1592; 18 U.S.C. § 1593A;  18 U.S.C. Code § 1201; 28 U.S. Code § 1738 A; U.S.C. § 1512; 18 U.S. Code § 2258; 18 U.S. Code § 2; Title 28 U.S. Code § 455; 18 U.S.C. § 1584; 8 U.S. Code §1329. Jurisdiction of district courts | Deprivation of rights under the color of law. Conspiracy against rights, Forced labor. Unlawful conduct with respect to documents. Benefiting financially from peonage, slavery, and trafficking of persons. Parental Kidnapping. Full faith and credit given to child custody determinations. Second degree kidnapping. Witness Tampering. Failure to report child abuse and endangerment. Aiding and abetting in a crime. Disqualification of justice, judge, or magistrate judge. Involuntary servitude. Violation of Jurisdiction. |

This criminal complaint is based on these facts:

Comes now the Complainant Alberto Rojas Jr. acting Pro Se and under indigent status, pursuant to 42 USC § 1983 and Bivens Vs. Six Unknown Named Agents, 403 U.S. 388 (1971) hereby submits the following complaint for criminal acts committed by the Defendants Hon. Ann Gail Meinster, Eric Motter, Cynthia Schippert, Eric J. Kelly, and Andrew Louizeaux. Evidence hereto presented will corroborate and expose judicial misconduct, abuse of authority, criminal activity, child endangerment, and unethical medical/therapist malpractice.

☑ Continued on the attached sheet.

Alberto Rojas Jr.
3848 King St.
Denver, CO 80211

_____
*Complainant's signature*

ALBERTO ROJAS JR.
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____Denver, Colorado_____

_____
*Printed name and title*

# TABLE OF CONTENTS

LEGAL AUTHORITY SUPPORTING THE CRIMINAL COMPLAINT...... 1

CASE BACKGROUND.................................................................. 2

SUMMARY OF ACTIONS BY JUDGE ANN GAIL MEINSTER................ 3

SUMMARY OF ACTIONS BY ERIC MOTTER................................. 17

SUMMARY OF ACTIONS BY CYNTHIA SCHIPPERT........................ 25

SUMMARY OF ACTIONS BY ERIC J. KELLY................................. 26

SUMMARY OF ACTIONS BY ANDREW LOUIZEAUX....................... 31

CONCLUSION......................................................................... 38

CERTIFICATE OF SERVICE........................................................ 41

LIST OF EXHIBITS.................................................................. 41

# LEGAL AUTHORITY

## THIS COMPLAINT IS BROUGHT FORWARD UNDER 42 USC § 1983 AND BIVENS V. SIX UNKNOWN NAMED AGENTS, 403 U.S. 388 (1971)

**Pursuant to 42 U.S.C. § 1983** the law allows a person whose Constitutional rights were violated by government officials to sue in federal court. The defendant in the case must be someone acting on behalf of a state or local government. A plaintiff can also sue a local government, such as a city, for violating his constitutional rights.

**Under Bivens V. Six Unknown Named Agents, 403 U.S. 388 (1971)** The Court has violated the Complainant and his Child's Constitutional Rights along with Due Process.

## CASE BACKGROUND

The Hon. Judge Ann Gail Meinster is currently presiding over Jefferson County District Court Case No. 16DR1911 since November 1st, 2016. The litigants in the case regarding Allocation of Parental Responsibility are: **Petitioners**: Eric

Motter and Cyntha Schippert. **Respondent:** the Child's biological father Alberto Rojas Jr. **The Child:** Roslyn Marie Rojas Baker DOB 10/05/2005.

Judge Ann Gail Meinster was appointed by the Hon. Chief Justice Phillip McNulty to preside over Case No 16DR1911 on July 1, 2016. The Chief Justice removed Magistrate Shelley B. Rodriguez who previously presided over the case under 11JV1024. Because the Magistrate had been overseeing the litigation since August 2011, the Chief Justice justified his decision to remove the Magistrate by commenting (along these words) "the case had been litigated too long under Magistrate Rodriguez." He further changed the case to a DR rather than a JV. However, The Hon. Judge Ann Gail Meinster was the Magistrate's immediate superior and reviewed all motions requested from either party. Therefore, Judge Ann Gail Meinster had prior knowledge of the case thereby disqualifying her to preside over the matter under suspicion of a bias view, prejudicial perspective, partiality, and conflict of interest.

Judge Ann Gail Meinster has willfully abused her judicial discretion; she has violated and dismissed the following rules and laws applicable to her position while acting under the color of law and abuse of her judicial immunity:

a) Rule 1.2: Promoting Confidence in the Judiciary,

b) Rule 2.10: Judicial Statements on Pending and Impending Cases (A)

c) Rule 2.3: Bias, Prejudice, and Harassment

d) Rule 2.5: Competence, Diligence, and Cooperation

e) Rule 2.11: Disqualification and 28 U.S. Code § 455

f) Wright v. District Court, 731 P.2d 661 (Colo. 1987).

g) Hammons v. Birket, 759 P.2d 783 (Colo. App. 1988).

2

h) Lijenberg v. Health Services Acquisition Corp., 486 U.S. 847, 108 S. Ct. 2194 (1988)

i) United States v Balistreri, 779 F 2nd 1191 (7th Cir. 1985) Section 455 (a)

j) United States V Sciuto, 512 F.2d 842, 845 (7th Cir. 1996)

k) Wood Bros. Homes v. City of Fort Collins, 670 P.2d 9    (Colo. App. 1983).

l) Aiding and abetting in crime (Parental Kidnapping and Witness Tampering)

m) 18 U.S.C. § 241 Conspiracy Against Rights.

n) 18 U.S.C. § 241 Deprivation of rights under the color of law

o) 18 U.S.C. § 1592 Unlawful Conduct with Respect to Documents

p) 18 U.S.C §1584 Disqualification of justice, judge, or magistrate.

q) 18 U.S. Code § 3283. Offenses against children

r) C.R.S. Title 19 Children's Code § 19-3-304 Persons required to report child abuse or neglect.

s) 18 U.S. Code § 1512. Tampering with a witness, victim, or an informant

## SUMMARY OF ACTIONS BY JUDGE ANN GAIL MEINSTER

### Argument and Citation to Legal Authority

**a)    Rule 1.2: Promoting Confidence in the Judiciary**

A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety. Impropriety occurs when the conduct compromises the ability of the judge to carry out judicial responsibilities with integrity, impartiality and competence. Actual improprieties include

3

violations of law, court rules or provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge.

Applicable Rule/Law. Wood Bros. Homes v. City of Fort Collins, 670 P.2d 9 (Colo. App. 1983). Courts must meticulously avoid any appearance of partiality, not merely to secure the confidence of the litigants immediately involved, but to retain public respect and secure willing and ready obedience to their judgments.

Supporting Arguments: The Court has ignored the Defendant Eric Motter's disobedience and compliance with court orders despite the overwhelming evidence submitted throughout this case. The Court has dismissed two motions for citation and contempt against the Defendant with ludicrous excuses such as stating that documents have become separated during the filing, or that copies of a former order were not attached, or that they simply did not comply with the rules of service.

The Court has shown disdain for the child's safety and welfare by ignoring emergency motions as in the most recent traumatic events in the child's life, the death of her mother, her run-away action and her suicidal diagnosis by a professional counselor. The Court has further mocked the Complainant by recurring to body language that denotes disrespect toward the parties involved. On June 29, 2017, during a Status Conference, the court "smirked" at the Complainant's affirmation that the Court acted as the Defendant's attorney by offering legal advice requesting the Defendant's counsel to file a motion for Allocation of Parental Responsibility and withdraw his motion for Guardianship.

4

On 04/26/2019 the Court was informed that the U.S. Department of Justice Civil Rights Division, Criminal Section is currently evaluating the Judge's performance for violation of civil rights and judicial misconduct. While the Complainant asked Judge Ann Gail Meinster if she was sure she would be able to preside without bias or prejudice she once again smirked in a sarcastic manner and assured the Complainant she would be unbiased. Of course, her credibility has dissipated from the onset of the case; currently is nonexistent.

**b)    Rule 2.10: Judicial Statements on Pending and Impending Cases (A)**

A judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court or make any nonpublic statement that might substantially interfere with a fair trial or hearing. (B) A judge shall not, in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office.

**Supporting Arguments:** On May 23rd, 2017 the Court stated that it would share the investigative report by Ms. Leigh Hinze from the Division of Children, Youth and Families. The Court failed to adhere to its statement and as of this date, the Complainant has not received a copy of said report issued and initiated by this Judge or her assistants. The Court further stated that "on its own motion," it was ordering a CFI investigation at the Court's expense, and yet it issued an order for both parties to share the cost of a CFI. Later on the CFI withdrew from the case and recommended an appointment of a PRE further imposing financial strain upon the Complainant.

Continued next page

5

## c) Rule 2.3: Bias, Prejudice, and Harassment

(A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice. A judge must avoid conduct that may reasonably be perceived as prejudiced or biased.

**Supporting Arguments:** The Court has been acting and supervising this case as the prior court official's superior. This Court has consistently denied and ignored all motions, status reports, and evidence submitted by the Complainant including motions for review and petitions for citation for contempt of court, yet it has endorsed and approved every motion filed by the Defendant Eric Motter and his counsel. The Complainant has filed several status reports report stating the Defendant was reluctant to fully cooperate with the PRE investigation ordered by the Court. Supporting evidence was submitted to corroborate his actions. On April 4, 2018 the Court opted not to address the issue and threatened the Complainant with an order and citation to show cause if he did not pay his portion of the PRE investigation fees despite the fact that he has declared bankruptcy, is indigent, and underemployed. The Court is and has been well aware of the Complainant indigent status.

Moreover, the Court ordered the Child's mother mental health and medical records sealed knowing the mother was terminally ill and that the matter was critical for the child's best interest, safety, and welfare. In doing so, both father and child had no means of communicating and conferring for an unplanned outcome. On April 10, 2017, the Child's mother succumbed to Stage IV Rectal Cancer. The Defendants did not inform or communicate with the Complainant about the Child's mother passing or the Child's whereabouts, rather, on April 12, 2017 the Complainant was informed by a third party about the Child's mother death. The informant (Ms. Priscila Sandos) read about the incident through social media.

6

## d) Rule 2.4: External Influences on Judicial Conduct

(A) A judge shall not be swayed by public clamor or fear of criticism. An independent judiciary requires that judges decide cases according to the law and facts, without regard to whether particular laws or litigants are popular or unpopular with the public, the media, government officials, or the judge's friends or family. Confidence in the judiciary is eroded if judicial decision making is perceived to be subject to inappropriate outside influences.

**Supporting Arguments:** The Court is aware that political and judicial figures have received complimentary copies of the Complainant's filings, as well as the media involvement and coverage of this case. The Court is further aware that this issue has been formally presented to the Colorado Commission on Judicial Discipline requesting an investigation for misconduct and violation of Canon Laws by Judge Meinster. The Judge's handling of the case has been covered by a local news network. The network attempted to contact the Judge, yet they were directed to speak with the court's public relations dismissing their request. There is reason to suspect that the Court has concerns of being criticized for its endless mistakes, lack of diligence, partiality, and unfair/contradicting rulings.

## e) Rule 2.5: Competence, Diligence, and Cooperation

(A) A judge shall perform judicial and administrative duties, competently and diligently. (B) A judge shall cooperate with other judges and court officials in the administration of court business. Competence in the performance of judicial duties requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary to perform a judge's responsibilities of judicial office. [2] A judge should seek the necessary docket time, court staff, expertise, and resources to discharge all adjudicative and administrative responsibilities. [3] Prompt

7

disposition of the court's business requires a judge to devote adequate time to judicial duties, to be punctual in attending court and expeditious in determining matters under submission, and to take reasonable measures to ensure that court officials, litigants, and their lawyers cooperate with the judge to that end. [4] In disposing of matters promptly and efficiently, a judge must demonstrate due regard for the rights of parties to be heard and to have issues resolved without unnecessary cost or delay.

**Supporting Arguments:** The Court has ignored a motion for Emergency Custody knowing that the Complainant had no idea as to the whereabouts of his child and her safety. Instead, the Court decided to set a "Status Conference" 42 days after the motion was filed. It further insisted in appointing Mr. Craig Eades as the only entity to supervise father and child visits. Concrete evidence has been submitted corroborating Mr. Eades admonishment from DORA (Department of Regulatory Agencies) for unethical and unprofessional conduct. The Court has been advised that the Complainant was unable to afford Mr. Eades exorbitant fees, the Court was also informed that Mr. Craig Eades stated he did not want to offer his services and yet the Court refused to cooperate with the Complainant by not addressing this issue promptly.

The Court went as far as stating that the Complainant can afford such fees ($120.00/hr) without requesting a Financial Affidavit from the Complainant. The Court is aware that through its actions and decisions, both father and child have been completely alienated, without any communication or contact for a period of 12 months beginning in August 1, 2016, and from February 3, 2018 to date (17 months).

Aside from being late to court hearings (May 23, 2017 and June 29, 2017) the Hon. Ann Gail Meinster has issued orders ex-parte and "via email" on the Defendant's

motions that were not shared with the Complainant before the Court issued such orders. Moreover, the Court continued to render orders while motions to recuse were pending.

**(f) Rule 2.11: Disqualification and 28 U.S. Code § 455**

(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances: (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding. (b) acting as a lawyer in the proceeding;

## Applicable Laws

**Wood Bros. Homes v. City of Fort Collins, 670 P.2d 9 (Colo. App. 1983).** The Courts must meticulously avoid any appearance of partiality, not merely to secure the confidence of the litigants immediately involved, but to retain public respect and secure willing and ready obedience to their judgments.

**Wright v. District Court, 731 P.2d 661 (Colo. 1987).** Upon reasonable inference of a "bent of mind" that will prevent judge from dealing fairly with party seeking recusal, it is incumbent on trial judge to recuse himself.

**Hammons v. Birket, 759 P.2d 783 (Colo. App. 1988).** At least an appearance of bias or prejudice existed due to a professional relationship between the trial judge and expert witness for defendants and the trial court erred in denying a motion for recusal.

**Supporting Arguments:** The Hon. Ann G. Meinster and Magistrate Shelley B. Rodriguez had a close working relationship; the Court had personal knowledge of Case No.11JV1024 and No 16DR1911. Both court officials have refused to recuse

9

on several occasions, and in doing so, the Court displays bias and prejudice. Moreover, on May 23, 2017, Judge Ann Gail Meinster acted as the Defendant's attorney by giving illicit legal advice requesting the Defendants to file for APR and withdraw their motion for Guardianship.

The Court needs to acknowledge that the United States Supreme Court has recognized the right of parents to be an active and integral part of their children's lives. This is the oldest of the fundamental liberty interests recognized by [the Supreme] Court." Troxel v. Granville, 530 U.S. 57 (U.S. 2000). This right is protected by the Fourteenth Amendment to the United States Constitution and is a "Fundamental Right" that may be interfered with only in limited circumstances. Liteky v. U.S., 114 S. Ct. 1147, 1162 (1994). Judge Ann Gail Meinster is aware that she has contributed to the 'systematic alienation" of both father and child for several months since she was appointed to preside over the case.

In 1994, the U.S. Supreme Court held that "Disqualification is required if an objective observer would entertain reasonable questions about the judge's impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified. Witnesses and legal experts' opinions affirm the Court's partiality.

Lijenberg v. Health Services Acquisition Corp., 486 U.S. 847, 108 S. Ct. 2194 (1988) (what matters is not the reality of bias or prejudice but its appearance); United States v Balistreri, 779 F 2nd 1191 (7th Cir. 1985) (Section 455 (a) "is directed against the appearance of partiality, whether or not the judge is actually biased.") (Section 455 (a) of the Judicial Code, 28 U.S.C. § 455(a), is not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process.").

Recusal under 455 is self-executing; a party need not to file affidavits in support of recusal and the judge is obligated to recuse herself sua-sponte under the stated circumstances. The Court also stated that section 455 (a) "requires a judge to recuse himself in any proceeding in which her impartiality might reasonably be questioned." Taylor v. O'Grady, 888 F2nd 1189 (7th Cir. 1989).

The judge has legal duty to disqualify herself even if there is no motion asking for her disqualification. The Seventh Circuit Court of Appeals further stated that "We think that this language [455(a)] imposes a duty on the judge to act sua-sponte, even if no motion or affidavit is filed." Balistrieri, at 1202. Should a judge not disqualify himself as required by law, then then judge has given another example of his "appearance of partiality" which, possibly, further disqualifies the judge. None of the orders issued by any judge who has been disqualified by law would appear to be valid. It would appear that they are void as a matter of law and are of no legal force or effect.

**Should a judge not disqualify himself, then the judge is in violation of the Due Process Clause of the U.S. Constitution. United States V Sciuto, 512 F.2d 842, 845 (7th Cir. 1996) (The right to a tribunal free of bias or prejudice is based, not on section 144, but on the Due Process Clause.").** Judicial impartiality is a significant element of justice. Judges should decide legal disputes free of any personal bias or prejudice. As a result of a conflict of interest, a judge may be unable to maintain impartiality in a case and thus should be disqualified. Even where a judge is impartial, but appears not to be, recusal is necessary. Should a judge issue any order after he has been disqualified by law, and if the party has been denied of any of his property, then the judge may have been engaged in a Federal Crime.

11

**Pursuant to 18 U.S.C. § 2.** The first provision one finds in Title 18 of the United States Code regards accessories to crime. Title 18, United States Code § 2 now provides: (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. Judge Ann Gail Meinster is aware that the Defendants have disobeyed her own orders. The Court was provided with copies of the Defendant Eric Motter crimes as reported by the *Jefferson County Sheriff reports No. 11-13606 Assault Third Degree Against a Minor. Case No. 19-90 Assault Felony Menace, and People of Colorado Vs. Eric Motter Case No. 2011M2516.* The Court is further aware that Eric Motter has engaged in Parental Kidnapping and Witness Tampering and yet it refuses to address and prosecute his crimes.

**Pursuant to 18 U.S.C. § 1592**, Judge Ann Gail Meinster has chosen to ignore all status reports, motions, and documents filed in Court thereby engaging in Unlawful Conduct with Respect to Documents. A multitude of reports have been submitted in court corroborating the incidents that have severely affected the Child in Case No 16DR1911 such as a **Sexual Assault Report, Run Away incident, and a Suicide Risk Assessment** conducted by a professional therapist. All the reports are "direct evidence" since they are reported by the local law enforcement agency. The Court chooses to dismiss all reports as "hearsay" thereby placing the Child in further and unnecessary physical and emotional harm. On October 2018, the Complainant mailed a birthday letter and card addressed to his daughter via the Court's address. Both the letter and card where not entered in the case log and the Child did not receive the card.

**Pursuant to 18 U.S.C. § 2.** The first provision one finds in Title 18 of the United States Code regards accessories to crime. Title 18, United States Code § 2 now provides: (a) Whoever commits an offense against the United States or aids,

12

abets, counsels, commands, induces or procures its commission, is punishable as a principal. Judge Ann Gail Meinster has willfully aided and abetted in a crime by endorsing the Defendants' criminal activity by denying and dismissing all reports and motions for contempt against the Defendants. The Court adamantly refuses to address the Defendants criminal activity and contemptuous behavior declaring "hearsay" as the court's view.

**Pursuant to 18 U.S.C. 242. Deprivation of Rights Under the Color of Law.** This provision makes it a crime for someone acting under color of law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States. It is not necessary that the offense be motivated by racial bias or by any other animus.

Defendants act under color of law when they wield power vested by a government entity. Those prosecuted under the statute typically include police officers, sheriff's deputies, and prison guards. However other government actors, such as **judges,** district attorneys, and other public officials, can also act under color of law and can be prosecuted under this statute.

**Under C.R.S. § 14-10-124(1.5) (a).**

a)   The Court has shown disregard for the wishes of the child's parents as to parenting time.

b)   The wishes of the child if he or she is sufficiently mature to express reasoned and independent preferences as to the parenting time schedule.

c)   The Court has denied the child access to interaction and interrelationship with her father and her siblings.

13

d)    The Court has ignored the ability of the parties to encourage the sharing of love, affection, and contact between the child and the other party.

e)    The Court dismisses the parties' system of values, heritage, cultural, religious, time commitment, and mutual support.

f)    The Court does not offer a clear explanation or timeline for supervised visitations or the amount of visitations; it denies the Complainant to any access to his child's activities and school events, and prohibits the father of the child to have access to her in case of an emergency without any reason given.

The allocation of parental responsibilities must be based considering the following:

"A claim of child abuse and neglect, sexual assault, and domestic violence has been submitted to this court. The Complainant has filed several law enforcement agencies reports on the child's neglect by the Defendant. The Court is also aware of the Defendant's domestic violence and assault on a minor; and the court is aware of the child's sexual assault."

**Pursuant to C.R.S § 14-10-123.4**, children have the right to have the determination of matters relating to parental responsibilities based upon the best interest of the child. The Complainant requested the Court to summon the child to close quarters and ask the child about her wishes. The Court chooses not to do so and continues to ignore the child's requests as per CFIs statements and reports. The Court further denied the Complainant's Motion for Appointment of a Guardian at Litem for the Child.

**Pursuant to C.R.S. § 18-6-401 (II)(A)** It is not in the child's best interest to allocate mutual or full decision-making responsibility over the objection of the

14

other party. Whether one of the parties has committed an act of domestic violence, has engaged in a pattern of domestic violence, or has history of domestic violence, which factor must be supported by a preponderance of evidence. Supporting law enforcement reports regarding the Defendant's assault on a minor, domestic violence, and felony menace against a Process Server by brandishing a handgun against the Server in January 2, 2019 have been filed and presented in court. The Defendant further admitted his heinous acts during cross-examination. Again, the Court chooses to dismiss and refuses to address such criminal acts.

**Violation of Due Process, 4th and 15th Amendments.** Judge Ann Gail Meinster has issued an order imposing severe restrictions upon the Complainant to file any Pro Se documents if he does not: a) File a Motion for Leave of Court, b) File and Affidavit, and c) File the pleas through ICSS which is not accessible to Pro Se parties in Jefferson County. Since July 12, 2018, the Court has chosen to ignore and dismiss all properly filed motions and status reports in *forma pauperis* by the Complainant thereby engaging in violation of Due Process. Both the Child and her father (the Complainant) do not have a voice in this matter. The Court has engaged in "Systematical and Criminal Alienation" between the Child and her father as well as her paternal family.

**Under 8 U.S. Code § 1329. Jurisdiction of district courts.** Judge Ann Gail Meinster has issued orders without proper jurisdiction over her own final orders. On November 15, 2017 the Court denied the Defendants' Motion for Equal Distribution of PRE Fees. Months later the Defendants filed a similar motion and the Court Granted the Motion forcing the Complainant to pay over $6800.00. Ignoring the Complainant's current indigent status and his objection, the Court issued a Citation for Contempt and has scheduled a Contempt Hearing for July 22,

15

2019 intending to incarcerate the Complainant for the third time under alleged "disrespect toward the Dignity of the Court."

Because the initial court order was not appealed, it is safe to conclude that the court's first decision to deny equal payments was final and the Defendants failed to appeal in a timely manner at the Court of Appeals. Moreover, the Court's last order regarding Equal Distribution of PRE Fees is currently under review at the Colorado Court of Appeals under Case No. 19CA66, hence, a *Stay of Order* is alluded and must be granted until the Court of Appeals renders a decision.

WHEREFORE, the actions of the Court, most specifically Judge Ann Gail Meinster are criminal in nature and without reasonable and convincing explanation to excuse such acts or exonerate her from criminal charges. The damage has been done and it cannot be remedied. Her conduct is criminal at best and shows no remorse for willful violation of Constitutional Rights, Canon Rules, and Federal Law. Her condescending and disrespectful conduct toward the Complainant is ratified by the attached transcripts of various hearings. Conduct such as being dismissive of the Complainant's claims, rushing the Complainant during cross examination of witnesses, endorsing misconduct and abusive language by the Defendant during hearings, making false statements against the Complainant such as "the father does not want to see his daughter," issuing threats for citation, stating she has spoken with others when said party denies such communication, and disallowing witnesses to testify under oath, is direct violation of state and federal rules and laws. The Court has inflicted intentional emotional, physical, and financial distress upon the Complainant and his child.

Lastly, and further proof of Judge Ann Gail Meinster abuse of authority, judicial misconduct, criminal behavior, and abuse of judicial discretion, the judge is currently facing criminal charges at the U.S Federal District Court for Violation

16

of Civil Rights and Conspiracy under U.S. District Court Colorado Case 1:18-cv-00620-MSK-MEH

## SUMMARY OF ACTIONS BY ERIC MOTTER/DEFENDANT

The Defendant Eric Motter inserted himself in the case on or about February 2011. The Defendant was then married and residing with Mrs. Nancy L. Elliot. Mr. Motter began an extramarital affair with the Child's mother and in the process, he met the Child in this case. On June 2011, the Complainant visited the Child as he was then residing in El Paso TX. The Child stated Mr. Motter was frequently visiting her mother and occasionally would stay overnights. The Child claimed she felt ignored by her mother as she would spend hours locked in her bedroom when the Defendant visited her home.

The Complainant returned to Colorado in April 2012 and established permanent residence in Lakewood CO with the intent to remain present in the Child's life on a regular basis if not daily. On or about January 2013, as the Complainant picked up his child for a scheduled parenting time visit, she immediately began to sob uncontrollably and while covering her face as in an act of shame, she stated she did not like how the Defendant Eric Motter used to hug her. The Complainant attempted to obtain information from the Child, but she refused to disclose any more details. The Complainant then attempted to communicate with both the Child's mother and Mr. Motter and rather than addressing his concerns, both opted to file a Restraining Order against the Complainant which was dismissed for lack of evidence or imminent harm and danger.

In fact, Mr. Motter has filed several vexatious and unfounded motions for restraining/protective orders, and they have been dismissed. However, on

December 12, 2018 the Court finally granted Mr. Motter's Permanent Protection orders against the Complainant without any substantial evidence to corroborate and confirm his claims. Mr. Motter and his attorney acted with Malicious intent and harassed the Complainant with their persistence in filing protection orders. Said order is currently under appeal at the Court of Appeals Case No. 19CA66.

Law enforcement records show that Mr. Eric Motter was married and residing with Mrs. Nancy L. Elliot during the following crime: as per Jefferson County Sheriff Report No. 11-13606 filed in June 21, 2011 Described an Assault Third Degree against a minor. Mr. Motter physically assaulted his stepson Max Schwartz as the minor stepped in and attempted to defend his mother from the ongoing violent and menacing behavior from Mr. Motter toward his mother. As per the Sheriff's report, Mr. Motter attempted to choke the minor by placing his hands on his neck and leaving red fingermarks on his neck and throat. Photographs were taken of the minor's neck and throat confirming signs of physical force.

Mr. Motter was charged by The People of The State of Colorado Vs. Motter, Eric under Case No. 2011M2516 for Assault 3-Know/Reckless Cause Injury and Disorderly Conduct to which he pleaded guilty thereby receiving a deferred sentence ordering him to attend Anger Management classes. According to the law enforcement report and the Prosecutor, Mr. Motter was not impeded by either the influence of alcohol or drugs, therefore he acted in full use of his senses and discretion. He incurred both physical and emotional harm upon his spouse and his stepson.

Mr. Motter and Mrs. Elliot divorce was finalized on November 2011. The prior altercation was the triggering event that moved Mrs. Elliot to file for divorce after several instances of child abuse by Mr. Motter toward her children along with predatory behavior and domestic abuse.

18

During his marriage to Ms. Elliot and through the separation process, Mr. Motter continued his amorous relationship with the Child's mother and eventually moved in together, married, and relocated the Child to Conifer CO. This was done without informing both the child's father and the Court or filing a motion to do so.

**Pursuant to C.R.S. Title 18 Criminal Code § 18-3-302 Second degree kidnapping.** The kidnapping is accomplished with intent to sell, trade, or barter the victim for consideration. During a Mediation in which Mr. Motter and the Child's mother participated along with the Complainant, the Child's mother offered to buy out the father if he relinquished his parental rights by stating she would forgo child support and obligations. She offered several thousand dollars as payout, but not without the father of the Child agreeing to remove his name from the Child's Birth Certificate. The Complainant refused the offer and both the Child's mother and Mr. Motter decided to remove themselves from the mediation. The mediation was ordered by the Court as the Child's mother continued her contemptuous behavior by disobeying orders to set up supervised visitations. Both father and Child had not seen each other for several months.

On April 12, 2017, around 2:45 P.M., the Child's father received a call from a former mutual co-worker of both the Child's mother and the Complainant. Ms. Priscila Sandos made the call to offer her condolences to the Complainant stating she found out about the Child's mother's death through Facebook. Immediately the Complainant filed an Emergency Motion for Custody as he was not aware of his child's whereabouts, her current condition, and was not informed by Mr. Motter, his counsel Eric J. Kelly, or Mrs. Cynthia Schippert of the child's mother death.

Rather than addressing the urgency of the matter, the Court, most specifically Judge Ann Gail Meinster decided to set a Status Conference 42 days after the Emergency Motion was filed. The judge dismissed the fact that both

father and child had not seen each other or had any contact over several months due to the child's mother's direct and indirect parenting time interference.

On or about July 11, 2017, the Complainant located Ms. Nancy Elliot, Mr. Motter's former spouse. The intent was to inform Ms. Elliot of potentially using her as witness in the hearing for APR. During that conversation, Ms. Elliot disclosed in detail Mr. Motter's conduct such as spousal and child abuse, assault against a minor, and predatory behavior. Ms. Elliot claimed Mr. Motter used to walk in on her children as they were taking showers.

Ms. Elliot further informed the Complainant of the Child's run-away incident from Mr. Motter's home which took place in June 11, 2017. Such event was reported by the Jefferson County Sheriff Case No. 11-14926. Mr. Motter, Mrs Schippert, and their attorney Eric J. Kelly failed to inform the Complainant about the imminent danger the Child experienced while she ran away. In fact, if it had not been for Ms. Elliot's sharing such incident, the Defendants would have kept their silence as this information was shared a month later after the incident took place by a "third party" not associated to the child.

**Witness Tampering**

In the United States, the crime of witness tampering in federal cases is defined by statute at 18 U.S.C. § 1512, which defines it as "tampering with a witness, victim, or an informant." Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

20

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings; shall be fined under this title or imprisoned not more than 20 years, or both. The punishment for such an offense is up to 20 years if physical force was used, attempted, or threatened.

Upon finding through his counsel and his child that Ms. Elliot would be subpoenaed to testify in court as the Complainant's witness, Mr. Motter contacted his ex-spouse (Ms. Elliot) and asked her not to get involved in the case, claiming it wasn't her business to testify in court (along those lines). There is strong suspicion that Mr. Motter either used his and Ms. Elliot's daughter Bella as his weapon or threatened Ms. Elliot based on his history of spousal and emotional abuse. Clearly Mr. Motter engaged in Witness Tampering hence Mr. Motter is liable to serve no less than 20 years in prison.

It is worth the redundancy to mention that neither Mr. Motter, his counsel or Mrs. Cynthia Schippert informed the Complainant about his child's runaway incident. As per the runaway report, the Child left her house at 5:30 AM, rode her bicycle for 6 miles through treacherous roads, fearing being attacked by wild animals or being hit by a moving vehicle on her way to a King Soopers in order to use a public telephone asking for help and shelter from friends. Neither the Sheriff Deputies nor Mr. Motter found the child, rather the child was returned to her home by a neighbor who just happened to have seen her riding her bycicle. The child was missing for over four hours.

On September 18, 2015, the Child was sexually assaulted by a classmate while attending 5th grade at Marshdale Elementary located in Conifer CO. The Complainant was not informed about the incident by either the Child's mother, Mrs. Cynthia Schippert or Mr. Motter. Three days after the assault, the school's

21

principal informed the child's father of such event. The school principal stated he chose not to file a report with the law enforcement agency as the Child's mother decided not to report the event. The Complainant then reported the incident to the Jefferson County CPS as well as the Sheriff's Department and they filed the incident under case No. 15-20404 Described as Unlawful Sexual Contact.

The Defendants hereto named, their counsel, and the Child's mother did not abide by the following rules as they were in a position to report child abuse and neglect: 18 U.S. Code § 3283. Offenses against children and C.R.S. Title 19 Children's Code §19-3-304 Persons required to report child abuse or neglect and(1)(a). Except as otherwise provided by section 19-3-307 , section 25-1-122(4)(d), C.R.S ., and paragraph (b) of this subsection (1), any person specified in subsection (2) of this section who has reasonable cause to know or suspect that a child has been subjected to abuse or neglect or who has observed the child being subjected to circumstances or conditions that would reasonably result in abuse or neglect shall immediately upon receiving such information report or cause a report to be made of such fact to the county department, the local law enforcement agency, or through the child abuse reporting hotline system as set forth in section 26-5-111, C.R.S .

(2) Persons required to report such abuse or neglect or circumstances or conditions include any: (a) Physician or surgeon, including a physician in training; (b) Child health associate pursuant to18 U.S. Code § 3283. Offenses against children and C.R.S. Title 19 Children's Code § 19-3-304 Persons required to report child abuse or neglect.

Further concern for the child's safety spans from her school's therapist report. According to the Therapist, the child was subjected to a Suicide Risk Assessment and it yielded the possibility that the child will likely succeed in taking

her own life. Mr. Shea Robinson, acting as school counselor at West Jefferson Middle School, reported the child's classmates and friends informed him that the Child had been talking about taking her life. This claim further disclosed that the child was the target of bullying and threats at her school by her classmates.  Mr. Robinson's report was issued on October 11, 2017. Once again, Mr. Motter, Mrs. Cynthia Schippert, Eric J Kelly and Dr. Louizeaux failed to disclose such information in court.

Despite the many efforts by the Complainant to inform and present the evidence to Judge Ann Gail Meinster, she dismissed all the reports as hearsay based on Eric J. Kelly's objection. In doing so, the judge displays her failure to remain neutral and unbiased toward the parties thereby placing the child in harms way.

After an in-depth investigation, the Complainant was able to locate Ms. Alex Schwartz, former stepdaughter and victim of Mr. Motter's voyeurism and predatory behavior. She corroborated that Mr. Motter had an indoor surveillance system with remote access to it. He engaged in viewing the children while at home and opted to walk in on her while taking showers. Moreover, she disclosed that Mr. Motter discharges his firearms in his residence targeting random animals while the minors witness his heinous acts.

On the evening of January 2, 2019, at approximately 7:10 PM Mr. Motter was served with a Summons at his home address. The Process Server properly identified himself as such and when Mr. Motter opened his door, he brandished a handgun against the server. According to the Process Server, he stated that he heard Mr. Motter ordering "the girls" to get down and take cover. The Server asserted to the deputy Sheriff that he feared for his life. It is reasonable to assume that both Mr. Motter's own daughter and the Child in this case were in the house

23

while Mr. Motter engaged in a felony menace and child endangerment. This incident was reported by the Jefferson Sheriff's Dept under Case No. 19-90 described as Assault-F Menace.

**Refusal to Cooperate with a PRE Evaluation and Court Orders**

On October 12, 2017 the Court issued an order designating Andrew Louizeaux, Psy.D. as the PRE investigator. The Court ordered that Dr. Louizeaux must complete an evaluation and report by February 20, 2018. Both parties were to fully cooperate with the evaluation. Mr. Motter chose not to cooperate with the PRE's request for a final unsupervised visit between the Complainant and his daughter. The PRE was clear that such visit would yield a critical piece of data required to issue and finalize his report.

On May 1, 2018, the Court also ordered that Mr. Motter had to choose among three supervising individuals to render their services. Mr. Motter and his counsel claim they contacted all three individuals yet two of them testified that they have never heard from Mr. Motter. Instead, Mr. Motter chose Terry J. Banks as the supervisor but refuses to acknowledge that Ms. Banks confirmed she has a close working relationship with Dr. Andrew Louizeaux and created a conflict of interest. Mr. Motter refuses to engage with the other two individuals, they are Tom Nellesen and Nancy Hass.

The Court ordered that both the Complainant and his child may have up to 3 hours of supervised visitations every other week. Due to Mr. Motter's conduct, both father and child have not seen or spoken with each other since February 3, 2018 placing him in direct contempt for violation of court orders. Hence, Mr. Motter has willfully engaged in Parental Kidnapping pursuant to 18 U.S.C. § 1201 - U.S. Code - Unannotated Title 18. Crimes and Criminal Procedure § 1201.

Kidnapping. (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when (c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life. (d) Whoever attempts to violate subsection (a) shall be punished by imprisonment for not more than twenty years.

In conclusion, Defendant Eric Motter has committed several crimes against humanity, most specifically against his former spouse and the children under his custody. His criminal activity elicits no less than imprisonment for flagrant violation of federal laws, as well as child endangerment by keeping loaded weapons, and discharging firearms by shooting random animals in his property knowing both minors in his home are suicidal. His demeanor and approach to the minors is that of an authoritarian provider, ordering the minors to serve his needs by cooking, cleaning, shoveling snow, and cleaning up dog feces. His placement of both indoor and outdoor surveillance system with remote access to his dwelling and the minors' living quarters is certainly alarming and worrisome. Both minors are females 13 and 15 years of age respectively.

**SUMMARY OF ACTIONS BY CYNTHIA SCHIPPERT/DEFENDANT**

Mrs. Cynthia Schippert filed joint custody and APR along with Mr. Motter. Mrs. Schippert's role in this case is that of being one of two of the Child's Godmothers who apparently hosts the Child at her home every other weekend. Other than a long relationship with both the Child's father, the Child's mother, and the Child herself, she has failed to report all the incidents in which the child's safety has been compromised. She has remained silent and withdrawn in many of the pleas and hearings requested by Eric Motter and his counsel.

25

Mrs. Schippert works as a school counselor and is well aware of her responsibilities when it pertains to reporting child abuse and neglect. Instead, her actions leave no other option but to believe she is conspiring with Eric Motter and their counsel to perpetuate sequestering and alienating the Child from her father and her parental family. Mrs. Schippert does not profess any religion nor attends any church as per the Complainant's recollection. The Child was baptized in the Roman Catholic Church by Jorge and Deborah Nasta, close friends of the Child's father. Yet the Child has been denied access to at least receive instruction about her father's faith and religion. Likewise, it is unknown if Mr. Motter practices and or endorses any faith.

In May 1, 2018 during the hearing for APR, the Complainant reached out to Mrs. Schippert and requested her assistance in monitoring both child and father's relationship and she refused. Therefore, it is unclear what -if any- obligation or responsibility she holds when the Child is in her care. One can only conclude that Mrs. Schippert's involvement in the Child's life is limited and uninterested at best. Her silence and decision not to report the Child's unfortunate yet harmful events denote her carelessness about the child's welfare. The probability of conspiracy between her and Mr. Motter cannot be ruled out. Mr. Motter is currently receiving timely payments of Child Support and as per his counsel Eric J. Kelly, he was looking into the Social Security Office for Survivor's Benefits.

**SUMMARY OF ACTIONS BY ERIC J. KELLY, COUNSEL FOR THE DEFENDANTS ERIC MOTTER AND CYNTHIA SCHIPPERT**

Mr. Kelly's conduct has been unethical and unprofessional. While one may acknowledge the confidentiality between client and his counsel, he is also in a position of trust. Mr. Kelly has been acting in a retaliatory and vengeful demeanor against the Complainant as he was reported to the Office of Attorney Regulation

26

Counsel under the following charges: willful obstruction to the administration of justice pursuant to People v. Kenelly, 648 P.2d 1065 (Colo. 1982); Violation with regards to People v. Haase, 781 P.2d 80 (Colo. 1989); Rules 4.3, 8.3 of the Colorado Rules of Professional Conduct, along with Malicious Prosecution.

Mr. Kelly failed to disclose and inform the Court about his client's habitual domestic violence behavior and prior criminal record, most specifically his client's (Eric Motter) arrest for assault on a Minor, which pursuant to C.R.S. §18-6-401 (II)(A) it would have disqualified his client from obtaining full decision making and APR. Mr. Kelly further refuses to engage and advice his client in abiding by court rules. Nonetheless, and in accordance to his well noted comportment and attitude, he has filed a motion for citation for contempt on a court order that was issued without jurisdiction by Judge Ann Gail Meinster, this action merits charges for Malicious Prosecution.

The following is the formal complaint filed at the Office of Attorney Regulation Counsel.

**Rule 8.4 Misconduct**

(a) Eric J. Kelly has violated the Rules of Professional Conduct by knowingly assisting or induce another to do so or do so through the acts of another. The counsel Eric J. Kelly has endorsed his client's misconduct and contempt of court by failing to communicate and maintain the Respondent (Complainant) updated on his child's well being as ordered by the Court on May 1, and 17, 2017.

(b) Counsel Eric J. Kelly has committed a criminal act that has reflected adversely in his honesty, professionalism, trustworthiness and fitness as a lawyer by aiding and abetting his client who has committed various criminal acts supported by law enforcement reports. His client has engaged in Parental

Kidnapping and Witness Tampering, Malicious Prosecution, and Domestic Violence/Assault against a Minor.

(c) Counsel Eric J. Kelly has engaged in conduct involving dishonesty, fraud, deceit and misrepresentation by making false accusations such as stating the Respondent in Case No. 16DR1911 does not want to see his daughter and that he is engaging in stalking behavior against his client. Mr. Kelly has further retained information critical in the court's decision making by withholding his client's most recent criminal activity such as a 2nd degree felony where his client produced and brandished a handgun during the serving of a summons to his client in January 2, 2019. Jefferson County Sheriff's Case No. 19-90

(d) Eric J. Kelly has engaged in conduct that is prejudicial to the administration of justice, such as withholding evidence on his client's criminal background which rendered an unlawful advantage during court proceedings. His conduct elicited an illegal and dangerous placement of a child in the hands and custody of his client who is automatically disqualified from having any rights to custody of a child pursuant to C.R.S. §18-6-401 (II)(A) which states: It is not in the child's best interest to allocate mutual or full decision-making responsibility over the objection of the other party. Whether one of the parties has committed an act of domestic violence, has engaged in a pattern of domestic violence, or has history of domestic violence, which factor must be supported by a preponderance of evidence. Supporting law enforcement reports regarding the counsel's client assault on a minor and domestic violence have been filed and presented in court. His client further admitted his heinous acts during cross-examination. See Sheriff report on Case No. 11-13606.

(f) Eric J. Kelly knowingly assisted the court in conduct that is a violation of applicable rules of judicial conduct and Constitutional laws by filing frivolous and

28

repetitive motions knowing the court has placed a restriction on the Respondent (Complainant) by disallowing him to file any pleas, responses, or motions against his motions if it is not through an attorney at law via ICSS.

(g) Eric J. Kelly has engaged in conduct that he knows or reasonably should know is harassment or discrimination on the basis of this Complainant's socioeconomic status in conduct related to the practice of law. The counsel is directly harassing the Complainant in Case No. 16DR1911 by insisting in filing vexatious motions asking an already bent and bias court to impose further financial strain on the Complainant when in fact his previous motions for such relief were denied and were not appealed by Mr. Kelly and his clients. His deeds are malicious and viciously inclined toward influencing a judge's decision.

**Pertaining to Rule 8.3 Reporting Professional Misconduct**

(a) Eric J. Kelly is aware that the judge in case No. 16DR1911 has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that judge's honesty, trustworthiness or fitness as a judge, Mr. Kelly has failed to report the judge's misconduct to the appropriate professional authority. In doing so, Mr. Kelly is taking advantage of an officer of the Court who is willingly engaging in violation of Constitutional Rights, Canon Laws and Due Process. Mr. Kelly is well aware that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office.

People v. Kenelly, 648 P.2d 1065 (Colo. 1982); People v. Haase, 781 P.2d 80 (Colo. 1989). Mr. Eric J. Kelly has willfully engaged in deceptive measures and obstructed justice in his intent to benefit his client.

29

Following his pattern of deception, Eric J. Kelly deceived the court by making false statements regarding an alleged agreement between him and this Complainant regarding a date agreed to appear in a court trial for charges against his client for Malicious Prosecution at the Denver Court House on Case No. 18C00881. In fact, no proof exists of such agreement or communication. Clearly his intent was to discredit the Complainant's credibility by claiming he had contacted the Complainant, and both agreed to a court date which was false.

Most recently Mr. Kelly refuses to communicate about the Child's accident while skiing. As per his client's brief notice, the Child suffered a cervical strain while skiing and had to be hospitalized. He refuses to disclose who was supervising the child, where was she being cared for, whether she was wearing proper safety gear and her current status.

Mr. Kelly continues to file ex parte pleas and motions in court without adhering to C.R.C.P. Rule 5(b) on various occasions. The Court has ruled on his motions without informing the Complainant.

Mr. Kelly attempted to collect funds from the Complainant that were not approved by the court as per his email sent on February 28, 2019. The court approved $2,467.50 for attorney fees plus $155.77, Mr. Kelly attempted to collect $2,998.27 for his fees. He refuses to disclose his records. His conduct reflects an attempt to extort the Complainant by asking for unjustified compensation.

Mr. Kelly filed a motion to issue a Citation for Contempt of Court knowing beforehand the order was being appealed at the Court of Appeals. Mr. Kelly is yet to respond to the following email/inquiry sent to him on Feb 28, 2019:

*Today at 12:45 PM I received a message from your client Eric Motter via Talking Parents informing me my daughter has suffered a fall while skiing and that she has*

30

*suffered a cervical strain. I requested further information and he has not responded, I will appreciate if you provide a detailed answer to the following:*

> *a) who was with Roslyn when it happened?*

> *b) where did it happened?*

> *c) why was she not in school today since today is a regular school day and classes have not been canceled?*

> *d) who was supervising her?*

> *e) where is Roslyn being cared for right now?*

Such inquiry does not involve or compromises client/attorney privilege and confidentiality unless both conspire to retain critical information regarding the Child's welfare and safety. Wherefore, Mr. Eric J Kelly is guilty of conspiracy, and unethical conduct/misconduct while engaging and covering up his clients' criminal activities. His violation of applicable rules pertaining to the discharge of his duties as an attorney at law is evident and verifiable.

## SUMMARY OF ACTIONS BY DR. ANDREW LOUIZEAUX

On October 12, 2017 the Court issued an order designating Andrew Louizeaux, Psy.D. as the PRE evaluator. The Court ordered that Dr. Louizeaux must complete an evaluation and report by February 20, 2018. Both parties were to fully cooperate with the evaluation.

Dr. Louizeaux engaged in fraud and defamatory conduct by issuing an incomplete report to the court. After several visits with Dr. Louizeaux by both parties, as part of his report he submitted both Eric Motter and the Complainant to a Minnesota Multiphasic Personality Inventory (MMP-I)2 test. It is the most

widely used psychometric test for measuring adult psychopathology in the world. The MMPI-2 is used in mental health, medical and employment settings.

After a lengthy process of answering hypothetical questions, the answer sheet is scored through a computer. Allegedly, Dr. Louizeaux had to submit such report to an independent source to evaluate and score the results. The test yielded a high score on the L Scale which if it is compared and matched accordingly to the adjacent scale scores, it can tell if the individual was either lying or is in fact a person who is known as a Conformist Moralist.

Dr. Andrew Louizeaux stated he could not interpret the test score because he saw that the L Scale was too high and therefore he determined the Complainant was lying. He chose not to finalize the test. Rather, he rendered a slanderous and calumnious report practically criminalizing the Complainant's personality and ability to parent a child. He further recommended to the Court that if the Complainant made any

After Dr. Louizeaux released the test scores, the Complainant secured the assistance of a professional therapist with vast experience in Psychotherapy and Psychology, Mr. Donald Bove. The interpretation of the Complainant's test scores was that of a man with morals and principles. Someone who has very strong opinions about what is right and what is wrong. Accordingly, most moralists are offended when other people don't share their values. ... The Latin root word, moralis, means "pertaining to morals." Dr. Louizeaux failed to interpret the test scores and hence issued a botched and flawed report to the court.

Dr. Louizeaux was present during two visitations between the Complainant and his daughter, he witnessed their interaction both in his office and at the Complainant's home. After a third unsupervised visit between father and child, he

32

visited with both parties and stated that he was going to recommend the to the court to remove supervised visitations as the child had expressed she was comfortable visiting her father every other weekend for overnight stays.

Dr. Louizeaux along with the child, physically inspected the Complainant's house and met his girl friend Ms. Denise Allen who is a Registered Pediatrics Nurse. The Child was happy and elated that she was finally going to be with her father and have her own room and "home."

After the unsupervised visitation, the Complainant shared an email with Dr. Louizeaux reporting all the events and statements made by the child. During that visit, the child disclosed that she had been engaging in self destructive behavior by punching objects until her knuckles bled. She confirmed she was angry and anxious. She further stated she was uncomfortable at her home because it was infested with rodents. Moreover, she confirmed that Mr. Motter maintains an overzealous watch of both her and his daughter by commanding them to conduct house chores typically carried on by males.

The Children are asked to cook, clean the house, shovel snow and pick up dog feces while Mr. Motter watches Television. The children are prohibited from using the telephone landline, cell phones, and cannot use their computers or tablets after 5:00 PM. The cell phone reception at his house is sketchy at best since it is located in a rural area.

Dr. Louizeaux had requested Mr. Motter to have the child available for a last unsupervised visit with her father as it was a "critical piece of data" for his final report. After the aforementioned report via email, Dr. Louizeaux decided to issue the report and made a complete turnabout on his statement made in front of Ms. Denise Allen and the Complainant, that he was going to recommend uplifting the

33

order for supervised visitations. He submitted the most appalling, slanderous, libelous and defamatory evaluation that leads to suspect he shared the events with the Defendant and his counsel and engaged in conspiracy.

Dr. Louizeaux and his associates at Katz and Louizeaux have a long history of complaints at DORA by several individuals whom they have harmed with their unethical practices. Mr. John Ashley PhD. contacted the Complainant and shared his investigation on Louizeaux and his associates. Through Metadata Analysis:

Conceptually, a **meta-analysis** uses a statistical approach to combine the results from multiple studies in an effort to increase power (over individual studies), improve estimates of the size of the effect and/or to resolve uncertainty when reports disagree

Dr. John Ashley was able to confirm that Dr. Louizeaux engages in deceptive procedures by pasting and inserting excerpts from other individuals' case reports and issues them as his work. Dr. Louizeaux "doctors" his reports to benefit his clients whom he favors. It is also known that he engages in money laundering, racketeering, and bribery according to Ms. Lori Hills. Throughout the years of practice, Louizeaux has incurred great harm both emotionally and financially upon several individuals including Dr. Ashley and Ms. Lori Hills to name a few.

Based on his conduct and the accusations he faces, the firm possibility that Dr. Louizeaux might have been bribed or conned to yield such slanderous and negative report would be hard to dismiss. Furthermore, Dr. Dana Cogan had conducted an in-depth evaluation on the Complainant and his findings were only positive toward the Complainant and dismissed any possibility that the Complainant suffered from any psychopathy or mental illness. The question is when does a court accept a final evaluation and from which professional? How does the court sanctions a professional report with the assurance that it has not been doctored or full of slander and libelous accusations?

**Malpractice**

Dr. Louizeux failed to report to the court, and investigate the following:

a) Eric Motter's criminal background

b) Failed to interview witnesses

c) Failed to seek out and obtain law enforcement reports regarding Eric Motter's crimes. The reports were given to him by the Complainant and he did not follow through with an in-depth investigation.

d) Failed to acknowledge the Child's and a deputy Sheriff's report that Mr. Motter has an indoor surveillance system in his home.

e) Failed to investigate whether or not Mr. Motter was engaging in predatory and voyeurism behavior as reported by his ex-spouse and ex-stepdaughter.

f) Failed to inform the Court that Mr. Motter had assaulted a minor.

g) Failed to report in court that Mr. Motter had attended Anger Management courses ordered by the Court.

h) Failed to interpret and score a (MMP-I)2 test on the Complainant.

i) Engaged in further accusatory behavior against the Complainant by sending the email (Exhibit F) in which he attempts to negatively influence Eric J. Kelly.

j) and Dr Louizeaux failed to inform the court that Mr. Motter claimed during a court hearing that the death of his wife "took the wind under his sails" yet less than a month after her death he was actively seeking a relationship in a singles' site. His emotional stability can be easily questioned.

On page 1 of Exhibit G Dr. Louizeux acknowledges his office has made billing errors blaming the "new administrator" for such errors when the public has expressed concerns of over billing. He further addresses Mr. Motter refusal to make the child available for another visit and then is followed by another

35

email stating Mr. Motter did not want to cooperate with the visitation. It is undoubtedly a malicious stance by Dr. Louizeux to deny or attempt to deny that he was incapable to interpret his own materials, issue wrongful billing statements as per his own claim and that of Eric J. Kelly's findings, and that he simply engages in unethical conduct.

In an attempt to excuse his wrongdoings and cover up his criminal acts, Dr. Louizeux includes the following conclusion:

In conclusion, I fear that Alberto's rigidly entrenched mental health and parenting problems may make the recommendations offered below naïvely optimistic. Consequently, if the Court's concerns are raised further by his response to this report or during his testimony, the Court should view such as an indication for supervised parenting time, for Roslyn will potentially be endangered if Alberto is unable to change.

By making such statement, Dr. Louizeaux is engaging in libel, extortion, slander, and defamation of character. Here again, Dr. Louizeux believes that it is best for the child to be under the care of an unstable man with a criminal background rather than her true father.

Lastly, Dr. Louizeux failed to inform the Court that the Complainant has raised two successful children. His oldest daughter Adriana is currently a VP at CHASE Manhattan Bank in Dallas TX. His son Robert works in Cyber Security for Boeing Corp. in Phoenix AZ, both children are college graduates and homeowners. Adriana has earned a MA in Criminal Justice. Robert is a former USMC Infantryman; he served two combat tours in Iraq and has a degree in International Conflict Resolution from SDSU. The Complainant has earned a BS in Business Management, and a MS in Criminology from Regis University. He has co-authored a textbook in Victimology currently used at CTU and has

36

been instructing Criminology, Criminal Justice, and Policing Principles at the college level for CTU, CU Denver, CCD and FRCC.

The Complainant has further earned the highest soccer licenses and diplomas from the US Soccer Federation, the NSCAA, the AFF/CIF and The Brazilian Professional Coaching License issued in Brasil. His children are fluent in English and Spanish, along with various other languages they can communicate with slight limitations.

The Complainant has instructed hundreds of coaching candidates while serving at four state youth soccer associations; worked as Olympic Development Program and Bilingual Coaching Education Staff, established his own business and ran it successfully for 11 years in Southern CA. Proof of emotional stability regarding relationships, The Complainant was married to his spouse Emma Rojas for 25 years. The Complainant does not have any record to denote any criminal activity such as assault on a minor or domestic violence, spousal abuse, predatory behavior, voyeurism, drug use or DUIs.

Throughout his career as a soccer coach and program director and coordinator at both the local and national levels, the Complainant has worked with multicultural youth since 1985 as advisor, professor, mentor, and educator. Most recently the Complainant worked for Denver Public Schools as Restorative Justice Coordinator with "at risk youth" of High School age dealing an addressing issues ranging from sexual assault, assault and battery, possession of illegal substances, behavioral and learning issues, child abuse, probation, theft, etc.

The Complainant comes from a Hispanic heritage where family, religious and cultural traditions are essential in a child's life. Moral principles are critical

to raise a child and sustain a family. It is obvious that Dr. Louizeaux did not consider these achievements and principles as proof of a well-educated and balanced man or considered them good enough for the Child's benefit. Rather, his report depicts a psychopath full of mental and emotional issues, which is contradictory to Dr. Dana Cogan's report. Dr. Louizeaux certainly does not hesitate to render a slanderous and libelous report and recommends a child to be placed under the care of a criminal. His report and recommendations are ill intended and criminal in nature.

## CONCLUSION

Since 2013, the child, Roslyn Marie Rojas Baker has been molested, sexually assaulted, har run away from her home, diagnosed suicidal, and is engaging in self destructive behavior. She has been prevented from enjoying the love and care of her father and her siblings. Her Constitutional Rights including her right to practice her father's religion has been trampled, all while under the care of her now deceased mother and Eric Motter.

Judge Ann Gail Meinster has overseen and presided in case No. 16DR1911 since August 2011. Law enforcement and therapist reports supported by witness's testimony confirm the harm the child has suffered throughout the years. Both direct and circumstantial evidence, supported by the preponderance of evidence, confirm the Defendants have committed numerous criminal acts.

Judge Ann Gail Meinster embarked in a relentless stance to ensure both father and child would be systematically alienated throughout the years. Her willful and reckless violation of Constitutional and Civil Rights, Due Process, Canon Rules and Federal laws has been properly cited and presented.

In her attempt to cover up her misconduct she has shown no hesitation to continue perjuring herself and obstruct justice by denying due process to the Complainant. Her actions have placed a Child in extreme danger and cannot be condoned or allowed to continue; the Child might succeed in taking her own life or surrender herself to the consequences of a young girl who has suffered both emotional and physical abuse.

Eric Motter's behavioral pattern and conduct is disturbing based on his criminal background and witness testimonies. Evidence shows Mr. Motter does not hesitate to recur to physical force and emotional abuse when his whimsical needs are not met. Witnesses confirm his predatory and philandering attitude toward women, he does not hesitate to abuse and threaten those under his care. His failure to report the child's alarming incidents and attempting to cover up his actions by filing protection orders against the Child's father under false pretenses falls under Malicious Prosecution and certainly abuse of judicial resources. His criminal record speaks for itself.

Mrs. Cynthia Schippert is guilty of endorsing and covering up for Mr. Motter, her attorney's and the Court's misconduct. It is unclear what her role "if any" she has as the child's guardian, yet the Court has granted her Full Allocation of Parental Responsibilities. Her irresponsible conduct by not reporting the child's sexual assault, runaway incident, and suicidal tendencies confirm her lack of interest in the child's wellbeing. There is no evidence Mrs. Schippert has been involved in the Child's life other than in a social role but not as a care provider.

Mr. Eric J. Kelly's unprofessional conduct has been reported and presented to this court and the Office of Attorney Regulation Counsel. His practice of filing motions/pleas without copying or serving the other party has been confirmed. Mr. Kelly deems it practical to use in his favor the judge's misconduct thereby making

39

him an accomplice to a crime. He further dismisses the Child's suffering and current condition perhaps with one objective in mind, to continue profiting from his client's and the Court's misconduct.

Dr. Andrew Louizeaux's prior history of unethical practice, and his endless negative public reports about his malpractice has rendered a negative impression of his professionalism, credibility, and persona. It is inexplicable and futile to endorse his demeanor without recurring to the evidence hereto submitted. Charging over $23,000.00 for an unfinished, botched, and slanderous report is criminal at best.

WHEREFORE, the Complainant respectfully requests the Court to issue an injunction against the District Court Judge Ann Gail Meinster for willful violation of Constitutional Rights, violation of Due Process, laws and rules applicable to her position as an officer of the court. The Complainant further seeks monetary compensation from all Defendants as deemed justifiable and fair by the Court, and imprisonment as required and mandated by legal authority, specifically all the rules and laws violated by the Defendants. Great harm has been done to both the child and her family. Denial of basic and fundamental rights is a crime, especially when committed willfully and with the intent to harm an individual by abusing authority under the veil of immunity, conspiring to commit a crime, aiding and abetting in a crime, and rendering slanderous and libelous reports.

Most respectfully submitted by.

Alberto Rojas Jr./Complainant/Plaintiff

40

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st of July 2017, a copy of CRIMINAL COMPLAINT was filed and served via the United States District Court on the following:

Judge Ann Gail Meinster at 100 Jefferson County Pkwy. Golden CO 80402

Eric J. Kelly attorney for Eric Motter and Cynthia Schippert at 4704 Harlan St. Ste 250 Denver, CO 80212

Andrew Louizeaux at 1191 S Parker Rd, Denver, CO 80231

By:

Alberto Rojas Jr./Complainant

**LIST OF EXHIBITS**

A. Jefferson County Sheriff's Sexual Assault Report No. 15-20404

B. Jefferson County Sheriff's Runaway Report No. 17-14926

C. Jeffco Public Schools Suicide Risk Assessment dated 10/11/2017

D. Jefferson County Sheriff's Assault 3rd degree Report No. 11-13606

E. Jefferson County Sheriff's Parental Kidnapping Report No 18-29064

F. Jefferson County Sheriff's Assault-Menace F Report No. 19-90

G. **Page 1:** email dated 2/23/2018 at 8:27 AM by Dr. Louizeaux to all parties requesting the Defendants to allow the child and father to have an unsupervised visit scheduled for March 3, 2018 from 1 PM to 5 PM. Louizeaux claims the visit "is a critical piece of data, as well as an opportunity for him to get updated on Rosalyn's wishes and perceptions."

**Page 2.** Louizeaux email to both Eric Motter and the Complainant stating the Defendant's refusal to cooperate with the evaluator's

41

request for a visit between the child and her father along with an explanation. Louizeaux further confirms and blames his "new administrative assistant" for his billing errors.

**Page 3.** Louizeux confirming Eric Motter's refusal to cooperate with the evaluation by canceling the visit between father and child.

**Page 4.** Louizeaux email admitting he was unable to "interpret" and score the Complainant's personality test.

H. Louizeaux email attempting to influence Eric J. Kelly, intending to discredit the Complainant's claims against him. His actions are corroborated by Exhibit G.

I. Transcripts from court hearing held in 04/04/2018 via telephone in which Judge Meinster refuses to address the following: a) an incomplete PRE evaluation, b) the Complainant's indigency, c) Judge Meinster threatening to issue a citation against the Complainant if he did not pay his portion of the PRE fees.

J. Transcripts from a Status Conference held in May 23, 2017 where Judge Meinster perjures herself by claiming she has spoken with Craig Eades regarding his availability to supervise visits, and her illicit advice to Eric J. Kelly to withdraw his motion for Guardianship and file for APR.

K. Transcripts of hearing for Permanent Protection Orders held in 12/12/2018. During the hearing the Court's conduct denotes her bias, prejudice, condescending, disrespectful, and authoritarian approach toward the Complainant. Judge Meinster further rushes the Complainant and treats him with disrespect by stating she did not know what he was talking about regarding her orders and how to enforce them. She makes the following slanderous statement on

42

page 62:

MR. ROJAS:  So are you forbidding me from visiting my daughter?

THE COURT:  I am not going to change the order at this time on therapeutic supervised.  I mean the fact is there's no contact at this time because Mr. Rojas hasn't done what he needs to do to see her –

L. Page 1. E-mails from Craig Eades confirming he has not had communication with the Court, highlighted in yellow, contrary to Judge Meinster's claim she spoke with him.

Page 2. Final email from Craig Eades stating: I will not be able to help you. Good luck.

M. Letter from Mr. Dick Feuerborn, a neutral observer, and witness during the hearing held on 04/27/2019. Mr. Feuerborn confirms there is "tension" between the Plaintiff and the judge.

N. Emails from Dr. Louizeaux confirming he was unable to score and interpret the Complainant's personality test (MMPI-2)

**15-20404**     Supplement No
ORIG

# Jefferson County Sheriff Office

Reported Date
**09/22/2015**
Nature Of Call
**USB-M**
Member/Dept ID#
**FLEMING, CHAD M**



SEXUAL ASSAULT

## Administrative Information

| Agency | | | | Report.No. | | Supplement.No | Reported Date | | Reported Time |
|---|---|---|---|---|---|---|---|---|---|
| Jefferson County Sheriff Office | | | | 15-20404 | | ORIG | 09/22/2015 | | 11:02 |

| CAD Call No | Status | Nature Of Call |
|---|---|---|
| 150175290 | EXCEPTIONALLY CLEARED | UNLAWFUL SEXUAL BEHAVIOR - MISDEMEANOR |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 26663 NORTH TURKEY CREEK RD | | EVERGREEN | 80433 | 52JC |

| Area | From Date | From Time | Member#/Dept ID# |
|---|---|---|---|
| JCM | 09/18/2015 | 08:00 | 2132/FLEMING, CHAD M |

| Assignment | Entered by | Assignment | RMS Transfer |
|---|---|---|---|
| PATROL MOUNTAIN WATCH A | 2132 | PATROL MOUNTAIN WATCH A | Successful |

| Prop Trans Stat | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|
| Successful | 0475 | 09/24/2015 | 09:26:47 |

| Assisting Deputy |
|---|
| A. IGEL |

| -JUVENILE- | Witness Statement |
|---|---|
| Yes | Yes |

| # Offenses | Offense | Description | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|
| 1 | 18-3-404(1) | UNLAWFUL SEXUAL CONT | | C | N | 99 | 22 |

| #Pr | MOE | Act | Weapon/Force | IBRS | No |
|---|---|---|---|---|---|
| | N | 99 | | 11D | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| WIT | RP | 1 | ROJAS, ALBERTO | W | M | 07/26/1959 |
| VIC | VIC | 1 | See Confidential Page | | | |
| WIT | OTH | 1 | BAKER, MYRIAM | W | F | 02/08/1962 |
| WIT | OTH | 2 | ███████████████ | | | |
| SUS | SUS | 1 | See Confidential Page | | | |
| WIT | OTH | 3 | ███████████ | ██ ██ ███ | | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| OTH | 1 | I | BAKER, MYRIAM | 966228 | W | F | 02/08/1962 |
| OTH | 2 | G | KINGSBURY, CHRISTIAN | 1183283 | | | |
| OTH | 3 | I | ████████████████ | ██ | ██ | ██ | ██ |
| RP | 1 | I | ROJAS, ALBERTO | 908934 | W | M | 07/26/1959 |
| SUS | 1 | | See Confidential Page | | | | |
| VIC | 1 | | See Confidential Page | | | | |

*EXHIBIT A*

| Report Officer | Printed At |
|---|---|
| ████ /███████ ████ █ | 11/03/2015 14:05 |

15-20404         Supplement No
                 ORIG

# Jefferson County Sheriff Office

## OTHER 1: BAKER MYRIAM

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| OTHER | 1 | Individual | BAKER,MYRIAM | | 966228 | WHITE | Female |

| DOB | Age | Ethnicity | | Juvenile? | Height | Weight | Hair Color | Eye Color | Res Status |
|---|---|---|---|---|---|---|---|---|---|
| 02/08/1962 | 53 | Not of Hispanic origin | | No | 5'10" | 155# | Brown | Green | Resident |

**PRN** 1673764

| Type | Address | | City | State |
|---|---|---|---|---|
| Home | 10803 HAWKINS AVE | | CONIFER | Colorado |

| ZIP Code | Date |
|---|---|
| 80433 | 09/22/2015 |

| Phone Type | Phone No | Date |
|---|---|---|
| Home | (303)519-0781 | 09/22/2015 |

**Employer/School** UNKNOWN

## OTHER 2: KINGSBURY CHRISTIAN

| Involvement | Invl No | Type | Name | MNI | PRN |
|---|---|---|---|---|---|
| OTHER | 2 | Government | KINGSBURY,CHRISTIAN | 1183283 | 1673765 |

| Type | Address | City |
|---|---|---|
| Work/Business | 26663 NORTH TURKEY CREEK RD | EVERGREEN |

| State | ZIP Code | Date |
|---|---|---|
| Colorado | 80433 | 09/22/2015 |

| Phone Type | Phone No | Date |
|---|---|---|
| Work | (303)982-5188 | 09/22/2015 |

| Employer/School | Position/Grade |
|---|---|
| MARSHDALE ELEMENTARY | PRINCIPAL |

| Location | City | State | ZIP Code |
|---|---|---|---|
| 26663 NORTH TURKEY CREEK RD | EVERGREEN | Colorado | 80433 |

## REPORTING PARTY 1: ROJAS ALBERTO

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| REPORTING PARTY | 1 | Individual | ROJAS,ALBERTO | 908934 |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|
| WHITE | Male | 07/26/1959 | 56 | Hispanic origin | No | 5'10" | 205# | Brown | Hazel |

| Res Status | PRN |
|---|---|
| Resident | 1673767 |

| Type | Address | City | State |
|---|---|---|---|
| Home | 422 S UNION BLVD | LAKEWOOD | Colorado |

| ZIP Code | Date |
|---|---|
| 80228 | 09/22/2015 |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (303)868-6501 | 09/22/2015 |

**Employer/School** SELF

## SUSPECT 1: Confidential

| Involvement | Invl No | Name |
|---|---|---|
| SUS | 1 | See Confidential Page |

| Report Officer | Printed At | |
|---|---|---|
| 2132/FLEMING,CHAD M | 11/03/2015 14:25 | Page 2 of 5 |

15-20404    Supplement No
ORIG

## Jefferson County Sheriff Office

### VICTIM 1: Confidential

| Involvement | Invl No | Name |
|---|---|---|
| VIC | 1 | See Confidential Page |

### Modus Operandi

| Premise Type | Victim's Race | Victim's Sex | Victim's Age | Vulnerability |
|---|---|---|---|---|
| SCHOOL | WHITE | Female | Juvenile | Knows suspect/Young |

**Victim's Action**
Said no

| **Suspect Action** | **Crime Code(s)** |
|---|---|
| Lone suspect | SEX OFFENSE |

### Narrative

On 09/22/2015 at about 1103 hours, I was dispatched to Marshdale Elementary, located at 26663 North Turkey Creek Road in regards to a sex offense. Dispatch advised, "RP STATING DAUGHTER WAS SEXUALLY ASSAULTED BY ANOTHER STUDENT / RP CONTACTED SCHOOL BUT SAID THEY DID NOT FILE A REPORT / CALL RP FIRST". The reporting party was Alberto Rojas (DOB 072659), the biological father of the victim, ▓▓▓▓▓ (DOB 100505).

I called Alberto and he identified himself to me verbally. Upon Speaking with Alberto he told me the following:

This morning Alberto had been contacted by the Principal of Marshdale Elementary, Christian Kingsbury. Christian told Alberto that he had met with Roslyn's mom on Friday September 18th, regarding an incident that had happened at the school. Christian informed Alberto that Roslyn had been touched on the butt by a fellow 5th grader named ▓▓▓▓▓▓▓▓. Christian had also spoken with the mother of ▓▓▓▓. Christian had decided to suspend ▓▓▓▓ from school because of the incident and Roslyn's mom had been satisfied with the outcome.

After speaking with Christian, Alberto reported the incident to the Jefferson County Sheriff's Office because he had been told by Christian that it had not been reported. Alberto was concerned for his daughter and wanted to report the incident. I told Alberto that I would contact Christian and give him a call back once I had spoken with school staff.

I then responded to Marshdale Elementary and met with Christian in his office. Christian told me that Roslyn had approached him on Friday after recess and told him about ▓▓▓▓ touching her innappropriately. Christian then met with both juveniles separately in his office. According to Christian, ▓▓▓▓ admitted the behavior to him. Christian also had Roslyn write a statement detailing what had happened.

After speaking to the juveniles, Christian spoke with Myriam Baker (DOB 020862). Myriam is the mother of Roslyn and has sole custody of her. Christian spoke with Myriam about the incident with Roslyn and it was decided by her that she did not want the Police to be involved. Myriam was satisfied with the internal investigation and discipline that had been given to ▓▓▓▓.

Christian then contacted the mother of ▓▓▓▓▓▓▓▓▓▓▓ was told about the incident involving her son, as well as the internal discipline that Christian was to place on him.

Christian provided me with a copy of the statement Roslyn had made when he had spoke with her in his office, as well as some hand written notes he had made when speaking with ▓▓▓▓.

I called and spoke with Myriam and asked her if she wanted charges pursued against ▓▓▓▓. Myriam was emphatic that she did not want charges pursued and said that the discipline which had been placed on ▓▓▓▓ was adequate. I then asked Myriam if she had any concerns for her daughters safety at the school and she did not. Roslyn and ▓▓▓▓ were in the same grade and Myriam did not have any concerns with Roslyn being around ▓▓▓▓ once he came back to school from the suspension. I asked Myriam to call the JCSO if she ever felt that her daughter's safety was compromised. I provided Myriam with my business card information and the JCSO case report number assigned to the call.

I attempted to contact ▓▓▓▓ with no success. I wanted to notify ▓▓▓▓ that the JCSO had been notified of the incident and that it would be documented but also that Myriam did not want charges pursued. After four unsuccessful attempt to contact ▓▓▓▓ by telephone I left a voicemail asking for her to call me back. As of 09/23/2015 I have not received a call from ▓▓▓▓.

| Report Officer | Printed At | |
|---|---|---|
| 2132/FLEMING,CHAD M | 11/03/2015 14:25 | Page 3 of 5 |

15-20404    Supplement No
ORIG

# Jefferson County Sheriff Office

## Narrative

After speaking with Myriam I notified Jefferson County Child Protective Services and advised them of the call. I provided them with the information for all person's mentioned in this case as well as the JCSO case report number.

I then notified the JCSO School Resource Sergeant.

At the end of shift I submitted the written statements as a case report attachment. With Myriam being the sole legal guardian and not wanting to pursue criminal charges against ▓▓▓▓ this case will be Exceptionally Cleared in the interest of justice.

I cleared the call at about 1300 hours.

Disposition: Exceptionally Cleared

15-20404

Supplement No
ORIG

# Jefferson County Sheriff Office

## Confidential Section

### VICTIM 1: BAKER-ROJAS ROSLYN MARIA

| Involvement | Invl No | Type | | Name | | | | | MNI | | Race |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VICTIM | 1 | Individual | | BAKER-ROJAS,ROSLYN MARIA | | | | | 1245380 | | WHITE |

| Sex | DOB | | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | Confidential |
|---|---|---|---|---|---|---|---|---|---|---|
| Female | 10/05/2005 | | 9 | Hispanic origin | Yes | 5'00" | 32# | Brown | Brown | JUVENILE |

| Res Status | | VictOfnd Age | PRN |
|---|---|---|---|
| Resident | | 9 | 1673769 |

| Type | Address | | City | State |
|---|---|---|---|---|
| Home | 10803 HAWKINS AVE | | CONIFER | Colorado |

| ZIP Code | Date |
|---|---|
| 80433 | 09/22/2015 |

| Phone Type | Phone No | Date |
|---|---|---|
| Home | (303)519-0781 | 09/22/2015 |

| Employer/School | Position/Grade |
|---|---|
| MARSHDALE ELEM | STUDENT |

| Location | City | State | ZIP Code |
|---|---|---|---|
| 26663 NORTH TURKEY CREEK RD | EVERGREEN | Colorado | 80433 |

### IBRS Info

| Victim Invl No | Offense Codes | Injury |
|---|---|---|
| 1 | 11D | None |

| Report Officer | Printed At | |
|---|---|---|
| 2132/FLEMING,CHAD M | 11/03/2015 14:25 | Page 5 of 5 |

# Jefferson County Sheriff Office

**17-14926**

Supplement No
ORIG

Reported Date
06/11/2017
Nature Of Call
~RUNAWAY
Member/Dept ID#
JOHNSON, BRANDON H

## Administrative Information

| Agency | | | Report No | Supplement No | Reported Date | | Reported Time |
|---|---|---|---|---|---|---|---|
| Jefferson County Sheriff Office | | | 17-14926 | ORIG | 06/11/2017 | | 09:16 |

| CAD Call No | Status | Nature Of Call | | | | | |
|---|---|---|---|---|---|---|---|
| 170103926 | CLOSED | RUNAWAY | | | | | |

| Location | | | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| 10803 HAWKINS AVE | | | | CONIFER | 80433 | 54JC |

| Area | From Date | From Time | Member/Dept ID# | | | |
|---|---|---|---|---|---|---|
| JCM | 06/11/2017 | 09:16 | 2135/JOHNSON, BRANDON H | | | |

| Assignment | | | Entered by | RMS Transfer | Prop Trans Stat | Approving Officer | |
|---|---|---|---|---|---|---|---|
| PATROL MOUNTAIN WATCH A | | | 2135 | Successful | Successful | 5040 | |

| Approval Date | Approval Time |
|---|---|
| 06/11/2017 | 15:57:09 |

| Assisting Deputy |
|---|
| S. STEELE |

| Other 1 |
|---|
| Yes |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| OTH | 1 | I | HARRINGTON, DUSTY | 1415148 | W | F | 04/19/1982 |
| OTH | 2 | I | HARRINGTON, CHRIS | 1453690 | W | M | 12/22/1981 |
| RP | 1 | I | MOTTER, ERIC | 557709 | W | M | 12/10/1962 |
| RU | 1 | | See Confidential Page | | | | |

| Report Officer | Printed At | Page |
|---|---|---|
| 2135/JOHNSON, BRANDON H | 07/11/2017 15:30 | Page 1 of 4 |

9/037

*EXHIBIT B*

17-14926    Supplement No
ORIG

## Jefferson County Sheriff Office

### OTHER 1: HARRINGTON, DUSTY

| Involvement | Invl No | Type | Name | | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|---|
| OTHER | 1 | Individual | HARRINGTON, DUSTY | | | 1415148 | WHITE | Female |

| DOB | Age | Ethnicity | | Juvenile? | Height | Weight | Hair Color | Eye Color | Res Status |
|---|---|---|---|---|---|---|---|---|---|
| 04/19/1982 | 35 | Not of Hispanic origin | | No | 5'03" | 130# | Brown | Hazel | Resident |

PRN
1786305

| Type | Address | City | State |
|---|---|---|---|
| Home | 10852 HAWKINS AVE | CONIFER | Colorado |

| ZIP Code | Date |
|---|---|
| 80433 | 06/11/2017 |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (720) 220-7050 | 06/11/2017 |

Employer/School
UNKNOWN

### OTHER 2: HARRINGTON, CHRIS

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| OTHER | 2 | Individual | HARRINGTON, CHRIS | | 1453690 | WHITE | Male |

| DOB | Age | Ethnicity | Juvenile? | Res Status | PRN |
|---|---|---|---|---|---|
| 12/22/1981 | 35 | Not of Hispanic origin | No | Resident | 1786306 |

| Type | Address | City | State |
|---|---|---|---|
| Home | 10852 HAWKINS AVE | CONIFER | Colorado |

| ZIP Code | Date |
|---|---|
| 80433 | 06/11/2017 |

Employer/School
UNKNOWN

### REPORTING PARTY 1: MOTTER, ERIC

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| REPORTING PARTY | 1 | Individual | MOTTER, ERIC | 557709 |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color |
|---|---|---|---|---|---|---|---|---|
| WHITE | Male | 12/10/1962 | 54 | Not of Hispanic origin | No | 5'11" | 194# | Brown |

| Eye Color | Res Status | PRN |
|---|---|---|
| Hazel | Resident | 1786307 |

| Type | Address | City | State |
|---|---|---|---|
| Home | 10803 HAWKINS AVE | CONIFER | Colorado |

| ZIP Code | Date |
|---|---|
| 80433 | 06/11/2017 |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (303) 898-1564 | 06/11/2017 |

| Employer/School | Position/Grade |
|---|---|
| GENEX | NURSE |

### RUNAWAY 1: Confidential

| Involvement | Invl No | Name |
|---|---|---|
| RU | 1 | See Confidential Page |

### Modus Operandi

Crime Code(s)
OTHER

### Narrative

On 06/11/2017 around 0916 hours, Deputy S. Steele and I were dispatched to 10803 Hawkins Avenue, reference a runaway. The reporting party, later identified as Eric Motter (DOB: 12/10/1962), advised that a juvenile female had runaway from the home and had left a note saying that she was running away. He also advised that the female's mother had passed away two months ago. He identified her as Roslyn Maria Baker-Rojas (DOB: 10/05/2005). She was described as 5'5", 110 lbs., with brown hair, and was last seen around 0100 hours.

I arrived at the house around 0925 hours, while Deputy Steele drove around the area looking for Roslyn.

Around 0930 hours, Eric returned to the residence; he had been driving around looking for Roslyn. He identified himself by Colorado driver's license and told me the following:

Roslyn is his stepdaughter and her mother, his wife, died from cancer two months ago. Roslyn has been acting up recently and he has put her into counseling to help cope with the loss of her mother. He recently found out that she had signed up for some social media sites and she was not supposed to. As a result, he had asked her to

| Report Officer | Printed At | | |
|---|---|---|---|
| 2135/JOHNSON, BRANDON H | 07/11/2017 15:30 | P | of 9/038 4 |

17-14926    Supplement No
ORIG

# Jefferson County Sheriff Office

## Narrative

write an apology letter for not following the rules.

On 06/11/2017, he woke up and found that Roslyn was gone. She had left three notes, explaining that she was running away. Copies of those notes are attached to this case report.

While speaking with Eric, he looked at his cell phone and saw that he had missed a call. On checking his voicemail, he learned that his neighbor had found Roslyn and was bringing her home. He verbally identified the neighbor as Dusty Harrington (DOB: 04/19/1982).

Eric said that he just wanted Roslyn home safe and did not want her taken to the Juvenile Assessment Center.

Around 0940 hours, Dusty arrived back at the house. I could see Roslyn seated in the front passenger seat of her car. Deputy Steele spoke with Dusty, while I spoke with Roslyn.

She verbally identified herself and told me the following:

Lately, she has been "messing up" at home and "causing everyone trouble." She felt that she needed to get out of the house for "a couple days" and go stay with her friend, "Brooklyn". On 06/11/2017 around 0515 hours, she left the house and rode her bike to the Bradley Sinclair gas station located at US Highway 285 and County Highway 73. She tried to get directions to her friend's house, then rode her bike to the King Soopers, located in Aspen Park. She sat inside the King Soopers until Dusty saw her and picked her up to take home, where she was returned without incident.

I then spoke with Deputy Steele, he told me the following, in summary from his interview of Dusty:

Dusty and her husband, Chris Harrington (DOB: 12/22/1981), live close to Eric and his family. Around 0600 hours, Chris was driving and thought he saw Roslyn riding her bike. He called and told Dusty that he had seen Roslyn near the King Soopers. Dusty went to the King Soopers and saw Roslyn sitting there around 0850 hours. She had Roslyn sit in her car, then drove her home.

I stood by while Eric spoke with Roslyn about her actions. I gave him my business card with the case report number on it and cleared the call around 1009 hours.

Disposition: Closed.

| Report Officer | Printed At | 9:039 |
| --- | --- | --- |
| 2135/JOHNSON, BRANDON H | 07/11/2017 15:30 | Page 3 of 4 |

17-14926

Supplement No
ORIG

# Jefferson County Sheriff Office

**Confidential Section**

Do not distribute

**RUNAWAY 1: BAKER-ROJAS ROSLYN MARIA**

| Involvement | Invl No | Type | Name | | | | | MNI | Race |
|---|---|---|---|---|---|---|---|---|---|
| RUNAWAY | 1 | Individual | BAKER-ROJAS, ROSLYN MARIA | | | | | 1245380 | WHITE |

| Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | Confidential |
|---|---|---|---|---|---|---|---|---|---|
| Female | 10/05/2005 | 11 | Hispanic origin | Yes | 5'05" | 110# | Brown | Brown | JUVENILE |

| Res Status | PRN |
|---|---|
| Resident | 1786308 |

| Type | Address | City | State |
|---|---|---|---|
| Home | 10803 HAWKINS AVE | CONIFER | Colorado |

| ZIP Code | Date |
|---|---|
| 80433 | 06/11/2017 |

| Relationship | Name | Race | Sex | DOB |
|---|---|---|---|---|
| Stepfather | MOTTER, ERIC | WHITE | Male | 12/10/1962 |

| Employer/School |
|---|
| WEST JEFFERSON MIDDLE |

| Report Officer | Printed At | Page | 9.040 |
|---|---|---|---|
| 2135/JOHNSON, BRANDON H | 07/11/2017 15:30 | Page 4 of 4 | |


PUBLIC SCHOOLS

# SUICIDE RISK ASSESSMENT

Student:   **Roslyn Baker**                                          School:   West Jefferson Middle

Date:   10/11/2017      Student Number:   2108177      Grade:  7    Age:        Gender: ☐M ☒F

Parent/Guardian:      Eric Motter (Guardian) Alberto Rojas (Parent)      Phone:   Eric Motter -(303)697-0348

**Initial Assessment Takes Place:**

☒  At school          ☐   Outside of school (please fill out page 1 and anything else you have information for)

**Who Identified Student as Being At-Risk:**

☐ Student self-reported      ☒ Classmate reported          ☐ Counselor reported
☐ Text Message              ☐ Social Media Post (Facebook etc.)   ☐ Teacher reported
☐ Parent reported           ☐ Principal/AP reported         ☐ Safe2Tell/Safe2Text
☐ School Psych./Social Worker  ☐ Campus Supervisor/SRO        ☐ Other:

**Ensure Student Safety:**

☒ Appropriately supervise student(s)      ☐ If there is imminent danger, call 911 or a school resource officer

**Notify the Site Administrator/Principal Immediately**

Who notified the principal?    Shea Robinson                                    Time:   1250pm

**Identify Two Jeffco Public School Staff Members (1 completes/1 consults) to Complete Screening**

It is *recommended* that this assessment process include two staff members with mental health training. If only one staff member is present for the assessment; he/she <u>must</u> consult with a second staff member. If these individuals are not available, call Student Services at (303)982-7263.

Name:   Shea Robinson                      Title:   Counselor

Name:   Bridget Williams                    Title:   Social Worker

**Description of the Situation Leading Up to the Suicide Risk Assessment *required***
   *(If the Initial Suicide Risk Assessment Takes Place Outside of the School proceed to page 3 of the assessment)*

Describe the incident of concern below. *Use the questions on the next page as your guide and fill in notes where helpful.* Use your professional judgment and clinical skills to conduct a comprehensive and sensitive interview. What happened? What were you meaning to say? What warning signs lead to the referral? What problem is the student experiencing? How does the student solve problems? What supports do they have?

Roslyn came to the counseling office with her two friends. The friends reported that Rosalyn had been talking about wanting to kill herself. Her stepfather does not want her talking to her boyfriend and a couple of her friends. She has a boyfriend here at school. She is struggling because parents don't want her to date.

*EXHIBIT C*

1

| SUICIDE IDEATION DEFINITIONS AND PROMPTS (ask questions that are **bolded** and <u>underlined</u>) | |
|---|---|
| **Ask Questions 1 and 2** | |
| **1.) _Have you wished you were dead or wished you could go to sleep and not wake up?_** <br> Wish to be Dead: <br> Person endorses thoughts about a wish to be dead or not alive anymore, or wish to fall asleep and not wake up. | YES ☐  NO ☒ <br> NOTES: |
| **2.) _Have you actually had any thoughts of killing yourself?_** <br> Suicidal Thoughts <br> General non-specific thoughts of wanting to end one's life/commit suicide, *"I've thought about killing myself"* without general thoughts of ways to kill oneself/associated methods, intent, or plan. | YES ☒  NO ☐ <br> NOTES: <br> Felt this way last weekend when she was at aunts house. Came back from school dance and heard rumors going around from peers about her and her boyfriend. At aunts house thinking about rumors her and not sure what to do about it. |
| **If YES to 2, ask questions 3, 4, 5, and Suicide Behavior. If NO to 2, go directly to question about Suicide Behavior.** | |
| **3.) _Have you been thinking about how you might kill yourself?_** <br> • If the student states that they have not, ask them: **_What is creating hope for you?_** <br> Suicidal Thoughts with Method (without Specific Plan or Intent to Act): <br> Person endorses thoughts of suicide and has thought of at least one method during the assessment period. This is different than a specific plan with time, place or method details worked out. *"I thought about taking an overdose but I never made a specific plan as to when, where or how I would actually do it."* | YES ☒  NO ☐ <br> NOTES: <br> Thoughts started on Saturday. Friends have been checking in on her and she has felt hopeful because of that. When she was at aunts house she talked with aunt about her feelings and they were very supportive. She felt cared about. |
| **4.) _Have you had these thoughts and had some intention of acting on them?_** <br> Suicidal Intent (without a Specific Plan): <br> Active suicidal thoughts of killing oneself and individual reports having <u>some intent to act on such thoughts</u>, *"I have the thoughts about taking an overdose and it just seems easier to do that than to go on."* | YES ☐  NO ☒ <br> NOTES: <br> Grabbed a knife 3 weeks ago but then someone came home. Step dad has security camera in house to view main living areas so this prevents her from doing anything. "Thought of pills before but seems painful". She has looked at labels on pills. They are in house. |
| **5.) _Have you started to work out or worked out the details of how to kill yourself?  Do you intend to carry out this plan?_** <br> Suicidal Intent with Specific Plan: <br> Thoughts of killing oneself with details of plan fully or partially worked out and person has some intent to carry it out. If a student answers an affirmative to either of these questions, then check the "YES" box to the right. | YES ☒  NO ☐ <br> NOTES: <br> Yes. See above plans about pills, knife above. |
| Add up the number of YES answers above to guide and/or inform the suggested level of _Suicidal Ideation_ of the person being assessed on the table below. Use the next question on _Suicide Behavior_ below to determine whether the student has ever made an attempt and the time frame of when the student was most recently suicidal. | Number of YES answers from above: <br> 3 |
| Recent/Past Suicide Behaviors | |
| **_Have you ever done anything, started to do anything, or prepared to do anything to end your life?_** <br> • If YES, ask: **_How long ago did you do any of these?_** | YES ☐  NO ☒ <br> NOTES: <br> None |

3

| Suicide Behavior Examples: Collected pills, obtained a gun, gave away valuables, wrote a will or suicide note, took out pills but didn't swallow any, held a gun but changed your mind, went to the roof but didn't jump, cut yourself with suicidal intent, tried to hang yourself, etc. | | |
| --- | --- | --- |

| 0-3 months | Suicidal and Self-Injurious Behavior | Lifetime |
| --- | --- | --- |
| ☐ | Actual suicide attempt | ☐ |
| ☐ | Interrupted attempt | ☐ |
| ☐ | Other preparatory acts to kill self | ☐ |
| ☒ | Self-Injurious behavior without suicidal intent | ☒ |
| ☐ | Other: | ☐ |

## DETERMINING LEVEL OF RISK/NEXT STEPS

| | Suicidal Ideation | Recent Suicidal Behavior (0-3 mo.) | Past Suicidal Behavior (+3 mo.) | Protocols |
| --- | --- | --- | --- | --- |
| Very Low Risk | 0 | N | N | Notify parents & have them sign the *Parent Acknowledgement of Contact Form*. Potentially: Fill out *Student Support Plan*, refer to JCMH, Second Wind, or mental health provider |
| Low Risk | 1-2 | Y/N | Y/N | Notify parents & have them sign the *Parent Acknowledgement of Contact Form*. Fill out the Student *Student Support Plan* with student. Refer to JCMH, Second Wind, or a mental health provider. |
| Moderate Risk | 3 | Y/N | Y | |
| High Risk | 4-5 | N | Y/N | Emergent Action Necessary. Notify parents, recommend transport or immediate services. Contact destination for transport to notify of their arrival. Contact SRO, local law enforcement, or safety and security if necessary. Mandatory *Re-Entry Support Plan* before student comes back to school. |
| Very High Risk | 4-5 | Y | Y/N | |

**Contact Numbers: Colorado Crisis Services: 844-493-8255 JCMH: 303-425-0300 Safety & Security: 303-982-2445**
**Dial 9-1-1 if risk is imminent**

**Notify the Parent(s) or Guardian(s)** ☐ in person ☒ by phone

Staff who notified parent/guardian:   Shea Robinson          Date notified:   10/11/17

Parent acknowledgement form signed: ☐ Yes ☒ No  If no, reason:   Verbal, over phone

*If the student is rated a 4 or 5:*

☐ Inform parents that a *Re-Entry Support Plan* meeting will need to take place before student returns to school.

☐ Have parents take filled out *Release of Information* form to be signed by therapist or doctor (If this has not already been done).

| Check all risk and protective factors that apply. To be completed following the suicidal ideation and prompts, review of any records or history, and/or consultation with family members and/or other professionals. These can also be good questions to ask a student to ensure we are covering all possible factors that can be helpful in both determining risk and providing support. |
| --- |

| Activating Events | | Risk Factors | |
| --- | --- | --- | --- |
| ☐ | Anxiety about Schoolwork | ☐ | Chronic pain or other acute medical problem |
| ☒ | Bullying | ☐ | Family/Friend history of suicide |
| ☐ | Break-up with Significant Other | ☐ | Method for suicide available (i.e. gun, pills) |
| ☒ | Conflict with friends/peers | ☐ | Refuses or feels unable to agree to *Support Plan* (unable/unwilling to list a contact person or use help-line phone numbers) |
| ☐ | Chronic Attendance and Tardy Issues | ☐ | Sexual abuse (lifetime) |
| ☐ | Current or pending isolation or feeling alone | ☐ | Substance abuse or dependence |
| ☐ | Cyber Bullying | ☐ | Other: |
| ☒ | Death of someone close to them | | Notes: |
| ☐ | Discipline Issue at School | | |
| ☒ | Family Problems | | |
| ☒ | Financial Issues | | Protective Factors |
| ☐ | Homelessness | ☒ | Positive friends |
| ☐ | Legal problems | ☒ | Family support – can be any group that functions like a family |
| ☐ | Parents' Divorce | ☒ | Mentors/trusted adults |
| ☐ | Recent Move or Change of Address | ☐ | Healthy activities |

4

| | |
|---|---|
| ☐ Sexual Identity Issues | ☐ Generosity/Doing things for others |
| ☐ Sexual Orientation Issues | ☐ Spirituality – belief in something greater than themselves |
| **Notes:** Mother passed away in April. | ☐ Medical access |
| | ☒ Mental health access |
| **Mental Health Status** | **Notes:** Aunt is supportive and she can call her anytime. Brother Chase who lives in Colorado. |
| ☐ Agitation or severe anxiety | |
| ☐ Anger/Aggressive behavior towards others | **Treatment History** |
| ☐ Command hallucinations to hurt self | ☒ Currently in treatment and it's going well |
| ☐ Highly impulsive behavior | ☐ Hopeless or dissatisfied with treatment |
| ☐ Homicidal ideation **(fill out a Building Level Threat Assessment)** | ☐ Currently taking medication: |
| ☐ Hopelessness | ☐ Non-compliant with treatment |
| ☐ Mood swings | ☐ Not receiving treatment |
| ☐ Perceived burden on family or others | ☐ Psychiatric diagnosis and treatments: |
| ☐ Sad or depressed affect | |
| **Notes:** | **Notes:** Going to grief counseling every other week. |

Make sure to note the Suicide Risk Assessment was conducted in the JPS Secure Information tab in Infinite Campus.

5

**11-13606**    Supplement No
ORIG

# Jefferson County Sheriff Office

Reported Date
**05/21/2011**
Nature Of Call
**FAMILY-M**
Member#/Dept ID#
**GARCIA,JOSHUA**

## Administrative Information

| Agency | | | Report No | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|---|
| Jefferson County Sheriff Office | | | 11-13606 | ORIG | 05/21/2011 | 23:54 |

| CAD Call No | Status | | Nature Of Call | | | |
|---|---|---|---|---|---|---|
| 110084642 | CLEARED BY ARREST | | FAMILY-RELATIONS--MISDEMEANOR | | | |

| Location | | | | City | Rep Dist | Area |
|---|---|---|---|---|---|---|
| 9515 MARAUDER DR | | | | CONIFER | 53JC | JCM |

| From Date | From Time | To Date | To Time | Member#/Dept ID# |
|---|---|---|---|---|
| 05/21/2011 | 23:54 | 05/21/2011 | 23:55 | 1582/GARCIA,JOSHUA |

| Assignment | | Entered by | RMS Transfer | Prop Trans Stat | Property? |
|---|---|---|---|---|---|
| PATROL MOUNTAIN WATCH B | | 1582 | Successful | Successful | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 5101 | 05/22/2011 | 08:02:12 |

| Assisting Deputy |
|---|
| DEPUTY SCHUL |

| -JUVENILE- | Summons |
|---|---|
| Yes | Yes |

| # Offenses | Offense | Description | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|
| 1 | 18-3-204 | ASSAULT 3RD DEGREE | M | C | N | 99 | 20 |

| #Pr | MOE | Act | Weapon/Force | IBRS | No |
|---|---|---|---|---|---|
| | N | 40 | | 13B | 1 |

| Link | Involvement | Invl No | Name | | | | |
|---|---|---|---|---|---|---|---|
| VIC | VIC | 1 | See Confidential Page | | | | |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| ARR | ARR | 1 | MOTTER,ERIC | W | M | 12/10/1962 |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| ARR | 1 | I | MOTTER,ERIC | 557709 | W | M | 12/10/1962 |
| OTH | 1 | I | MOTTER,NANCY LINN | 808938 | W | F | 02/18/1963 |

| Report Officer | Printed At | |
|---|---|---|
| 1582/GARCIA,JOSHUA | 02/20/2018 06:59 | Page 1 of 4 |



*EXHIBIT D*

**11-13606**   Supplement No **ORIG**

# Jefferson County Sheriff Office

## ARRESTEE 1: MOTTER, ERIC

| Involvement | Invl No | Type | Name | | | | | MNI | Race |
|---|---|---|---|---|---|---|---|---|---|
| ARRESTEE | 1 | Individual | MOTTER, ERIC | | | | | 557709 | WHITE |

| Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | Dom Violence | Res Status |
|---|---|---|---|---|---|---|---|---|---|---|
| Male | 12/10/1962 | 48 | Unknown | No | 5'11" | 194# | Brown | Hazel | No | Resident |

| OFN_INVL | Vic/Ofnd Age | PRN |
|---|---|---|
| 1 | 48 | 1392560 |

| Type | Address | City | State |
|---|---|---|---|
| Home | 9515 MARAUDER DR | CONIFER | Colorado |

| Date |
|---|
| 05/21/2011 |

| Phone Type | Phone No | Date |
|---|---|---|
| Home | (303)838-2974 | 05/21/2011 |

| Employer/School | Position/Grade |
|---|---|
| LUTHERAN HOSPITAL | NURSE |

| Involvement | Arrest Type | Arrest Date | Arrest Time | Status | Dispo |
|---|---|---|---|---|---|
| Cited | Summons/cited | 05/22/2011 | 01:00:00 | Cited | ADULT MISDEMEANOR |

| Arrest Location | City | Rep Dist | Citation No |
|---|---|---|---|
| 9515 MARAUDER DR | CONIFER | 53JC | 226739 |

| Fingerprt Taken? | Mug? | Armed | Multi-arrests |
|---|---|---|---|
| No | No | Unarmed | Not applicable |

| Charge | Level | Charge Literal |
|---|---|---|
| 18-3-204 | M1 | ASSAULT 3RD DEGREE |

## OTHER 1: MOTTER, NANCY LINN

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| OTHER | 1 | Individual | MOTTER, NANCY LINN | | 808938 | WHITE | Female |

| DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | Dom Violence | Res Status |
|---|---|---|---|---|---|---|---|---|---|
| 02/18/1963 | 48 | Unknown | No | 5'05" | 145# | Red or Auburn | Blue | No | Resident |

| PRN |
|---|
| 1392561 |

| Type | Address | City | State |
|---|---|---|---|
| Home | 9515 MARAUDER DR | CONIFER | Colorado |

| Date |
|---|
| 05/21/2011 |

| Phone Type | Phone No | Date |
|---|---|---|
| Home | (303)838-2974 | 05/21/2011 |

| Relationship | Name |
|---|---|
| Son | MAX SCHWARTZ |

| Employer/School | Position/Grade |
|---|---|
| KENDRICK LAKES ELEM | TEACHER |

## VICTIM 1: Confidential

| Involvement | | |
|---|---|---|
| ▮▮▮ | ▮▮▮ | |

## Narrative

On 052111 at about 2354 hours I was dispatched to 9515 Marauder Dr., in reference to a disturbance. Dispatch advised that the RP was a seventeen year old male and said his father just tried to strangle him, and he was outside and locked himself in a car. While en-route dispatch advised that the father was also calling and advised to stay in the house.

At about 0005 hours I contacted a male in the driver side of a vehicle parked at 9515 Marauder Dr.. The male identified himself verbally as ▮▮▮▮▮▮▮▮ In the passenger seat of the vehicle was a female who identified herself as Nancy Linn Motter (021863), ▮▮▮ mother. The following is what ▮▮▮ told me:

Earlier in the day Nancy and his step father, identified later as Eric Motter (121062), were having and argument in their bedroom. ▮▮▮ entered the bed room to stick up for his mother because Eric was swearing and can be aggressive toward his mother. When ▮▮▮ interjected, Eric turned to him and got in his face eventually shoving ▮▮▮▮▮▮ and Eric had to be separated by Nancy after the argument escalated. Eventually at about 1400 hours ▮▮▮ left to go to his girlfriend's house, returning home at about 2350 hours. ▮▮▮ pulled into the driveway and opened his driver side door and exited the vehicle when he noticed the garage open up and Eric walk towards him. ▮▮▮ sat back in the driver seat and closed the door and attempted to lock it. ▮▮▮ could not find the locking mechanism quick enough as Eric opened the door. ▮▮▮ said "I'm not gonna talk to you," and attempted to grab the door handle and close the door. At this point grabbed ▮▮▮ by the throat and said "Just remember if you ever

| Report Officer | Printed At | |
|---|---|---|
| 1582/GARCIA, JOSHUA | 02/20/2018 06:59 | Page 2 of 4 |

**11-13606**    Supplement No
ORIG

# Jefferson County Sheriff Office

**Narrative**

stand up to me again I'll knock you out." A brief struggle ensued, and eventually ███ "got away" and closed the door locking it. ███ immediately called "911."

I observed ███ to have and abrasion on the right side of his throat that was red in color, and another abrasion on the left side lower neck that was red in color. I was also able to see red marks consistent with finger marks on the right side of ███ neck.

After speaking with ███ I spoke with Eric while Nancy was present in the kitchen, the following is what he told me:

Earlier in the day he was having a small argument with his wife when ███ decided that he wanted to "insert" himself into the argument. Eric told ███ that this had nothing to do with him, and that he should leave. ███ said "I'm not afraid of you," and got into Eric's face. Eric and ███ ended up in the living room face to face arguing and were separated by Nancy. But ███ was cursing at him and taunting him stating that he was not afraid of him and would kick his "ass." Eric told ███ that they needed to separate and told Nancy to tell ███ to calm down and stop speaking to Eric like that, because it was part of their counseling that Nancy be the one to calm ███ down. ███ eventually left at about 1400 hours. Eric called the Sheriff's office earlier in the day and had a Deputy contact him so that he could find out what to do if ███ was getting in his face and assaulted him. An unknown Deputy advised him that he could take any measure he needed to protect himself from danger, as long as he didn't go overboard. Eric stated that he used to teach martial arts and asked the Deputy if he could subdue ███ by using a bent wrist technique and wait for Deputies if he needed to. He was told by a Deputy that he could, as long as he didn't "beat on him." At about 2350 hours ███ returned home. Eric went outside and opened the car door after ███ sat back inside. While at the driver side open door Eric told him "You can come inside and stay here but it can't get physical." ███ said something to the effect of "Fuck you I don't have to listen to you." Eric tried to tell ███ that he didn't appreciate the way he was talking to him, only receiving the same type of response. At that point ███ made a quick movement with his arm that Eric perceived as a threat. Eric quickly pushed ███ away with his hand and "detached myself from the situation" after he saw ███ calling "911." Eric went inside the house and dialed "911" also telling them that they were separated and he would stay inside and wait for deputies to arrive.

While Eric was telling me his side of the story I heard and saw Nancy objecting to some of Eric's story. While Eric was telling me about calling "911" earlier in the day, Nancy said "And I've had enough," got up from the kitchen counter and left the house.

After speaking with Eric, I returned outside to the vehicle ███ was waiting in and contacted Nancy. The following is what Nancy told me:

Eric likes to exaggerate things and make them bigger that what they are. She did not see Eric shove ███ earlier in the day but saw ███ "lunge" out of the door way in to the hall, as if he was pushed." While separating ███ and Eric, ███ never cursed at him but did say "C'mon, push me again." Nancy eventually separated the two by telling the both to stop, and had ███ go upstairs. While ███ was gone, Eric was mad at Nancy and demanded an apology from her because she told him to "stop." Eric also was telling Nancy, "Give me one good reason I shouldn't call the cops." Nancy told Eric that it was just an argument and to calm down, they didn't need the police to come out. Nancy believes that Eric called earlier in the day to "set up all this tonight," in reference to the incident at 2350 hours. Nancy said that she believed ███ when he told her what Eric said to him in the car, because he has a temper and it sounded like something he would say. Nancy said Eric has three black belts in martial arts and carries a knife on his ankle at all times including when he is watching television.

At about 0100 hours I issued Eric a summons (226739) for third degree assault.

At about 0130 hours Deputy Schul arrived on scene and acted in the capacity of a certified C.S.T.. Deputy Schul took digital photographs of ███ injuries. See his report for further detail.

███ left the residence for the evening and Eric and Nancy stayed on scene. I cleared at about 0143 hours.

| Report Officer | Printed At | |
|---|---|---|
| 1582/GARCIA,JOSHUA | 02/20/2018 06:59 | Page 3 of 4 |

# Jefferson County Sheriff Office

**11-13606**

Supplement No
**0001**

Reported Date
**05/22/2011**
Nature Of Call

Member#/Dept ID#
**SCHUL,X**

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|
| Jefferson County Sheriff Office | | 11-13606 | 0001 | 05/22/2011 | 03:09 |
| Member#/Dept ID# | | | Assignment | | Entered by |
| 1973/SCHUL,X | | | PATROL MOUNTAIN WATCH B | | 1973 |
| Assignment | RMS Transfer | Prop Trans Stat | Approving Officer | | |
| PATROL MOUNTAIN WATCH B | Successful | Successful | 5101 | | |
| Approval Date | Approval Time | | | | |
| 05/22/2011 | 07:12:42 | | | | |
| Assisting Deputy | | | | | |
| DEPUTY J GARCIA 1582 | | | | | |

## Narrative

DISPATCH TIME: 0057 hours    ARRIVAL: 0130 hours    CLEAR: 0143 hours

LOCATION OF RESPONSE: 9515 Marauder Drive

KIT NO: P22    CAMERA: P22 - card#5    START TIME:    END TIME:

(S)(V)
V    PHOTOGRAPH
V    INJURIES - red marks on neck

SCENE

X    PHOTOS-OVERALL
X    PHOTOS-CLOSE UP

PHOTO LOG

1. Beginning photo template
2. Overall victim front side
3. Overall victim right side
4. Overall victim back side
5. Overall victim left side
6. Medium victim front neck area
7. Medium victim left side of neck
8. Medium victim right side of neck
9. Close up of marks on neck
10. Close up of marks on left side of neck with scale
11. Close up of marks on left side of neck with scale
12. Close up of marks on right side of neck with scale
13. Ending photo template

NARRATIVE:

On 5-22-2011, I was dispatched to 9515 Marauder Driver in reference to conducting CST duties on injuries sustained during a disturbance. I arrived on scene at about 0130 hours and met with Deputy J. Garcia. Deputy Garcia told me the victim, ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ had red marks on the front and sides of his neck. Deputy Garcia identified ▓▓▓▓ see his original report for further.

I took overall, medium and close up photographs of the victim and his neck. I submitted the photocard to the evidence vault prior to the end of my shift.

| Report Officer | Printed At | |
|---|---|---|
| 1973/SCHUL,X | 02/20/2018 06:59 | Page 1 of 1 |

# Jefferson County Sheriff Office

**11-13606**    Supplement No
0002

Reported Date
04/20/2012
Nature Of Call

Member#/Dept ID#
BINGHAM, CHAD E

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|---|---|
| Jefferson County Sheriff Office | | | 11-13606 | | 0002 | 04/20/2012 | 00:52 |
| Member#/Dept ID# | | | | Assignment | | | Entered by |
| 1842/BINGHAM, CHAD E | | | | PATROL SOUTH WATCH B | | | 1842 |
| Assignment | | RMS Transfer | Prop Trans Stat | | Approving Officer | | |
| PATROL SOUTH WATCH B | | Successful | Successful | | 0363 | | |
| Approval Date | Approval Time | | | | | | |
| 04/20/2012 | 07:05:41 | | | | | | |
| Other 1 | | | | | | | |
| Yes | | | | | | | |

## Narrative

This supplemental was written at the request of District Attorney J. Dill.

On May 21st 2011 I contacted Eric Motter (121062) by phone at 303-888-1564 in reference to a dispatched harassment report.

Eric had questions about what he could/ should do about his son. I did not pull a case report because Eric requested that I do not document the incident but I did put some notes in Computer Aided Disptach (CAD) in which I did documented that I "advised him to contact the sheriffs office he feels things are getting out of hand." I did explain to him that if it became physical and he had no choice he could restrain his son until we arrived. I also explained that he could do what he need to protect he and his wife but he was the adult and physically stronger so he needed to be careful in how he handled the situation and that he would have to justify his actions. I told him it would be best to call the sheriffs office if things got out of hand instead of trying to deal with it himself.

A copy of the CAD notes are included as a case report attachment.

| Report Officer | Printed At | |
|---|---|---|
| 1842/BINGHAM, CHAD E | 02/20/2018 07:00 | Page 1 of 1 |

## Jefferson County Sheriff Office

**18-29064**   Supplement No **ORIG**

Reported Date
**12/06/2018**
Member#
**MEDLIN, PHILIP**

Nature of Call
**-INFO**   *Parental Kidnapping*

### Administrative Information

| Agency | | | | | Report No | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|---|---|---|
| **Jefferson County Sheriff Office** | | | | | **18-29064** | **ORIG** | **12/06/2018** | **09:16** |

| CAD Call No | Status | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **181518277** | **CLOSED** | **INFORMATION** | | | | | | |

| Location | | | | | | | City |
|---|---|---|---|---|---|---|---|
| **10803 HAWKINS AVE** | | | | | | | **CONIFER** |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | |
|---|---|---|---|---|---|---|
| **80433** | **54JC** | **JCM** | **54JC** | **12/06/2018** | **09:16** | |

| Member# | | | | Assignment | | Entered By |
|---|---|---|---|---|---|---|
| **2180/MEDLIN, PHILIP** | | | | **PATROL MOUNTAIN WATCH B** | | **2180** |

| RMS Transfer | Prop Trans Stat | Property? | DV | Approving Officer |
|---|---|---|---|---|
| **Successful** | **Successful** | **None** | **No** | **1582** |

| Approval Date | Approval Time |
|---|---|
| **12/07/2018** | **21:15:53** |

-BODY WORN CAMERA-
**Yes**

### Person Summary

| Invl | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| **OTH** | **1** | **I** | **MOTTER, ERIC** | | **557709** |
| Race | Sex | DOB | | | |
| **W** | **M** | **12/10/1962** | | | |
| Invl | Invl No | Type | Name | | MNI |
| **OTH** | **2** | **I** | **BAKER-ROJAS, ROSLYN MARIA** | | **1245380** |
| Race | Sex | DOB | | | |
| **W** | **F** | **10/05/2005** | | | |
| Invl | Invl No | Type | Name | | MNI |
| **RP** | **1** | **I** | **ROJAS, ALBERTO JR** | | **908934** |
| Race | Sex | DOB | | | |
| **W** | **M** | **07/26/1959** | | | |

| Report Officer | Printed At |
|---|---|
| **2180/MEDLIN, PHILIP** | **01/17/2019 16:03** |

Page 1 of 4

*EXHIBIT E*

**18-29064**    Supplement No
ORIG

# Jefferson County Sheriff Office

## OTHER 1: MOTTER,ERIC

| Involvement | Invl No | Type | Name | | | | | | | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OTHER | 1 | Individual | MOTTER,ERIC | | | | | | | 5'11" | 194# | Brown | Hazel |

| MNI | Race | Sex | DOB | Age | Ethnicity | Juvenile? | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 557709 | WHITE | Male | 12/10/1962 | 55 | Unknown | No | | | | | | | |

| PRN | NIBRS |
|---|---|
| 1893000 | R |

Res Status
**Resident**

| Type | Address |
|---|---|
| Home | 10803 HAWKINS AVE |

| City | State | ZIP Code | Date |
|---|---|---|---|
| CONIFER | Colorado | 80433 | 12/06/2018 |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (303)888-1564 | 12/06/2018 |

## OTHER 2: BAKER-ROJAS,ROSLYN MARIA

| Involvement | Invl No | Type | Name | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OTHER | 2 | Individual | BAKER-ROJAS,ROSLYN MARIA | | | | | | | | | | |

| MNI | Race | Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|---|
| 1245380 | WHITE | Female | 10/05/2005 | 13 | Unknown | Yes | 5'05" | 110# | Brown | Brown |

| PRN | NIBRS |
|---|---|
| 1893001 | R |

Res Status
**Resident**

| Type | Address |
|---|---|
| Home | 10803 HAWKINS AVE |

| City | State | ZIP Code | Date |
|---|---|---|---|
| CONIFER | Colorado | 80433 | 12/06/2018 |

Employer/School
**WEST JEFFERSON MIDDLE SCHOOL**

## REPORTING PARTY 1: ROJAS,ALBERTO JR

| Involvement | Invl No | Type |
|---|---|---|
| REPORTING PARTY | 1 | Individual |

| Name | | MNI | Race | Sex |
|---|---|---|---|---|
| ROJAS,ALBERTO JR | | 908934 | WHITE | Male |

| DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|---|
| 07/26/1959 | 59 | Unknown | No | 5'10" | 205# | Brown | Hazel | 1893002 |

| NIBRS | Res Status |
|---|---|
| N | Non-resident |

| Type | Address |
|---|---|
| Home | 3848 KING ST |

| City | State | ZIP Code | Date |
|---|---|---|---|
| DENVER | Colorado | 80211 | 12/06/2018 |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (303)868-6501 | 12/06/2018 |

## Modus Operandi

| Premise Type | Crime Code(s) |
|---|---|
| RESIDENTIAL (SINGLE FAMILY | OTHER |

## Narrative

BWC

On 12/06/2018 at around 0919 hours, I was dispatched to call Alberto Rojas (DOB 07/26/1959) about a possible violation of a child custody order. I had access to the following dispatch call notes before making the call:

RP SAYS HE SPOKE WITH DEPUTY PREVIOUS BUT THEY WERE NOT ABLE TO ENFORCE THE COURT ORDER DUE TO IT NOT BEING SEALED/STAMPED- RP HAS SINCE GOTTEN THAT DONE // REQ TO SPEAK WITH JEFFCO- PHONE CALL OK // RP HAS A COURT ORDER FOR SUPERVISED VISITATIONS

I noted that Alberto had gone to the Public Reporting Desk of the Sheriffs Office on 12/05/2018 and reported that Eric Motter (DOB 12/10/1962) had violated a child custody order. He worked with Deputy Knowlton, who had determined no violation had occurred and did not take a report.

| Report Officer | Printed At |
|---|---|
| 2180/MEDLIN,PHILIP | 01/17/2019 16:03 |

Page 2 of 4

**18-29064**    Supplement No
ORIG

# Jefferson County Sheriff Office
## Narrative

I noted that Alberto was the restrained party in a temporary protection order in which he was prohibited from, among other things, going within 100 yards of Eric, Eric's home, or Eric's workplace. The latest order had been issued that very morning (12/06/2018) in a hearing that occurred around 0830 hours, approximately 47 minutes before Alberto called the Sheriff's Office administrative line to report this crime. A hearing to make the order permanent was scheduled for the following week, on 12/12/2018."

I spoke with Alberto on the phone. He explained that he is the father of Roslyn Baker (DOB 10/05/2005). Rosyln's mother has passed away. Roslyn is currently living with her step-father Eric, pursuant to the permanent parental custody order issued in May 2018. In that order, Alberto is permitted visits, which Alberto claimed Eric was failing to allow. Alberto alleged that Eric was "predatory" and was, in summary, a bad man. He would not provide specific allegations, but rather that the "red flags" were there for abuse. I told him I needed to meet to inspect the order. We arranged to meet later.

While waiting for Alberto to come to Evergreen from Denver, I spoke with Eric on the phone. Eric advised that he had just left court. I told him that Alberto had contacted law enforcement with allegations that he was in violation of a custody agreement and that I had been tasked with looking into it. Eric explained that they had been going through a lengthy custody dispute, during which Eric believed that he had been subjected to harassment by Alberto. He advised that Alberto had used the Sheriff's Office itself as a mechanism for that harassment, in the form of "welfare checks" that Alberto had repeatedly called in and ask deputies to check on Roslyn at his house without legitimate reason. There was a lengthy history between them.

Eric advised that the permanent order, Jefferson County District Court 2016DR1911, issued in May 2018, allowed Alberto supervised therapeutic visits and listed three individual therapists that the visits could occur with. Eric advised that one of the therapist declined to work with them, one of them told Eric that she did not possess the requisite licensing to conduct the visits, but that the third therapist, Terry James-Banks (DOB Unknown), was fine with him. He indicated that Alberto was the one with a problem with the third therapist.

I met with Alberto at the Wal-Mart at 952 Swede Gulch Road in Evergreen. He provided me a copy of the permanent order. He also had the original sealed document. I inspected the order.

It read, in part:

"Respondent may have up to 3 hours of supervised therapeutic visitation with the Minor every other weekend. The supervised therapeutic visitation shall be with one of the following individuals: [Lists three names]. Petitioners Eric Motter and Cynthia Schippert [godmother] shall have all other parenting time with the Minor including all overnights. Petitioner Eric Motter shall choose and shall have final say regarding who shall serve as the therapeutic visitation supervisor out of the individuals referenced above. Petitioners shall offer times that the Minor is available for supervised therapeutic visitation to Respondent one week in advance of the available time slot. Respondent shall respond to Petitioners within 48 hours as to whether Respondent would like to exercise his supervised therapeutic visitation during the time slot provided by petitioners. Respondent shall pay 100% of all fees and costs for supervised therapeutic visitation.

I asked Alberto about the three therapists. He did not want to use Terry James-Banks because he believed she had a conflict of interest with the person who recommended him to the Court. Also, she was more expensive than one of the others. He advised that he had contacted her in October but that she had not replied. In speaking with Alberto, it seemed that the problems with the visits not happening seemed to be more of a matter of Alberto's preference towards or against certain therapists rather that anything Eric had done.

Alberto also gave me "screen shots" of messages he had exchanged with one of Eric's daughters, Alex Schwartz (DOB Unknown) (who no longer stayed with Eric and was not related to Roslyn). In the messages, they go on about how Eric is bad, such as (Alex:) "He's been married like 6 times, abused all of them and their kids, and cheated on all of them" and that he had walked in on Alex while she was in the shower.

I spoke with Eric on the phone. I knew he had an attorney retained in this case, and invited him to have his attorney join us on a conference call. His attorney did. From speaking with Eric and his attorney, it did not appear

Report Officer
2180/MEDLIN, PHILIP

Printed At
01/17/2019 16:03

Page 3 of 4

18-29064    Supplement No
ORIG

# Jefferson County Sheriff Office

## Narrative

that Eric had created any barriers to stop the visitations from occurring and was within his rights to select a therapist from the three listed in the order. Eric advised that he believed the next step that needed to happen was for Alberto to call Terry and do an "intake" to get set up to be seen by her.

I called Alberto and left him a message to call me back.

Around 1315 hours, Alberto emailed me advising me that he had obtained a case number from the National Center for Missing and Exploited Children for this situation and told me that charges he "needed to bring forth" were Parental Kidnapping and Second Degree Kidnapping.

Alberto called me back around 1342 hours. I told him that the charges of kidnapping were not at all appropriate for the facts of this case. I told him that I did not believe Eric had done anything criminal, and that I would not be continuing my investigation into Eric. I began to explain to Alberto that he should contact Terry and begin the intake process to start the visits. He stopped me advised that he would just "file in court."

It does not appear that any criminal violation of C.R.S. 18-3-304 (Violation of Custody Order or Order of Parental Responsibility) has occurred. The civil case involving the men is open and they are scheduled to appear before a judge in less than a week.

I spoke with School Resource Officer (Deputy) Wonner at West Jefferson Middle School around 1425 hours to discuss the situation. School was out, but I made arrangements to come by and speak with Roslyn during the following school day to make sure everything was ok at home.

Disposition: Closed, Information only.

Report Officer
2180/MEDLIN, PHILIP

Printed At
01/17/2019 16:03

Page 4 of 4

**18-29064**    Supplement No 0001

# Jefferson County Sheriff Office
Reported Date
**12/07/2018**
Member#
**MEDLIN, PHILIP**

Nature of Call

## Administrative Information

| Agency | | | Report No | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|---|
| Jefferson County Sheriff Office | | | 18-29064 | 0001 | 12/07/2018 | 11:22 |
| Member# | | | | Assignment | | Entered By |
| 2180/MEDLIN, PHILIP | | | | PATROL MOUNTAIN WATCH B | | 2180 |
| RMS Transfer | Prop Trans Stat | Property? | DV | Approving Officer | | |
| Successful | Successful | None | No | 1582 | | |
| Approval Date | Approval Time | | | | | |
| 12/07/2018 | 21:18:04 | | | | | |

## Narrative

On 12/06/2018, at around 2254 hours, I received emails from Alberto in which he expressed his beliefs that Eric was in violation of the law and that he would be approaching the District Attorney Offices and Denver and Jefferson County for resolution if I did not file charges. The emails will be attached this report as a case attachment.

On 12/07/201 I went to West Jefferson Middle School to check on Roslyn and to advise her that Alberto had contacted the Sheriff's Office the day before to report her as "kidnapped". After speaking with Roslyn, she was doing fine and had no crimes to report. I did not have concerns of abuse after speaking with her.

Later, Eric and his attorney called me. They wanted to know why I talked to Roslyn at the school. I explained that I have a responsibility to check on the safety and welfare of at-risk populations such as children, the elderly, and the disabled. They expressed concerns that Alberto was using the legal system to harass him, to the point it was affecting Eric's job, and were worried about what would happen after the hearing next week. They wished Alberto to be prosecuted for false reporting if appropriate. I told them to report any violations of the protection order and that false reporting charges were a possibility in the future if there was sufficient evidence that Alberto had committed any false reporting.

| Report Officer | Printed At |
|---|---|
| 2180/MEDLIN, PHILIP | 01/17/2019 16:03 |

Page 1 of 1

**18-29064**   Supplement No 0002

## Jefferson County Sheriff Office

Reported Date
**12/12/2018**
Member#
**MEDLIN, PHILIP**

Nature of Call

### Administrative Information

| Agency | | | Report No | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|---|
| Jefferson County Sheriff Office | | | 18-29064 | 0002 | 12/12/2018 | 10:42 |

| Member# | | | | Assignment | | Entered By |
|---|---|---|---|---|---|---|
| 2180/MEDLIN, PHILIP | | | | PATROL MOUNTAIN WATCH B | | 2180 |

| RMS Transfer | Prop Trans Stat | DV | Approving Officer | | Approval Date |
|---|---|---|---|---|---|
| Successful | Successful | No | 0469 | | 12/12/2018 |

Approval Time
16:13:42

### Narrative

On 12/11/2018, Alberto emailed me urging me to continue to investigate Eric Motter. He believed that Eric should also be charged with witness tampering. He included transcripts of email or text conversations discussing how Eric is bad.

On 12/12/2018, Alberto contacted the Sheriff's Office via online web form submission urging the Sheriff to investigate Eric.

I advised Alberto via email that, again, this case was closed and no charges were being filed.

Those emails will be attached to this report as case report attachments.

Disposition: Previously closed.

Report Officer
2180/MEDLIN, PHILIP

Printed At
01/17/2019 16:03

Page 1 of 1

**19-90**

Supplement No
**ORIG**

# Jefferson County Sheriff Office

Reported Date
**01/02/2019**
Member#
**WALDER,CURTIS**

Nature of Call
**ASSAULT-F.**

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|---|---|
| **Jefferson County Sheriff Office** | | | **19-90** | | **ORIG** | **01/02/2019** | **19:29** |

| CAD Call No | Status | Nature of Call |
|---|---|---|
| **191003072** | **UNFOUNDED** | **ASSAULT - FELONY** |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| **10803 HAWKINS AVE** | | | | | | | | **CONIFER** |

| ZIP Code | Rep Dist | Area | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|---|
| **80433** | **54JC** | **JCM** | **01/02/2019** | **19:10** | **01/02/2019** | **19:20** |

| Member# | | Assignment | Entered By |
|---|---|---|---|
| **1655/WALDER,CURTIS** | | **PATROL MOUNTAIN WATCH B** | **1655** |

| RMS Transfer | Prop Trans Stat | Property? | DV | Approving Officer |
|---|---|---|---|---|
| **Successful** | **Successful** | **None** | **No** | **1582** |

| Approval Date | Approval Time |
|---|---|
| **01/03/2019** | **23:17:40** |

Assisting Deputy/Employee Number
**DEP J.HUFFMAN, A.BOYKO**

-BODY WORN CAMERA-
**Yes**

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| **1** | **18-3-206(1)** | **MENACING** | |

| NIBRS | | | | | | Seq# | IBRS |
|---|---|---|---|---|---|---|---|
| **1 13CAN** | **88** | **20** | **N** | **1399** | | **1** | **13C** |

| Attempted/Completed | Used | Bias | Location Type | # Premises | Method of Entry | Criminal Activity | Weapon/Force | NCIC_OFF |
|---|---|---|---|---|---|---|---|---|
| **A** | **N** | **88** | **20** | | | **N** | | **1399** |

Cargo Theft?

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| **VIC** | **VICT** | **1** | **VIGIL,LEVITICUS ALAN** | **W** | **M** |

| DOB |
|---|
| **12/06/1998** |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| **SUS** | **SUS** | **1** | **MOTTER,ERIC J.** | **W** | **M** |

| DOB |
|---|
| **12/10/1962** |

## Person Summary

| Invl | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| **RP** | **1** | **I** | **ROJAS,ALBERTO JR** | **908934** |

| Race | Sex | DOB |
|---|---|---|
| **W** | **M** | **07/26/1959** |

| Invl | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| **SUS** | **1** | **I** | **MOTTER,ERIC** | **557709** |

| Race | Sex | DOB |
|---|---|---|
| **W** | **M** | **12/10/1962** |

| Invl | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| **VIC** | **1** | **I** | **VIGIL,LEVITICUS ALAN** | **1467628** |

| Race | Sex | DOB |
|---|---|---|
| **W** | **M** | **12/06/1998** |

| Report Officer | Printed At |
|---|---|
| **1655/WALDER,CURTIS** | **01/04/2019 13:10** |

**Page 1 of 3**

*EXHIBIT F*

**19-90**

Supplement No
**ORIG**

# Jefferson County Sheriff Office

## REPORTING PARTY 1: ROJAS,ALBERTO JR

| Involvement | | Invl No | Type | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REPORTING PARTY** | | **1** | **Individual** | | | | | | | | |

| Name | | | | | | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|---|---|
| **ROJAS,ALBERTO JR** | | | | | | | **908934** | **WHITE** | **Male** |

| DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|---|
| **07/26/1959** | **59** | **Unknown** | **No** | **5'10"** | **210#** | **Brown** | **Hazel** | **1896889** |

| NIBRS | | Res Status |
|---|---|---|
| **N** | | **Non-resident** |

| Type | Address |
|---|---|
| **Home** | **3848 KING ST** |

| City | State | ZIP Code | Date |
|---|---|---|---|
| **DENVER** | **Colorado** | **80211** | **01/02/2019** |

| Phone Type | Phone No | Date |
|---|---|---|
| **Cell** | **(303)868-6501** | **01/02/2019** |

| Employer/School | Position/Grade |
|---|---|
| **UNIVERSITY OF COLORADO** | **TEACHER** |

## SUSPECT 1: MOTTER,ERIC

| Involvement | Invl No | Type | | Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SUSPECT** | **1** | **Individual** | | **MOTTER,ERIC** | | | | | | | | |

| MNI | Race | Sex | DOB | | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **557709** | **WHITE** | **Male** | **12/10/1962** | | **56** | **Unknown** | **No** | **5'11"** | **194#** | **Brown** | **Hazel** |

| OFN_INVL | PRN | NIBRS | |
|---|---|---|---|
| **1** | **1896890** | **56** | **R** |

| Vic/Ofnd Age | Res Status |
|---|---|
| **56** | **Resident** |

| Type | Address |
|---|---|
| **Home** | **10803 HAWKINS AVE** |

| City | State | ZIP Code | Date |
|---|---|---|---|
| **CONIFER** | **Colorado** | **80433** | **01/02/2019** |

| Phone Type | Phone No | Date |
|---|---|---|
| **Cell** | **(303)888-1564** | **01/02/2019** |

| Employer/School |
|---|
| **UNKNOWN** |

## VICTIM 1: VIGIL,LEVITICUS ALAN

| Involvement | Invl No | Type | | Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **VICTIM** | **1** | **Individual** | | **VIGIL,LEVITICUS ALAN** | | | | | | | | |

| MNI | Race | Sex | DOB | | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **1467628** | **WHITE** | **Male** | **12/06/1998** | | **20** | **Unknown** | **No** | **5'10"** | **165#** | **Brown** | **Brown** |

| PRN | NIBRS | |
|---|---|---|
| **1896891** | **20** | **N** |

| Vic/Ofnd Age | Res Status |
|---|---|
| **20** | **Non-resident** |

| Type | Address |
|---|---|
| **Home** | **1260 VRAIN ST APT 303** |

| City | State | ZIP Code | Date |
|---|---|---|---|
| **DENVER** | **Colorado** | **80204** | **01/02/2019** |

| Phone Type | Phone No | Date |
|---|---|---|
| **Cell** | **(720)586-3187** | **01/02/2019** |

| Alias Name | Race | Sex | DOB |
|---|---|---|---|
| **LEVI** | **WHITE** | **Male** | **12/06/1998** |

| Height | Weight | Hair Color | Eye Color |
|---|---|---|---|
| **5'10"** | **165#** | **Brown** | **Brown** |

| Employer/School | Position/Grade |
|---|---|
| **UNIVERSITY OF COLORADO** | **STUDENT** |

## IBRS Info

| Victim Invl No | NIBRS |
|---|---|
| **1** | **13C** |

| Related Offenses |
|---|
| **13C** |

| Report Officer | Printed At |
|---|---|
| **1655/WALDER,CURTIS** | **01/04/2019 13:10** |

**Page 2 of 3**

**19-90**  Supplement No
ORIG

# Jefferson County Sheriff Office

| IBRS Info | | | | | | |
|---|---|---|---|---|---|---|
| Ref | Involvement | Invl No | Name | | Race | Sex |
| RU | SUS | 1 | MOTTER, ERIC | | W | M |
| DOB | | | | | | |
| 12/10/1962 | | | | | | |

| Modus Operandi | | | | | |
|---|---|---|---|---|---|
| Weapon Used | Premise Type | | Victim's Race | Victim's Sex | Victim's Age |
| FIREARM | RESIDENTIAL (SINGLE FAMILY | | WHITE | Male | Adult |
| Vulnerability | | Victim's Action | | | |
| Alone | | Present | | | |
| Suspect Action | | | | | Crime Code(s) |
| Armed/Lone suspect | | | | | OTHER |

## Narrative

BWC

On 01/02/2019, at about 1932 hours I was dispatched, with Deputies J. Huffman and A. Boyko to King Soopers, located at 25637 Conifer Road reference a weapons violation. Dispatch advised the reporting party (RP) stated he had just served paper on a male who had a pistol visible while he was serving the papers. The RP stated they were no longer on scene (10803 Hawkins Avenue) and would like to meet us at the King Soopers.

We arrived at about 1939 hours and I met with Leviticus (Levi) Vigil (DOB 12/06/1998) who told me he was asked by Alberto Rojas (DOB 07/26/1959) to serve civil papers on an Eric Motter (DOB 12/10/1962) for him. Levi went on to explain he was a student of Alberto's last year at the University of Colorado and still works with him from time to time. Alberto (who was also present) stated he is restrained from Eric and went on to tell me he is aware and stayed away from Eric's residents during this whole transaction.

Levi told me Alberto gave him a ride to Eric's house and they arrived at about 1910 hours. Levi said they parked at the intersection of Oehlmann Park Road and Hawkins Avenue. Levi said he exited Alberto's car and walked to Eric's house. When he arrived he said he knocked on the lower door and did not get a response so he went up a set of stairs leading to an upper patio. Levi said when he ascended the stairs he heard several people laughing and talking, but when he got to the top of the stairs he heard a beep and the people went quite. Levi said he proceeded to the door and knocked. After knocking Levi said he saw a white male through the door glass who did not say anything. Levi stated he yelled through door that he was a process server and had paperwork for Eric. Levi said after that the door open and a male matching Eric's description stood in the doorway with a black pistol in his left hand. Levi stated Eric had the gun pointed up (toward the ceiling) and he did not say anything but took the paperwork and closed the door. Levi stated during the altercation Eric never threatened him verbally or made any furtive movements to indicate Levi was going to be shot.

Levi told me he felt scared because Eric's body language indicated to him that he was going to be shot. Levi stated Eric appeared "hunched over" and appeared to slowly move the gun across his field of view while it was pointed upwards. Levi stated after giving the papers to Eric he left the house, got back into Alberto's car and called the Sheriff's Office.

At about 1957 hours Deputies Huffman and Boyko left to contact Eric while I stayed with Levi.

At about 2030 hours Deputies Huffman and Boyko returned and explained to Levi that after their conversation with Eric they believed Eric did not "knowingly place or attempt to place a person (Levi) in fear of imminent serious bodily injury." We went on to explain to Levi that Alberto and Eric have been in an on-going legal battle for about a year and due to this Eric may be more cautious and protective than the average person. In addition, we pointed out that Levi was contacting Eric at a later than normal time and it was dark. These are all element that could make an individual more cautious around their house, to include answering the door, at night with a pistol.

At this point the facts of the case do not support Menacing.

Closed: Unfounded.

| Report Officer | Printed At |
|---|---|
| 1655/WALDER, CURTIS | 01/04/2019 13:10 |

Page 3 of 3

**19-90**

Supplement No
**0001**

# Jefferson County Sheriff Office

Reported Date
**01/02/2019**

Member#
**HUFFMAN, JOSEPH**

Nature of Call

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|---|---|
| **Jefferson County Sheriff Office** | | | **19-90** | | **0001** | **01/02/2019** | **20:49** |
| Member# | | | | Assignment | | | Entered By |
| **1751/HUFFMAN, JOSEPH** | | | | **PATROL MOUNTAIN WATCH B** | | | **1751** |
| RMS Transfer | Prop Trans Stat | Property? | DV | | Approving Officer | | |
| **Successful** | **Successful** | **None** | **No** | | **1582** | | |
| Approval Date | | Approval Time | | | | | |
| **01/03/2019** | | **23:18:38** | | | | | |

## Narrative

BWC

On 01-02-19 at about 1932 hours, Deputy Walder and I were dispatched to 10803 Hawkins Avenue reference a possible weapons violation. The reporting party was verbally identified as Alberto Rojas (DOB 07-26-59) and Alberto wanted to meet us at the Kings Soopers in Conifer in about five minutes. Deputy Walder and I arrived at the King Soopers at about 1939 hours and met with Alberto and his male friend who was identified as Leviticus Vigil (DOB 12-06-98). Alberto advised that he was driving Leviticus to the address to serve legal papers to an Eric Motter. Alberto cannot go to the residence because he is restrained from the residence. Alberto dropped Leviticus about 200 yards away from the property and Leviticus walked up to the property.

Leviticus stated he knocked on the downstairs door but no one answered. Leviticus went upstairs and heard someone inside tell other occupants of the home to "get down". Leviticus said he identified himself as a process server and a male party, that Leviticus assumed was Eric Motter based on photos, answered the door with a gun in his hand and pointed in the air. Leviticus said Eric was angry. He handed Eric Motter the paperwork and turned around and walked away. Leviticus stated the gun was never pointed at him and Eric never threatened him with the gun. Eric stated he felt like he was going to be shot when he observed the gun.

I then proceeded to 10803 Hawkins Avenue to speak with Eric. I arrived at the residence and I identified Eric by his Colorado Driver's License as Eric Motter (DOB 12-10-62). Eric told me the following: Eric has a restraining order against Alberto and has alarms on his driveway and other security measures in place around his residence because of Alberto. Tonight Eric turned off the security on the driveway because his daughter was out shoveling snow. Eric forgot to turn the driveway security back on and did here another alarm go off letting him know that someone was walking up the stairs to his upstairs entry door. Eric told his daughters to get down and grabbed his gun. Eric answered the door with the gun in his left hand and holding it up in the air. Eric did not know who was at his door and initiated his emergency safety plan with his daughters and grabbed his gun for his protection. Eric never pointed the gun at Leviticus and never intended to scare him. Eric took the paperwork Leviticus handed him and closed the door.

I contacted Deputy Walder and informed him about the information Eric provided. I returned to the King Soopers and met with Leviticus and advised him of what Eric told us and that we were going to document the incident with a case report. Leviticus was given a business card with this case report number.

Disposition: See original report.

| Report Officer | Printed At |
|---|---|
| **1751/HUFFMAN, JOSEPH** | **01/04/2019 13:10** |
| **Page 1 of 1** | |

Sent from my T-Mobile 4G LTE Device

------ Original message ------
From: Loizeaux Andrew <loizeauxa@klfs.net>
Date: 2/23/18 8:27 AM (GMT-07:00)
To: alrojas759@gmail.com, harleyrn62@aol.com, cs@bluegrass.net
Subject: Rosalyn with Alberto March 3

Alberto, Eric, and Cindy,

I have receive feedback from each of you regarding Rosalyn's visit with Alberto on January 27. Thank you!

I would like Roslyn to have another four-hour visit with Alberto on Saturday, March 3 from 1 PM to 5 PM. I will come to Alberto's house at 4 PM to 5 PM and observe, debrief with Alberto and Rosalyn, as well as spend some 1:1 time with Roslyn. Once this visit is confirmed, I will talk with each of you regarding my expectations for the visit.

Eric and Cindy, I am unsure who has Rosalyn on March 3, so I will leave it up to you who will do the transportation.

I will be releasing the report on March 7. This final visit during the PRE is a critical piece of data, as well as an opportunity for me to get updated on Rosalyn's wishes and perceptions.

I hope each of you can make this work, please confirm.

Dr. Loizeaux

*EXHIBIT G*

*P.1*

# Alberto-Rosalyn Visit Cancelled

Inbox

**Loizeaux Andrew <loizeauxa@klfs.net>**                    Mar 2, 2018,
                                                            6:49 PM

to harleyrn62, Eric, me

Eric Motter,

Your attorney informed me that you are not comfortable bringing Roslyn for the visit with Alberto tomorrow.  I do not have the power to order a parent to comply with the evaluation procedures.  However, I did perceive a visit would be helpful to get more data about Alberto's relationship with Roslyn, given they have gone for years without seeing each other.  I was also interested in seeing how Alberto would respond to directives from me.  And most importantly, I was going to spend time alone with Roslyn at the end of the visit together her perceptions on how things have gone!

If you are canceling the visit, then I request that you bring Rosalyn into my office on either on Sunday, March 4 after 11am or on Monday, March 5 after 3:30pm.  During that time I would like to have a meeting with Roslyn alone, with Eric and Roslyn together, and with Eric alone.

I will certainly change our billing to match the agreement that was signed, and be consistent with the court order.  We recently have been changing our fees, and we have a new administrative assistant, and that combination has led to the errors!  Thank you for alerting me, and those issues will be corrected.

On Monday morning I will get out updated billing, which will need to be paid before the PRE is released.  I don't have a good estimate for you right now, but I will on Monday.  The email that I sent to the court on which the order was based stated the following, *" My retainer for a PRE is $8000, and my rate is $360/hour.  A typical PRE, including all the procedures, document review and report writing typically costs between $18,000 to $24,000.  When out of state travel is required, PRE costs are often between $22,000 to $28,000."*

Let me know when you can come in with Roslyn,
Dr. Loizeaux

*P.2*

# RE: Cancellation

Inbox

**Loizeaux Andrew <loizeauxa@klfs.net>**                    Mar 2, 2018,
                                                              6:53 PM

to me

Alberto!

I just sent you an email canceling the visit, after I was informed by Eric's attorney that he was unwilling to bring Rosalyn to be with you. Please confirm that you have received this cancellation notice!

I will want to talk with you after I meet with Roslyn and Eric.  I will email or call you after I meet with them to schedule a time.

I know you were looking forward to seeing Roslyn this weekend, and I'm sorry that I could not facilitate that,

Dr. Loizeaux

**From:** Loizeaux Andrew <loizeauxa@klfs.net>
**Sent:** Friday, March 2, 2018 5:08 PM
**To:** 'alrojas759' <alrojas759@gmail.com>
**Subject:** RE: Rosalyn with Alberto March 3

Got it and wanted to let you know I've received all you emails pertaining to Eric's charges.  I will send you an email tomorrow morning with what I want you to be attentive to during the visit.  See you tomorrow at 4pm.
Dr. Loizeaux

**From:** alrojas759 <alrojas759@gmail.com>
**Sent:** Friday, March 2, 2018 1:27 PM
**To:** Loizeaux Andrew <loizeauxa@klfs.net>; harleyrn62@aol.com; cs@bluegrass.net
**Subject:** Re: Rosalyn with Alberto March 3

Update.
Please drop off and pick up Roslyn at our new address.
3848 King Street.
Denver 80211
The house is practically in the corner of King and 39th St. Attached you can see the front of the house.
Thank you.

P.3

**M** Gmail          **Alberto Rojas <alrojas759@gmail.com>**

## Mr. Rojas post-report behavior w/PRE
3 messages

**Loizeaux Andrew** <loizeauxa@klfs.net>      Mon, Aug 20, 2018 at 10:31 AM
To: Eric Kelly <eric@vfalegal.com>
Cc: alrojas759@gmail.com, Casey Pendarvis <admin@klfs.net>

Eric Kelly,

I need to catch you up on Mr. Rojas behavior with me since my testimony on May 1, 2018. As Mr. Rojas may be going back to Court to request my underlying data, I think you should be aware of his behavior that is reflective of the themes noted in my report.

First, Mr. Rojas filed a grievance against me with the Psychology Board at the Department of Regulatory Agencies (DORA). Some of his allegations included that I "botched" the evaluation by not interpreting his MMPI-2; that I submitted a report when one party was not fully cooperative; that I refused to disclose a report from an associate; that I denied Mr. Rojas' constitutional rights; that I made unsupported claims regarding Mr. Rojas's employment and dependency; that I engage in accusatory questioning, attempting to entrap Mr. Rojas; that I deceived the Court and lied under oath; that I did not conduct a thorough investigation; and that my billing was inaccurate.

On August 16, 2018 the Psychology Board dismissed the complaint (see attached).

Additionally, Mr. Rojas has recently been threatening to sue me, as you probably noted in his email to me requesting part of my file. Here is a recent email he sent me elaborating on his civil suit intentions:

**From:** Alberto Rojas <alrojas759@gmail.com>
**Sent:** Thursday, August 9, 2018 12:41pm
**To:** Loizeaux Andrew <loizeauxa@klfs.net>
**Subject:** Re: K Kilian SPI Notes

*Louizeaux.*

*I am in the process of commencing a class action suit against you. It is very obvious you had issues and biased perspective on my case. You failed to disclose to the court the following:*

*a) that I have worked as Restorative Justice Coordinator with youth at risk and dealt with over 340 disciplinary cases ranging from sexual assault, harassment, possession of weapons, drugs, etc*

*b) you failed to disclose my other two children's success and letters*

*c) you failed to mention that Eric has engaged in extramarital affairs, his predatory behavior, domestic violence, and his assault and battery on Nancy's son*

*d) you lied under oath about my work status*

*e) you told the court that I had said Eric had a surveillance system when in fact you corroborated the fact and it was both Roslyn and the deputy Sheriff who disclosed such information*

*f) you failed to investigate if Eric is engaging in viewing those videos for self gratification*

*g) you did not even acknowledge that Eric has a tendency to be violent as he yelled at me in the court room and called me an asshole*

*h) you further failed to disclose that I teach at the university courses in Criminal Justice, Criminology, Policing Principles, and Deviant Behavior*

*i) you also failed to inform the court I authored a book in Victimology*

*I am not sure how much Eric and or his attorney paid you to lie and defecate on my persona, but all this will be disclosed in court along with the claims of at least three other individuals whom you have imposed considerable harm. So here's a proposal, you will need to contact the court by Monday August 13, 2018, acknowledge that you had purposely failed to conduct a thorough evaluation and investigation, and that your report is flawed as you have lied about and distorted the communication you had with me and others. We will also require you to reimburse us all our money and attorney fees of those who had one representing them at the time you participated as PRE.*

*This proposal is only good for 24 hours, I believe it is reasonable as it will cost you a substantial amount of money, fines, your credentials, and more than likely prison time. If you choose to contact the court, I will need to review your communication with the judge for accuracy and veracity. It is your choice, you have only 24 hrs to respond by tomorrow at 12:40 P.M.*

For the record, I did not acquiesce to the financial and litigation threats of Mr. Rojas. I have more emails from Mr. Rojas reflecting this behavior, but I do not want to inundate you. They are available if you wish to have copies of Mr. Rojas's post-report correspondence with me.

As I noted in my previous email, feel free to share this email correspondence with the Court.

Sincerely,

Andrew Loizeaux, Psy.D., P.C.

Parental Responsibilities Evaluator

303-752-1117  ext. 202

*Katz & Loizeaux Forensic Services, LLC*

1191 S. Parker Road

Denver, CO 80231

This is a transmission from Katz & Loizeaux, LLC and may contain information which is privileged, confidential, and protected by the Electronic Communications Privacy Act, 18 U.S.C. Section 2510. If you are not the addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this transmission in error, please destroy it and notify us immediately at our telephone number, 303-752-1117.

1

DISTRICT COURT
JEFFERSON COUNTY
STATE OF COLORADO
100 Jefferson County Parkway
Golden, Colorado 80401

MYRIAM LANTHER BAKER,
Petitioner,

and                                    ^FOR COURT USE ONLY^

ALBERTO ROJAS, JR.,                    Case No. 16 DR 1911
Respondent.                            Division 10

For the Petitioner:

For the Respondent:

          The matter came on for hearing held on April 4, 2018, before the HONORABLE ANN GAIL MEINSTER, Judge of the District Court, and the following proceedings were had.

                    (Recorded and Transcribed)

EXHIBIT I

INDEX

PAGE

WITNESSES:

(No Witnesses Were Called.)

3

INDEX (CONTINUED)

EXHIBITS                                    IDENTIFIED        ADMITTED

(No Exhibits Were Marked.)

4

PROCEEDINGS

THE COURT:  Hi.  This is Division 10.  Who do I have on the line?

MR. KELLY:  Good morning, Your Honor.  Eric Kelly, registration 46714.  Eric Motter is also here with me on the line.  I don't (not audible), but I think we can probably proceed (not audible).

DR. LOIZEAUX:  This is Dr. Loizeaux.  I was able to join as well.

MR. ROJAS:  We have Mr. Rojas on the phone (not audible).

THE COURT:  All right.  Good morning, everyone, this is Judge Meinster, can you hear me?

MR. KELLY:  Yes, Your Honor.

DR. LOIZEAUX:  Yes.

MR. ROJAS:  Yes

THE COURT:  All right.  Thanks for all being present this morning.  We're close to a hearing date, so I want to make sure that the issue of payment to the PRE has been resolved. Mr. Kelly, I understand that you have made your full 75 percent payment; is that right?

MR. KELLY:  That's correct, Your Honor.

THE COURT:  And, Mr. Rojas, when can we expect that you will complete your payment?

MR. ROJAS:  Your Honor, I shared with you the

5

information that I actually lost my employment. I have no means whatsoever to make payment, unless the doctor is willing to take payments, but he was very clear that he was not amenable for such arrangements.

THE COURT: I read that also. I know that it is not Dr. Loizeaux's policy to accept payments. That's very common with PREs. And the Court supports him being paid in full in advance of the hearing date, so what is your plan, Mr. Rojas?

MR. ROJAS: Well, based on the petitioner's reluctance to participate fully and cooperate in this investigation, I don't see why we should pay for something that is not finished yet.

THE COURT: Mr. Rojas, my question to you is what is your plan to complete your payment so that the hearing can proceed?

MR. ROJAS: Well, I'm actively seeking for employment. I don't have any funds. So I mean this is an order that you imposed on us and it was beyond any (not audible) that it would cost, it was going to cost over $25,000 for an investigation.

THE COURT: I'm going to set one more telephone conference the week of April 16th and we'll look for something on Tuesday, I think, April 17th. Mr. Rojas, if you have not paid in full at that time, it is the Court's intention to issue a show cause order.

MR. ROJAS: Well, in the meantime, what is the Court going to do about Mr. Motter not being amenable to participate in

the investigation?

THE COURT:  Mr. Rojas, we are dealing today with the issue of payment to the PRE.  All right.  Is everyone available on April 17th at 4:00?

MR. KELLY:  I am, Your Honor.  This is Eric Kelly speaking and I'm available.

THE COURT:  All right.  Mr. Rojas?

MR. ROJAS:  April 17th at 4:00.

THE COURT:  Yes.  Dr. Loizeaux, I certainly don't require your participation.  If you're available and want to join, it's the same call in information and we're happy to have you.

DR. LOIZEAUX:  Okay.  I'll do my best to make that work.  Thank you.

THE COURT:  Thank you.

MR. KELLY:  Eric, are you available that day?

MR. MOTTER:  This is Eric Motter and I am available.

THE COURT:  All right.  Mr. Kelly, Mr. Rojas, are there any other pretrial disclosure deadlines that we need to set?

MR. KELLY:  Your Honor, by the time we actually got the permanent orders set, we were beyond the 63-day deadline for disclosure of witnesses, however, I do think that the procedure at the temporary order to disclose 14 days before for witnesses and have a joint trial management certificate filed seven days before works fairly well, so I would just ask that the Court

7

impose those same deadlines for the permanent orders hearing date.

THE COURT:  That will be the order of the Court.  So 14 days for witness and exhibit lists, to exchange those.  And then a joint trial management certificate due seven days before trial.

MR. KELLY:  And, Your Honor --

MR. ROJAS:  Your Honor, just to be clear, just to be clear, the Court (not audible) to impose (not audible) for Dr. Loizeaux's fees even though the other party did not participate, fully participate.

THE COURT:  The Court is not making any finding in that regard.  The Court has previously appointed a PRE in order to have a very fair and full picture of the situation for the permanent orders hearing.

MR. ROJAS:  Well, according to Dr. Loizeaux, who is present, he said that that final visit was important and it was critical for his evaluation.  Dr. Loizeaux, isn't that what you stated?

THE COURT:  I'm not getting into that --

DR. LOIZEAUX:  (Not audible).

THE COURT:  Dr. Loizeaux, I'm not getting into the details of the investigation today.  However you conduct that is up to you.  Today we are addressing payment to the PRE and pretrial deadlines.

MR. ROJAS:  Just for the record, I would like to make

8

sure that it is noted that the Court (not audible) as to the fact that the petitioner did not fully participate in this investigation.

THE COURT:  I'm not addressing that today.  Anything else today, Mr. Kelly?

MR. KELLY:  No, Your Honor.

THE COURT:  Mr. Rojas?

MR. ROJAS:  No.

THE COURT:  Dr. Loizeaux?

DR. LOIZEAUX:  No, Your Honor.

THE COURT:  All right.  Thank you all for being available this morning.  I know we were a few minutes late getting you, that was just technical troubles on our end with the conference line, so thank you for your patience.

MR. KELLY:  Thank you, Your Honor.

THE COURT:  The Court will be in recess.  Thank you all.

(WHEREUPON, the digitally recorded proceeding concluded.)

9

TRANSCRIPTIONIST'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

DATED this 23rd day of May, 2019.

/s/*Kristie R. Karol-Chik*
Kristie R. Karol-Chik
Court Transcriber

DISTRICT COURT
JEFFERSON COUNTY
STATE OF COLORADO
100 Jefferson County Parkway
Golden, Colorado 80401

MYRIAM LANTHER BAKER,
Petitioner,

and

ALBERTO ROJAS, JR.,
Respondent.

^FOR COURT USE ONLY^

Case No. 16 DR 1911
Division 10

For the Petitioner:

For the Respondent:
    Alberto Rojas, Pro Se

The matter came on for hearing held on May 23, 2017, before the HONORABLE ANN GAIL MEINSTER, Judge of the District Court, and the following proceedings were had.

(Recorded and Transcribed)

EXHIBIT J

2

INDEX

PAGE

WITNESSES:

(No Witnesses Were Called.)

3

INDEX (CONTINUED)

EXHIBITS                                      IDENTIFIED    ADMITTED

(No Exhibits Were Marked.)

4

PROCEEDINGS

THE COURT:  The Court will call 16DR1911, In Re the Matter of Baker and Rojas.  I'll start with entry of appearance.

MR. KELLY:  Good morning, Your Honor.  Eric Kelly, registration 46716, appearing on behalf of Eric Motter and Cynthia Schippert, the petitioners in this matter.

Appearing also today are Chase Baker, the minor's brother, and Tom Schippert, Cynthia Schippert's husband.

THE COURT:  Tell me again who, point out to me who everybody is so I can make sure I've got the parties straight.

MR. KELLY:  So this is Mr. Eric Motter.  This is, also at the table here is Cynthia Schippert.  And behind both of them we have Mr. Tom Schippert, who is standing, and Mr. Chase Baker.

THE COURT:  Good morning to everyone.

MR. ROJAS:  Good morning, Your Honor.  My name is Alberto Rojas.  I am the father of the child and I am here pro se.

THE COURT:  Good morning.

MR. ROJAS:  Good morning.

THE COURT:  We are set for a status conference today. Are there any preliminary matters?  I do want to make clear that this is just a status conference.  The Court is not going to rule on the merits of any pending motions.  Mr. Kelly.

MR. KELLY:  Your Honor, just a couple of matters.  As the Court is aware, the respondent has filed a couple of status

5

reports here recently. Both allege that Mr. Craig Eades, who is the therapeutic supervisor that the Court appointed, respondent has indicated that Mr. Eades is not available for visitation. I just want to indicate to the Court that he is available for therapeutic visitation. He has been for over a month now.

In addition, Your Honor, respondent indicated that the minor was in need of therapy. The minor is currently in therapy. She has a therapist, Megan Christian of Alpine Services, that she sees every week and really likes her.

So just a couple of matters to clear up.

THE COURT: And, Mr. Rojas, anything preliminary for you today, sir?

MR. ROJAS: Yes, Your Honor. On the last status report I submitted the fact that the petitioner had submitted her own status report on, I believe two days after her passing, which was April the 12th. In that status report she clearly testified that Mr. Eades was not available for any consultations, therefore, I submitted a status report to you again and saying that, you know, he wasn't available. So really, this Court has not made a ruling on that and I haven't been able to see my daughter since August 1st of 2016.

THE COURT: Okay.

MR. ROJAS: I've already secured Ms. Meg Facion from the Responsible Fatherhood Program for an intake and reintegration, family reintegration between me and my daughter.

6

I've already attended the Veterans Administration mental health services just to see how can I actually assist my daughter in this case. And everything is pretty much lined up.

THE COURT: Okay. Well, the Court's order remains effective that Mr. Eades was appointed as the therapeutic visitation supervisor, so you have the ability to access his services and begin that therapeutic contact.

MR. ROJAS: Well, if he states that he's not available --

THE COURT: I've spoke with him personally and the last I heard, he was available.

MR. ROJAS: All right. Well, I wasn't aware actually.

THE COURT: Okay. All right. Go ahead, Mr. Kelly.

MR. KELLY: And, Your Honor, I apologize, I don't mean to beat a dead horse on this, but the respondent did file, on his status report, an exhibit including an e-mail from me where I did explain to him that Mr. Eades is available.

And I spoke with Mr. Eades personally as well and he informed me that respondent actually reached out to Mr. Eades to set up that visitation. So respondent is absolutely aware that Mr. Eades is available for visitation.

THE COURT: All right.

MR. ROJAS: And clarifying that, Your Honor, if I may.

THE COURT: Yes. And then I'm going to issue a couple of interim orders.

MR. ROJAS:  On March 15th I contacted Mr. Eades.  He was on vacation.  I testified saying that this Court had actually requested him to supervise our visitations, he was on vacation and again, he said, I'm not available.  I'm not sure how much it's going, you know, it's going to take probably all three parties to come in independently.

When I asked how much he charges he said it was $100 per hour.  Of course, I can't afford more than $1,600 a month, that would have been ridiculous, so that's why I actually submitted my appeal to the decision and also the status report and it was confirmed, again by the petitioner, that he was not available to render his services.

THE COURT:  All right.  Give me just a moment here.  The Court is going to treat this case, from this point forward, as an allocation of parental responsibilities case.

I'm going to find that Mr. Motter has standing in this matter pursuant to the statute, 14-10-124.

I'm very aware of the history in this case and the fact that this little girl has just suffered an enormous loss and I want to be very, keep that foremost, this little girl's best interests.

I'm not going to move her right now.  I'm going to keep everything, I'm going to maintain the status quo pending further hearing because this is a home where she's been for many, many years and she clearly is attached to her home and her community

8

and school.

And we have a father who we needs= to address his due process rights also.

I can't make any Troxel findings or anything. Today, this is just, these are really temporary orders that the Court is issuing under 14-10-128.

I do have Ms. Baker's expressed desires that came in her will and in her appointment of temporary guardians. She's followed, the proper procedures have been followed. The Court has pending the petition for confirmation of appointment of a guardian pursuant to 15-14-202, subsection 6.

So I'm going to issue, today, a case management order. And we'll set this matter for a permanent orders hearing. The orders issued today would be temporary orders.

The Court has already said the order appointing Mr. Eades remains valid, so father has the ability to begin to exercise parenting time.

And the Court, on its own motion, is going to appoint a CFI. So I will give the parties -- Mr. Kelly, I'm not sure if your intention was to file a motion for APR at this point. I've granted standing to your client.

MR. KELLY: Right, Your Honor. And I think now that standing has been granted, there would be no need to pursue trying to get temporary or permanent guardianship. I think that was a mere avenue to get to the APR.

9

THE COURT: And I think that was procedurally the correct way to appear, but having given it as much thought as I could, I think the, at this point it becomes an APR and that will be the best way for the DR case to issue the orders regarding the child's status.

MR. KELLY: We would certainly agree with that, Your Honor.

THE COURT: Okay. So I would expect, then, that Mr. Kelly you'll be filing a petition for APR.

MR. KELLY: Yes, Your Honor.

THE COURT: Okay. And I'll give the parties two weeks to each submit three names for a CFI. If you agree on somebody, great if there's somebody that both of you list, otherwise, the Court will review the submissions from the parties and either pick one of them or the Court will retain discretion to pick somebody that maybe neither of you know. But I have several people that I think would do an excellent job, but I want to give you all the opportunity first to see who you would like.

So, you know, rather than setting for permanent orders at this time let me change that a little bit. Let's do another status conference in about 30 days and make sure that we've got a CFI on board and I think then we can, we'll have a more realistic idea of when we'd be setting for a hearing.

MR. ROJAS: Your Honor, I would be happy if the Court sets its own CFI because we've already had one CFI investigation

10

report submitted on the 20th of December.

THE COURT:  It's been a while.

MR. ROJAS:  It's been a while, yes.

THE COURT:  Yeah.

MR. ROJAS:  At that time, quite a few findings and recommendations by the CFI were completely dismissed by the Court and that was the main reason why I'm still being supervised, you know, my visitations with my daughter.

Now I'm just trying to understand as to whether or not I'm going to have any access to my daughter because realistically, she not only lost a mother, she lost a father since this case became, the onset.  I have not seen or had contact with her for over 27 months.  And the fact that when she was sexually assaulted and sexually abused and so forth, not to have any contact with her, being able to support her, that was extremely painful.  And I imagine that you would understand my feelings.

THE COURT:  I understand that you haven't seen her in a long time.  You do have the ability to see her.  The Court's orders have provided a method for you to exercise parenting time with your daughter.

MR. ROJAS:  Your Honor, but the thing is that the petitioner never complied with the orders.  I mean I've submitted enough evidence and proof about it.  And so if the Court (not audible), I would like to request supervision because they are

11

providing therapy.  We have been to an intake.  We did two visitations and the petitioner terminated that at whim.  It wasn't any particular reason.  So unless --

THE COURT:  Mr. Rojas, I'm interested in moving forward here.  This child deserves to have her father in her life.  She deserves stability and emotional security.  I'm not going to change any orders today regarding visitation.  I think the Court has issued an appropriate order in that regard.  So we need to move forward and not keep looking back.

All right.  Let's look for a time we can do a status conference.  June 20th at 8:00 a.m. for 30 minutes.

MR. KELLY:  Your Honor, both myself and Mr. Motter are out of the state that week.

THE COURT:  All right.  Let's look for --

MR. KELLY:  The following week though, it's my understanding, might work.

THE CLERK:  June 29th (not audible).

MR. KELLY:  That works for petitioners, Your Honor.

MR. ROJAS:  Has the Court received the report from Jefferson County Human Services or Social Services?

THE COURT:  I have.  And I will file that and make that available to both parties.

THE CLERK:  (Not audible).

THE COURT:  Did that clear?

THE CLERK:  Yes.  June 29th at 8:30.

12

MR. KELLY: That works for petitioners, Your Honor.

THE COURT: All right. Thank you. And as soon as we receive a petition for APR, then we'll issue the case management order.

MR. KELLY: And I'll file that this week, Your Honor.

THE COURT: Okay. Very good. All right. Anything else today?

MR. KELLY: Your Honor, just briefly, one other issue. With the prior JV case I don't have access to it online because they're not uploaded online. I was hoping to get the Court's permission to have access to that file just to help better prepare for future hearings and so forth.

THE COURT: I think that's reasonable. I'll grant you access to that.

MR. KELLY: Thank you, Your Honor.

THE COURT: And we'll include that in the minute order. And if you wouldn't, well, okay, I don't think that we need another order for today, it will be reflected in the minute order. That will be the Court's, constitute the Court's order for today's hearing and we'll go from there.

And can I ask how Roslyn is doing?

SPEAKER: She's doing okay, Your Honor. She's in counseling. The counselor says that she's doing well with it. She's still pretty numb. She's not really, I don't think she's really come to full grips that her mother is gone. So she's

13

still, she's doing well in school.  She made honor roll.  She's doing sports.  Just kind of doing her thing, but I can tell she's still not fully processed the whole thing.

THE COURT:  Yeah.  It will take time.

SPEAKER:  Yeah.

THE COURT:  Okay.  All right.  Thank you all for appearing today.  The Court will be in recess.

(WHEREUPON, the digitally recorded proceeding concluded.)

14

TRANSCRIPTIONIST'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

DATED this 24th day of August, 2017.

/s/*Kristie R. Karol-Chik*
Kristie R. Karol-Chik
Court Transcriber

DISTRICT COURT
JEFFERSON COUNTY
STATE OF COLORADO
100 Jefferson County Parkway
Golden, Colorado 80401

MYRIAM LANTHER BAKER,
Petitioner,

and

ALBERTO ROJAS, JR.,
Respondent.

^FOR COURT USE ONLY^

Case No. 16 DR 1911
Division 10

For the Petitioner:

For the Respondent:

The matter came on for hearing held on December 12, 2018, before the HONORABLE ANN GAIL MEINSTER, Judge of the District Court, and the following proceedings were had.

(Recorded and Transcribed)



EXHIBIT K

4

PROCEEDINGS

(Recording starts in the middle of a sentence.)

THE COURT:  And can set this matter over for Mr. Rojas to obtain counsel.  And we are proceeding today on the permanent protection order.  Mr. Kelly.  Each party has one-half hour to present their case.

MR. KELLY:  Thank you, Your Honor.  I just want to note before we begin, so we did have two witnesses initially scheduled today.  Ms. Elizaldi, who is Mr. Motter's branch manager, had something some up and she is no longer able to testify, so we do just have Mr. Motter here today.

THE COURT:  All right.

MR. KELLY:  So we would like to call Mr. Motter.

THE COURT:  All right.  Good afternoon.  If you could please step up there and face me and raise your right hand.

ERIC MOTTER

was called as a witness on behalf of the petitioner Motter and having been sworn, was examined and testified as follows:

THE COURT:  Thank you.  Please have a seat.  There are cups and water are there to your right.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

BY MR. KELLY:

Q    Good afternoon, Mr. Motter.  Could you please state your full name and spell your last name for the record?

2

INDEX

PAGE

WITNESSES:

FOR THE PETITIONER:

ERIC MOTTER

Direct Examination by Mr. Kelly            4
Cross-Examination by Mr. Rojas            30
Redirect Examination by Mr. Kelly         44

FOR THE RESPONDENT:

ALBERTO ROJAS, JR.

Direct Examination by Mr. Rojas          47

5

A    Eric Motter, M-o-t-t-e-r.

Q    And what is your relationship to this domestic relations proceeding?

A    I'm the stepfather and the legal guardian.

Q    And what are you asking the Court for today?

A    I am asking for a permanent restraining order.

Q    Okay.  And against who?

A    Mr. Rojas.

Q    Okay.  And just for the record, who is Mr. Rojas in this proceeding?

A    He's the biological parent of Roslyn.

Q    Okay.  Mr. Motter, were you present for permanent orders in May of this year?

A    Yes, I was.

Q    Okay.  And do you recall what the Court ordered with respect to Mr. Rojas's contact and visitation with the minor?

A    Yes, I do.

Q    Okay.  And what did the Court order?

A    They ordered that the only interaction would be through therapeutic supervised visitation.

Q    Okay.

A    That was the only communication that was supposed to go on between him and Roslyn.

Q    Okay.  And what did the Court order with respect to Mr. Rojas's contact with you?

A     That communications would continue through Talking Parents and was to be limited to setting up visitation, other than me sending a weekly update on how Roslyn is doing.

Q     And have you sent weekly updates since permanent orders in May?

A     I have.

Q     Okay.  And how often does Mr. Rojas respond to those weekly messages?

A     It depends what you mean by respond.  He doesn't respond in the sense of addressing Roslyn other than to make threats to me or be verbally abusive.  He doesn't do things like saying, you know, how is she doing in sports now or, you know, how's she doing with, is she enjoying school.  I mean there's no, it's nothing focused on Roslyn other than continuously making these threats that I'm traumatizing her.

Q     Okay.  And have you noticed, since permanent orders in May, has there been any change in tone from Mr. Rojas's communications with you over time?

A     Yes.

Q     Okay.  How would you describe that change?

A     I would say they've become more aggressive and threatening.

Q     Okay.  And Mr. Motter, would you please turn to Petitioner's Exhibit 2 there on the desk.  We're going to go a little bit out of order here with the exhibits.  Do you recognize

3

INDEX (CONTINUED)

EXHIBITS                                         IDENTIFIED        ADMITTED

FOR THE PETITIONER:

| 1 | Facebook Messenger Message to Minor Child Bella | 9 | 10 |
| 2 | Talking Parents Transcript 10-28-18 to 11016018 | 6 | 8 |
| 3 | Talking Parents Transcript 11-26-18 | 19 | 19 |
| 4 | Denver County Court Summons and Complaint | 21 | 22 |

FOR THE RESPONDENT:

| A | Court Orders 5-17-18 | 31 | |
| B | Correspondence (Only Page 1 Admitted) | 31 | 32 |
| C | Sheriff's Documentation (Only Pages 1 and 2 Admitted) | 39 | 40 |

7

this document?

A    I do.

Q    Okay.  And what is it?

A    This is a transcript from Talking Parents.

Q    Okay.  And I know that we're obviously not looking at a computer screen here, is this a fair and accurate copy or depiction of the transcript of the messages between you and Mr. Rojas from October 28th of this year through November 16th of this year, 2018?

A    Yes, it is.

Q    Okay.

MR. ROJAS:  Objection, Your Honor.

THE COURT:  Yes.

MR. ROJAS:  This report is incomplete.  It doesn't have the record of all of the communication that Mr. Motter has had with me since May 1st.

THE COURT:  Mr. Kelly.

MR. KELLY:  And, Your Honor, we're not presenting this, we're not admitting this exhibit as a complete record of all communications between Mr. Motter and Mr. Rojas, we're presenting this specifically for the purpose of highlighting a couple of communications from Mr. Rojas to Mr. Motter that have been threatening and that have violated the Court's order with regard to communications.

MR. ROJAS:  Well, Your Honor, if the Court pleases, I

8

can actually get the copies and submit them to you of all of the communications that we have had because Mr. Motter has been in contempt of court several times.

THE COURT: You're entitled, of course, to cross-examine on this. And if you have messages you want to present to me during your direct, you may do that, but I will overrule the objection --

MR. ROJAS: Unfortunately, I do not have the messages, but I do have the dates.

THE COURT: When you're testifying, you can testify about that.

MR. ROJAS: Okay.

THE COURT: Go ahead, Mr. Motter.

MR. KELLY: So, Your Honor, I would just, I would move to admit Petitioner's Exhibit 2 into evidence.

THE COURT: Exhibit 2 will be admitted.

Q    (By Mr. Kelly) Mr. Motter, could you please read the first highlighted message from November 9, 2018, at 10:36 a.m.?

A    It says it runs in the genes. I heard you continue traumatizing her and your daughter. The warning still stands. It would be best if it is not true.

Q    And do you know what Mr. Rojas is referring to when he says that you're continuing to traumatize your daughters?

A    I have no clue whatsoever.

Q    Okay. Did you interpret this message as a threat?

9

A    I did.

Q    Okay. And now I would like to bring your attention to what's been marked Petitioner's Exhibit 1, and do you recognize this document?

A    I do.

Q    Okay. And what is this?

A    This was a message that my daughter, Bella, forwarded to me from her messenger account.

Q    Okay. And again, I know we're looking here at a screen shot instead of a physical, you know, electronic device, but --

MR. ROJAS:  I object, Your Honor. This case has no relevance whatsoever. This message has no relevance in proving that I am actually threatening Mr. Motter.

THE COURT:  So the basis of your objection is relevance; is that right?

MR. ROJAS:  Well, yes, because this girl has no --

THE COURT:  I'm just trying to clarify that. You have to have an evidentiary basis for an objection, so I'm just clarifying that relevance is your objection.

MR. ROJAS:  Correct.

THE COURT:  Okay. Mr. Kelly.

MR. KELLY:  So, Your Honor, one of the grounds for issuing a temporary and permanent protection order is stalking, is to prevent stalking. And what this exhibit and this message demonstrates is that Mr. Rojas has gone out of his way to go

10

beyond the Court's orders and to stalk Mr. Motter by actually doing his own research on where his daughters go to school and has actually taken the steps to contact Mr. Motter's daughters, in this case it's Bella, his daughter from a previous marriage, who has nothing to even do with this proceeding.

So it's a demonstration of his increasing efforts at stalking Mr. Motter.

THE COURT:  Okay.  Overruled.  He can answer.

MR. KELLY:  And so, Your Honor, I would move, actually, I guess I should, I think I was interrupted during the foundational question.

Q    (By Mr. Kelly) Mr. Motter, is this a fair and accurate representation of the message that you personally witnessed from Mr. Rojas?

A    Yes, it is.

MR. KELLY:  Okay.  Your Honor, I would move to admit Petitioner's Exhibit 1.

MR. ROJAS:  I move that it's dismissed, Your Honor, because it has --

THE COURT:  You're objecting to the admission of the evidence?

MR. ROJAS:  Right.

THE COURT:  Overruled.  Exhibit 1 will be admitted.

Q    (By Mr. Kelly) Mr. Motter, could you please read the message sent by Mr. Rojas to your daughter, Bella?

11

A    Hi Bella.  I'm aware that you have been told I am a crazy madman, but rest assured, it is not true.  I have spoken with your mom and your step sister, Alex.  Unfortunately, I believe they are worried they might get in trouble if they help me.  I just want to know how Roslyn is doing, feeling and if she is well.  Your dad told me she stated she does not want to see me and I believe she has been lied to.  Please let her know that I miss her and I think about her daily.  I have tried just about everything in ensuring justice is served, but I keep hitting roadblocks.  It is a very long story.

Just know that I wish I could have had Roslyn even before her mom passed.  I am not sure why your dad wants her.  And knowing his past, many people do not want to work with us setting up visitations.

I believe you might be 15 by now.  I hope you and Ros are doing well.  And again, just let her know I love and miss her tremendously.

I sent her a birthday card via the Court, but I assume they never sent it to her.  In the past, any mail I have sent to her has been intercepted either by your dad or Myriam.

For your information, I teach criminology and criminal justice courses at the University, so if I was a criminal, I would never be doing so or working with youth.  I think it's supposed to be, it says lumia, but look me up on Google and you'll see my profile.

12

I don't know what your dad will do if he finds out I contacted you, but I have the law enforcement and judicial people looking into this case.  Everything takes time and the courts are incredibly wasteful of time.

My full name is Alberto Rojas, Jr.  Be and stay safe.  And thank you for giving Roslyn my message.

Q    Mr. Motter, is Bella involved in this proceeding in any way?

A    Until this message, no, she was not.

Q    Does Bella have any connection to Mr. Rojas other than that Bella is Roslyn's sister?

A    No, none.

Q    And the Facebook account that Mr. Rojas contacted Bella through from this exhibit, was this Bella's general Facebook account?

A    No.

Q    What kind of an account was it?

A    Apparently, it's an account they use, a messenger account they use at the high school for the members of the student government to communicate with each other.

Q    And do Roslyn and Bella go to the same school?

A    They do not.

Q    Okay.  How did Mr. Rojas find out about this account?

A    I have no idea.  I didn't even know about it, but I wouldn't.  And like I said, the student government uses it for

13

coordinating their own activities at the school, so I had no idea about it. I can only guess that through an exhaustive search of some type.

Q    And does this communication concern you personally or as a parent?

A    Extremely.

Q    Why is that?

A    For a number of reasons. One, the fact that he is contacting my 15-year-old daughter is troubling. Also, that he is doing it through a school account while she's in high school --

MR. ROJAS:  Objection, Your Honor. There's nowhere in that Facebook account that says that it belongs to a high school. It's under Bella Motter, that's it.

MR. KELLY:  And, Your Honor, I can ask a foundational question.

THE COURT:  All right.

Q    (By Mr. Kelly) Mr. Motter, how do you know that this was a school-based account?

A    Because Bella informed me that it was because I normally don't have her on --

MR. ROJAS:  Objection, that's hearsay, Your Honor.

THE WITNESS:  I normally don't have her on, either of the girls on media.

THE COURT:  If you want to respond to the hearsay

14

objection.

MR. KELLY:  Well, Your Honor, I think here it's really, we don't have a situation where it's an out-of-court statement offered to prove the truth of the matter asserted.  It's an identification issue.  It's Bella simply identifying, you know, what kind of Facebook account this is.

If you would like, I can ask some further foundational questions.

THE COURT:  I agree it's not hearsay if it's not being offered for the truth of the matter asserted, but I think some additional foundation would still be helpful.

MR. KELLY:  Okay.

Q    (By Mr. Motter) Mr. Motter, do you monitor your kids' Facebook accounts in any way?

A    They don't have Facebook accounts that I am aware of.

Q    Okay.

A    I don't like them being on social media at this point.

Q    So Bella does not have a general Facebook account to your knowledge?    .

A    Not to my knowledge.

Q    Okay.  And then, okay, so moving on, Mr. Motter, if we can go --

A    I just wanted, if I could, I wanted to add that the other thing that really bothered me about this communication was the fact that, well, number one, he's attempting to circumvent

the Court's orders again.  And that he is also trying to draw my 15-year-old daughter into --

MR. ROJAS:  Objection, there's no order whatsoever preventing me from contacting anybody on Mr. Motter's ex-family. In fact, Mr. Motter engaged in witness tampering.

THE COURT:  That's not an evidentiary objection.  You can testify to that or include that in your closing argument.

MR. ROJAS:  Thank you.

THE WITNESS:  And to clarify, I'm referring to the communication with Roslyn outside of therapeutic, supervised visitation.

Q    (By Mr. Kelly) Mr. Motter, if you can turn back to Petitioner's Exhibit 2, and with this having already been read into evidence, kind of trying to follow a timeline here, so we had the Facebook communication, and again, do you recall what date that was, the Facebook communication?

A    The one we were just discussing?

Q    Yes.

A    No.

Q    Let me ask you this, was it within the past 30 days?

A    Oh, yes.  Yes.

Q    Okay.

A    It was, I'm pretty sure it was around the week of Thanksgiving, around that time.

Q    Okay.  And then going on to Petitioner's Exhibit 2, if

you could read the second highlighted passage, the one that is time stamped Alberto Rojas on 11-16-2018 at 5:08 p.m.

A    As I stated before, this case is not over.  You will pay the consequences for your predatory behavior and any emotional harm that you may be causing Roslyn.  If I have any, which is capitalized, confirmation that you have done anything to Roslyn, you will find out who I am.  You must be feeling like Trump, I am closing in on you.

Q    Mr. Motter, did you interpret this as a threat as well?

A    Most definitely.

Q    And since this message on November 16th, have you experienced any intimidating or threatening behavior from Mr. Rojas?

A    I have.  A number of harassments have continued, to include my branch manager from work called me the day before Thanksgiving to notify me that the previous day Mr. Rojas walked into her office posing as a private investigator and started asking questions about --

MR. ROJAS:  Objections, this witness is not present.  It's hearsay, Your Honor.

MR. KELLY:  And, Your Honor, certainly here, I think, I would ask Mr. Motter not to get into any specifics, but I do believe that the simple notification from Mr. Motter's boss to Mr. Motter regarding a work issue is a verbal act.  I think Mr. Motter can certainly testify to the fact that that is a part

of kind of protocol when there is a complaint received against an employee to then notify that employee.

And so I think, you know, there's no way to really describe that notification without, you know, some statement, but I think that the real intent of it is a verbal act and not a description.

MR. ROJAS: Again, it falls under the category of hearsay, Your Honor.

THE COURT: I think he can probably answer in a way without directly quoting as to what the end result was of that conversation with the employer.

Q   (By Mr. Kelly) So, Mr. Motter, without kind of giving any statements that you heard from Ms. Elizaldi, and just to clarify, who is Ms. Elizaldi?

A   Yes.

Q   I'm sorry, who is she?

A   She is the branch manager for GenEx.

Q   Okay.  And you stated that she gave you a call, correct?

A   She did.

Q   Okay.

A   She wanted to notify me that Mr. Rojas had been in the office and that there was questions about me, my employment, as well as some, him basically making some accusations.

Q   Okay.  And so after, so what was the overall result of

18

that activity?

A    Well, she had to notify HR, of course, human resources, because of this incident.  And then as I said, we discussed it.  And then there was also some policy changes regarding safety in the office.

Q    Okay.  And did hearing the news that Mr. Rojas had made a visit to your workplace concern you?

A    Extremely.

Q    And why is that?

A    Well, first of all, there's no way for him to have known whether or not I was going to be in the office at that time, which is concerning, what would have happened if I had been in the office, I have no idea.

And I can only see, since my work has nothing to do with the custody aspect of this case, I can only see it as a malicious attack on my person.

Q    All right.  And, Mr. Motter, I would like to next --

MR. ROJAS:  Your Honor, I would like to object.

THE COURT:  Do you have an evidentiary objection?

MR. ROJAS:  I have an objection.  The witness is just speculating and is working on a hunch.  There's nothing to corroborate.

THE COURT:  Okay.  I think is objection is speculation --

MR. KELLY:  Your Honor, I don't believe the witness was

19

speculating. I asked Mr. Motter why he was concerned and he answered why he personally felt that he was concerned. He is not speculating on someone else, he's talking about his own feeling.

THE COURT: And I didn't hear anything about a future event. Overruled. He can answer.

Q    (By Mr. Kelly) Mr. Motter, if you could turn to Petitioner's Exhibit 3, and do you recognize this document?

A    Yes, I do.

Q    And what is this?

A    This was, this is a screen shot from a message I sent to Mr. Rojas through Talking Parents.

Q    Okay. And is this a fair and accurate copy of the communication between you and Mr. Rojas on Talking Parents?

A    Yes, it is.

MR. KELLY: Your Honor, I would move to admit Petitioner's Exhibit 3 into evidence.

THE COURT: Any objection?

MR. ROJAS: No, Your Honor. And actually, this is very accurate.

THE COURT: All right. Exhibit 3 will be admitted.

Q    (By Mr. Kelly) Mr. Motter, can you read your message to Mr. Rojas on November 26, 2018? This is the one that's time stamped at 10:27 a.m.

A    Yes. It says is your address still 3848 King Street, Denver, 80211? Need to confirm for paperwork.

20

Q    And why did you send this message to Mr. Rojas?

A    Because we had just been here for the temporary restraining order hearing and I needed to make sure that I had an accurate address in order to present that paperwork to Mr. Rojas.

Q    Okay.  So you had sent this message after that temporary protection order was already issued.

A    That is correct.

Q    Okay.  And then can you read Mr. Rojas's response to this inquiry regarding his address that he sent to you on November 26th?  It's time stamped 11:05 a.m.

A    It says you need to inform the Court that you are not willing to secure a supervisor as the woman you picked is not responding to inquiries.  If you do not inform the Court, I will file criminal charges against you and it will not be at the same courtroom.  Witnesses claim that you are still traumatizing my daughter.

Q    And do you feel, did you feel threatened by this message as well?

A    Yes, I do.

Q    And why?

A    Because it is again threatening in nature.  He is perseverating on this idea that Roslyn is being traumatized.  And the fact that it's completely unprovoked, I simply asked for an address and this is often how, the type of messages I get back on Talking Parents are verbal attacks or threats that are completely

21

unprovoked.

Q    And, Mr. Motter, I would like to next point you to Petitioner's Exhibit 4, and do you recognize this document?

A    I do.

Q    And what is this?

A    This is a summons for me, though I was never actually, it was never actually presented to me.

Q    Okay.  And is it, the summons there on page 1 and the other documents starting on the second page, do you recognize that?

A    Yes.  It's basically a complaint that Mr. Rojas has filed regarding malicious prosecution and wanting to sue Cindy and I.

Q    Okay.

MR. ROJAS:  Your Honor, I object to this exhibit because actually, due to the legal clerk downstairs in this building, she gave me the wrong information, so an amended complaint is going to be filed tomorrow.

THE COURT:  You can note that.  That's not an evidentiary objection.  Go ahead, Mr. Kelly.

Q    (By Mr. Kelly) And Mr. Motter, is this a, to your knowledge, a fair and accurate copy of the summons and complaint that was filed in Denver County Court case 18C00881?

A    Yes.

MR. KELLY:  Your Honor, I would move to admit

22

Petitioner's Exhibit 4 into evidence.

THE COURT:  Any objection?

MR. ROJAS:  I object because it's not an accurate report or complaint.

THE COURT:  That wasn't --

MR. ROJAS:  The new one will be filed tomorrow.

THE COURT:  Do you acknowledge that this was filed?

MR. ROJAS:  It was filed.

THE COURT:  Okay.  I'll admit that and note for the record that an amended complaint is being filed.

Q    (By Mr. Kelly) And, Mr. Motter, I think you stated briefly earlier, but what claim has Mr. Rojas made against you in this complaint?

A    Well, a number of them.  He's going on about the last three years and about making groundless accusations against me that he, his reputation has been damaged and --

Q    And then just in general, what is the title of the claim against you?  What kind of claim is it?

A    Malicious prosecution.

Q    And has he asked the Court for damages against you and Ms. Schippert?

A    Yes, $15,000 from each of us.

Q    Okay.  And was this, to your knowledge, was this filed before or after Mr. Rojas was served with the temporary protection order?

A    Okay --

MR. ROJAS:  Your Honor, this is, I object again as to this exhibit primarily because it has nothing to do, again, with the temporary restraining orders.

MR. KELLY:  And, Your Honor --

THE COURT:  So it's not relevant?

MR. ROJAS:  It's not relevant.

THE COURT:  Mr. Kelly.

MR. KELLY:  Your Honor, so one of the grounds for making a temporary protection order permanent is evidence that the respondent or defendant is unlikely to stop taking actions to intimidate or retaliate against the protected person.

Here, Mr. Rojas was served with a, the evidence shows that Mr. Rojas was served with a, the temporary protection order and then he immediately went to county court and filed what is, even to his admission now, not a valid complaint.  So it's showing that he, you know, he is taking this action that the Court has done and is further intimidating and retaliating against Mr. Motter.

MR. ROJAS:  And in response to that, Your Honor, the citation does not show any charges nor does it mention any charges as to why this temporary restraining order was issued.

THE COURT:  I think it's relevant to the factors the Court needs to consider in whether to issue a permanent protection order.

Q    (By Mr. Kelly) Mr. Motter, do you believe that the filing of this complaint was designed to intimidate or retaliate against you?

A    I do.  I feel that, personally I feel that it was malicious in nature.

Q    Mr. Motter, do you recall when we were initially set for this permanent protection order hearing?

A    Excuse me?  Say it again.

Q    Do you recall when we were initially set for this permanent protection order hearing?

A    Yes, I do.

Q    Okay.  When was that?

A    That was last Thursday.

Q    Okay.  And since that date, have you experienced any other concerning activity by Mr. Rojas?

A    Yes, I have.

Q    Okay.  What happened?

A    I was contacted by a Jefferson County Deputy, and I believe it was Deputy Medlin, and he called to notify me that Mr. Rojas was, had called in a complaint against me and was seeking criminal charges that I was violating the permanent orders issued by this Court and, well, that was it.  He wanted me arrested because I was violating it.

Q    And do you remember what day that was that you got that call?

25

A    Yes, that was last Thursday.

Q    So that was immediately after the hearing here?

A    Within, I was actually, left the courthouse here, went straight home and was getting the call from the deputy by the time I was pulling into my garage in Conifer, so it was pretty fast.

Q    So that was last Thursday, I'm trying to do the math here, I believe the 6th, so did anything happen after that date, after December 6th?

A    Yes.

Q    Okay.

A    Well, I had December 6th where I had to do a number of interactions with the deputy and get additional information to him and then get ahold of him again, so it took a big chunk of my workday out.

And then the next day, I was contacted by Roslyn, while she was at school, to notify me that she had just had to meet with the deputy at the school.

Q    And was Roslyn upset when she called you?

A    Yes, she was very upset --

MR. ROJAS:  Hearsay, Your Honor.

MR. KELLY:  And, Your Honor, I would argue excite utterance.

MR. ROJAS:  That's hearsay again.

THE COURT:  It's an exception to the hearsay rule.  You

26

have to lay more foundation.

MR. KELLY:  Okay.

Q    (By Mr. Kelly) When you say that Roslyn was upset, can you kind of describe how she sounded?

A    Her voice was uneven.  She was shaken.  She was going on and on about getting called in by a deputy again and how constantly, you know, we have deputies even coming to the house or to her school.

Q    How often does she call you when she's at school?

A    Oh, very rarely, only if she's like sick.

Q    Okay.  All right.

MR. ROJAS:  Your Honor, for time purposes, he's already used 30 minutes and I --

THE COURT:  Not yet.

MR. KELLY:  Your Honor, I --

THE COURT:  He's got about three or four more minutes.

MR. KELLY:  So, Your Honor, I would ask that Mr. Motter be allowed to state briefly what Roslyn had told him.

THE COURT:  I'll find it's an excited utterance.  It qualifies.

THE WITNESS:  She informed me that the deputy had been asking her questions.  That he actually brought up that we've been in court previously and that her dad was seeking criminal charges against me.  And he asked her basically, you know, why would you think this is going on that your dad would be

27

contacting me.  And she denied that there was anything going on in the home that was, you know, threatening to her in any way, shape or form, but that --

MR. ROJAS:  Hearsay, Your Honor.  Again, we don't have the child to testify here.

MR. KELLY:  I think we can move on from this subject.

THE COURT:  All right.  I'll sustain that objection. We can move on.

Q    (By Mr. Kelly) Mr. Motter, so after this incident, this was on Friday of last week, how was Roslyn behaving over the weekend?

A    Moody.  Troubled.

Q    Can you kind of describe what she was doing or how she was acting moody or troubled?

A    The best term I could use is just acting out.  She was just in a bad-mood.  Upset.  Very easily emotionally triggered.

Q    And did you ask her why she was acting out or what was wrong with her?

A    I did.

Q    Okay.  And when you had this conversation, how, was Roslyn upset?

A    Yeah.  It actually got to a point where she was crying and I came and I asked her, you know, what's going on, can you help me understand what's going on and then that's when what she told me was my dad is getting in my head.

28

MR. ROJAS:  Hearsay.

MR. KELLY:  And again, Your Honor, I would say, the witness has testified that she was actually crying at this point, I would say excited utterance.

MR. ROJAS:  Hearsay again.

THE COURT:  Overruled.

Q    (By Mr. Kelly) All right.  Mr. Motter, do you feel like you need a permanent protection order against Mr. Rojas?

A    Yes, I do.

Q    Okay.  And would you like, are you asking the Court today to continue the same terms in the temporary protection order and to make those permanent?

A    Basically, with a small exception to it.

Q    Well, when you say small exception to it, do you mean an exception to the protection order itself or essentially additional orders?

A    Additional orders, yes.

Q    Okay.  And so what other orders are you asking the Court to make today?

A    I would request from the Court that we can get a no-contact order for my daughter, Bella, so that I can present it to the school so that he can't continue to involve her in any of this.

Q    And then what about anything, any changes that you're asking for with respect to the weekly updates to Mr. Rojas?

A    As far as the weekly updates, weekly updates are really difficult because we have routine lives, get up, go to school, come home, do homework, we have dinner, watch a show together and then do it again the next day, so there's very little change on a weekly basis.  And grades are once every three months and there's no sports right now, so there's very little to report.  And part of the problem has been I don't get any questions or anything directed about Roslyn from Mr. Rojas, all I get is he uses Talking Parents as a platform for launching personal, verbal attacks and threats on me at this point.

MR. ROJAS:  Your Honor, it's 34 minutes already.

MR. KELLY:  And, Your Honor, just one final question, if I could.

THE COURT:  Go ahead.

Q    (By Mr. Kelly) Mr. Motter, are you asking for any change in the visitation, you know, the Court's permanent orders with respect to visitation by Mr. Rojas?

A    Yes, I am.

Q    Okay.

A    I'm very concerned because of the history and demonstrated irrational behaviors and the perseverating on issues, the threats, that I feel unsafe with the idea of being at an appointed time and place that is known to him ahead of time. I feel that presents (not audible) to me and anyone else who is there, including Roslyn, the therapist or Bella if she was with

30

me and I just don't feel safe going anywhere where (not audible) going to be, especially after walking into my place of business like that.

MR. KELLY:  All right.  Your Honor, I don't have anything further of Mr. Motter.

THE COURT:  Okay.  Mr. Rojas, any cross-exam?

MR. ROJAS:  If you don't mind, can I call a witness that's on standby, she's out of state and she's going to testify and then later on I would like to come back to Mr. Motter.

THE COURT:  Let's finish with Mr. Motter and then we'll call your witness.

CROSS-EXAMINATION

BY MR. ROJAS:

Q    Mr. Motter claims, or you claim, Mr. Motter, that you keep me on an updated basis about my daughter's whereabouts and yet this Court has said specifically that you're supposed to provide weekly updates, okay, so --

MR. ROJAS:  Your Honor, may I approach the bench with exhibits?

THE COURT:  Yes.

MR. ROJAS:  Mr. Kelly has a copy.  Each exhibit is stapled individually.

THE COURT:  Are you handing them to the witness?

MR. ROJAS:  I don't have one unfortunately.

THE COURT:  Did Mr. Kelly see these?

MR. ROJAS:  Yes, he does have them.

THE COURT:  All right.  You can give my copy to the witness to look at if you're going to question about them.

MR. ROJAS:  Exhibit A, Your Honor, are your orders issued on May 17, 2018.  And on page 2 of number 2, paragraph 2, you specifically stated that the respondent may have up to three hours of supervised therapeutic visitation with the minor every other weekend.  The supervised therapeutic visitation shall be with one of the following individuals:  Tom Nellison; Nancy Haas; and Terry James Banks, okay, so those were the three individuals that this Court had authorized.

Exhibit B is a communication that I had with Mr. Eric Kelly --

MR. KELLY:  Your Honor, I don't believe Mr. Rojas is asking the witness any questions.

THE COURT:  This is cross-examination --

MR. ROJAS:  Yes, it is, Your Honor.

THE COURT:  -- you can ask Mr. Motter questions based on what he's testified to.

Q     (By Mr. Rojas) Did you, Mr. Motter, at any time contact Nancy Haas or Tom Nellison?

A     Yes, I did.

Q     Okay.

MR. ROJAS:  Your Honor, for the record Exhibit B states, it's an e-mail that I shared with Mr. Motter --

THE COURT:  Exhibit B, the Court hasn't seen it, it has not been admitted into evidence.

MR. ROJAS:  It's not admitted into evidence?

THE COURT:  There's been no foundation laid for it. You haven't asked that it be admitted into evidence.

MR. ROJAS:  So you're going to deny me to present my exhibits?  He has a copy --

THE COURT:  Let me clarify, I didn't deny you, I said you haven't asked to admit the exhibit into evidence.

MR. ROJAS:  Will you please let --

MR. KELLY:  Your Honor, no objection to Exhibit B.

THE COURT:  All right.  Exhibit B will be admitted.

MR. ROJAS:  Exhibit B is admitted?  Okay.

Q    (By Mr. Rojas) So page number 1 on Exhibit B, there's communication by Mr. Eric Motter where it says, dated October 19, 2018, he says that Roslyn is doing well except for the fact that she is well aware that you made no attempt to even wish her happy birthday --

MR. KELLY:  Your Honor, again, I don't think that Mr. Rojas is asking questions of the witness.

THE COURT:  What is the question?

MR. ROJAS:  I am leading towards the witness --

THE COURT:  What's the question?

Q    (By Mr. Rojas) Did you not, Mr. Motter, in this particular communication, engage in attempting to traumatize me?

33

A     I did not.

Q     All right.

A     I (not audible) to inform you.

Q     Is that right?  So it says --

A     (Not audible).

Q     -- I also find it distressing that even after I reminded you of the birthday, you didn't contact her.  Is that true?  That is typically your modus operandi; is it not?

A     I'm sorry, could you repeat?

Q     Did you step out, step out of basically order on this.

A     I'm not understanding your question.

Q     You're not communicating exactly what it's supposed to do, you're making accusations that are false.

THE COURT:  Mr. Rojas, you're testifying now.  What's the question?

Q     (By Mr. Rojas) So again, with Mr. Motter, do you know what parental alienation stands for, the parental alienation syndrome?

A     Are you asking --

MR. KELLY:  Objection, relevance, Your Honor.

MR. ROJAS:  Yes.  Parental alienation syndrome is developed --

THE COURT:  Wait.  Wait.  Wait.  There's an objection to the relevance.

MR. ROJAS:  Okay.  Well, Mr. Motter has engaged, with

34

his behavior, in parental alienation and so would you admit --

THE COURT:  The question, Mr. Rojas, is why parental alienation is relevant to question of the protection order?

MR. ROJAS:  Because Mr. Motter continues to engage in misconduct and is not obeying court orders and is traumatizing the child as per witnesses.

Now, Your Honor, I'm not an expert in legal matters and I ask this Court to allow me to have a court order, court-appointed counsel.  I submitted my request, my financial affidavit have been approved, I don't understand why you have not appointed one for --

THE COURT:  I don't have the authority to appoint court-appointed counsel in this proceeding.

MR. ROJAS:  I beg your pardon.

THE COURT:  I don't have the authority to appoint court-appointed counsel in this proceeding.

MR. ROJAS:  Well, that's --

THE COURT:  What's your next question?

MR. KELLY:  Your Honor, my apologies for interrupting, I just want to clarify for the record, I did initially say no objection to Exhibit B, although now I can see that Mr. Rojas has actually labeled as Exhibit B many different kinds of communications in this packet here, so to clarify, no objection to this page 1 of Exhibit B regarding the Talking Parents communication with Mr. Motter, but I haven't had a chance to

fully evaluate the other documents in this packet.

THE COURT:  Okay.

Q    (By Mr. Rojas) So, Mr. Motter --

THE COURT:  So at this time, I'll admit page 1, Exhibit B and give you more time to review that --

Q    (By Mr. Rojas) You admit that page 1 Exhibit B is your communication with me in stating that I didn't care about my daughter.

THE WITNESS:  Are we allowed to proceed with this, Your Honor?  I'm sorry, I'm confused.

THE COURT:  Can you answer that question?

THE WITNESS:  Can I hear the question again?

Q    (By Mr. Rojas) Are you deaf?  I'm just --

THE COURT:  Mr. Rojas, look at me, Mr. Rojas, look at me --

MR. ROJAS:  Yes, ma'am.

THE COURT:  -- I will not tolerate that type of conduct in this courtroom --

MR. ROJAS:  Your Honor, you tolerated him --

THE COURT:  -- do you understand me?

MR. ROJAS:  -- insulting me by calling me an asshole the other day --

THE COURT:  Do you understand me?

MR. ROJAS:  -- May 1st.  I do, Your Honor, but --

THE COURT:  Next question, Mr. Rojas.

36

MR. ROJAS:  Okay.

Q    (By Mr. Rojas) On page 1 of Exhibit B, is that your communication with the, in the Talking Parents?

A    Yes, it is.

Q    Okay.  Are you not saying that I do not care for Roslyn, I only care for myself?

A    That is not what I said.

Q    Okay.  Will you read it for me, please?

A    Roslyn is doing well except for the fact that she is well aware that you made no attempt to even wish her a happy birthday.  She expressed to me today that you are, wait, she expressed to me today that you are, that is apparently written poorly, but you are a person she had no desire to communicate with.  This was not solicited by me.

I also find it distressing that even after I reminded you the day of her birthday, you chose not even to send her a positive wish.  Just clarifies how much this is about you and not her.

Since May, I have been sending you weekly updates and except for a time or two, you never have any questions about how Roslyn is doing.  This is just very sad.  She is doing very well.

Q    Okay.  Has your attorney, Mr. Eric Kelly, informed you about the communications that I've had with him?  Has he always informed you?

MR. KELLY:  Objection as to attorney-client privilege,

Your Honor.

THE COURT:  Those would fall under the --

MR. ROJAS:  Well, in this case, Your Honor, I just want to make sure that I state for the Court that Exhibit B, page 1A is a communication that I had with Mr. Eric Kelly, as well as the other two supervising entities, and Mr. Kelly chose not to respond --

THE COURT:  Next question.

Q    (By Mr. Rojas) Mr. Motter, how long have you known my daughter?

A    Approximately seven, eight years.

Q    Seven or eight years.  When did you first meet her?

A    If you're asking for an exact date, I don't have that off the top of my head.

Q    But what actually prompted the meeting of my daughter, you meeting my daughter?

A    Dating my wife, back when we were dating.  We met --

Q    Seven years ago, that's --

A    Somewhere around there roughly.

Q    It was around, would you say June perhaps of 2011?

A    No, it wouldn't have been 2011.

MR. KELLY:  Your Honor, I'm going to object on grounds of relevance.  I understand that in addition to the protection order we did make some requests and Mr. Motter's testimony regarding some modifications to the Court's other orders in this

case, but I think what we've asked is really narrowed to the Court's order on communications between Mr. Motter and Mr. Rojas and Mr. Rojas's parenting time or visitation with Roslyn, it has nothing to do with whether Mr. Motter has built a sufficient relationship with Roslyn to warrant parental responsibilities, the Court has already issued a ruling on that, so I would object on grounds of relevance.

THE COURT:  Mr. Rojas, I would like to see you use your time to address the issue that's specifically before the Court today and that's --

MR. ROJAS:  It goes --

THE COURT:  -- whether there are grounds to issue a permanent protection order.

MR. ROJAS:  Because it was Mr. Motter character and behavior in the past that has actually elicited my concerns about the safety of my daughter and his character in regards to his credibility.  If Mr. Motter met my daughter seven years ago, he was still legally married to his wife and his divorce was actually case number 11DR3439, it was issued on November 30, 2011.

Now Mr. Motter was still residing with his wife when he was issued an arrest, a warrant for his arrest, he was actually arrested for assault on a minor --

THE COURT:  Mr. Rojas, that's not relevant to today's hearing.  Next --

39

MR. ROJAS:  How is it not relevant --

THE COURT:  -- question.

MR. ROJAS:  -- Your Honor?  Please explain to me.

THE COURT:  Next question.

MR. ROJAS:  Okay.

Q    (By Mr. Rojas) Do you have a criminal record, Mr. Motter?

A    Not, well, I have that incident, which was an infraction --

MR. ROJAS:  Your Honor, if you look at Exhibit C.

THE COURT:  I don't have the exhibit.

MR. ROJAS:  Yes.  Look at Exhibit C, please.

THE COURT:  I don't have Exhibit --

MR. ROJAS:  I'm going to ask the Court to admit it, please, because both counsel and petitioner have a copy.

MR. KELLY:  Your Honor, I can approach.

THE COURT:  Thank you, Mr. Kelly.  Thank you.  Go ahead, Mr. Rojas.

MR. ROJAS:  Exhibit C is the People of the State of Colorado versus Eric Motter.  Mr. Motter was actually charged with assault and he pleaded guilty --

MR. KELLY:  Your Honor, I'm going to object on the grounds of relevance as to Mr. Motter's arrest record seven years ago.

MR. ROJAS:  Well, Mr. Motter is stating that he does

40

not have a criminal record and so on page 2 of Exhibit C, there's a Jefferson County Sheriff's Record Report 11-13606, for an arrest and assault against a minor and threatening his spouse. And I move for this Court to admit Exhibit C as evidence.

THE COURT:  I think I will admit the printout, but I won't admit the sheriff's report.

MR. ROJAS:  You would not?

THE COURT:  I can't admit the sheriff's report, the sheriff isn't here to verify that.  I'll admit the first two pages.  What's your --

MR. ROJAS:  Well, Your Honor --

THE COURT:  What's your next question?

MR. ROJAS:  -- the sheriff's report is direct evidence, direct evidence to the case.

THE COURT:  Not unless the sheriff is here to testify.

Q    (By Mr. Rojas) For the record, you do admit that you have a record, right, a criminal record --

MR. KELLY:  I'm objecting on the grounds of relevance, Your Honor.  I don't know what Mr. Motter's criminal record has anything to do with Mr. Rojas --

THE COURT:  I'm going to allow him, he's answered the question, let's move on.  What's the next question?

Q    (By Mr. Rojas) Have you ever physically assaulted, threatened, verbally abused, (not audible) or caused emotional harm to anybody while they have resided with you?

41

MR. KELLY:  Again, objection on relevance.  I think we're now outside of the scope of any kind of admission of a criminal record.  This is a general sort of question that's irrelevant.

THE COURT:  The issue today is whether there's grounds for issuance of a permanent protection order, what's at question is your --

MR. ROJAS:  Your Honor, I'm trying --

THE COURT:  -- threats or perceived threats by Mr. Motter to your conduct, that's the ruling the Court is going to issue in about 15 minutes.

MR. ROJAS:  What I'm trying to prove here, Your Honor, is that this individual is a criminal and you have endorsed his behavior and continue to endorse his behavior --

THE COURT:  Mr. Rojas --

MR. ROJAS:  So he has admitted already --

THE COURT:  Mr. Rojas, that's commentary.  That's testimony.  If you want to reserve time to testify, you certainly can do that, but right now please continue with your questions of Mr. Motter.

Q    (By Mr. Rojas) Have you ever been arrested for assault against a minor?

MR. KELLY:  Objection on grounds of relevance again.

THE COURT:  We've gone over this.

Q    (By Mr. Rojas) Have you ever told my daughter that I

42

don't care about seeing her?

MR. KELLY:  Objection on grounds of relevance and hearsay.

THE COURT:  Sustained.

MR. ROJAS:  It's emotional abuse.

THE COURT:  Sustained.

Q    (By Mr. Rojas) Have you ever told my daughter --

THE COURT:  No, I sustained the objection.  What's your next question.

MR. ROJAS:  This is unbelievable.

Q    (By Mr. Rojas) In the process of all this case, you have maintained your innocence about being a righteous man, but yet you just admitted that you have a minor incident in which you assaulted a minor.

THE COURT:  What's your question?

Q    (By Mr. Rojas) My question is, are you lying under oath?

A    No, I am not.

MR. ROJAS:  Um-hmm.  Okay.  That is all for now, Your Honor.

THE COURT:  All right.

MR. ROJAS:  I would like to --

THE COURT:  Any redirect, Mr. Kelly?

MR. ROJAS:  -- present my witness.

MR. KELLY:  Your Honor, I just have one very, one

question for Mr. Motter.

THE COURT:  Okay.

MR. ROJAS:  One second.

MR. KELLY:  Sure.

MR. ROJAS:  Actually, if I could just add on, Your Honor, that if the Court allows me to submit the records from the Talking Parents from the following dates, May 31st to June 8th, which took Mr. Motter nine days to inform me on updates of my daughter; July 13th to July 22nd, 14 days; August 5th to August 17th, 12 days --

MR. KELLY:  Your Honor, Mr. Rojas is testifying again --

MR. ROJAS:  -- August 24th --

MR. KELLY:  -- (not audible).

MR. ROJAS:  I'm asking to just admit this report, Your Honor.

MR. KELLY:  Your Honor, we don't have the actual communications here, I don't believe, unless I'm not seeing them --

MR. ROJAS:  And the reason that I'm bringing it up is because I need --

THE COURT:  Do you have those with you?

MR. ROJAS:  -- to file contempt of court, Your Honor.

THE COURT:  That's not part of this proceeding.  All right.  Mr. Kelly, what's your question on redirect?

44

REDIRECT EXAMINATION

BY MR. KELLY:

Q    Mr. Motter, so Mr. Rojas asked you on cross-examination about the supervised therapeutic visitation folks that were ordered by the Court, the three names essentially, did you contact all three of those individuals?

A    Yes, I did.

Q    Who did you end up choosing?

A    I ended up choosing Terry Banks because Tom Nellison said he didn't want anything to do with this case.  Nancy Haas, when I spoke to her, said she's not actually a licensed therapist, which only left Terry Banks, who is a licensed therapist, and fortunately, said she would take on the case.

Q    Okay.  And what is your understanding as far as -- well, let me ask you this, have there been any visitations set up between Mr. Rojas and Roslyn since permanent orders in May?

A    There have not.  And I can't arrange anything because the intake by Mr. Rojas has not been completed and so there is no way for me to even try and set up any visits.

MR. KELLY:  Thank you, Mr. Motter.  I have nothing further.

THE WITNESS:  Oh, and he has refused to work with Ms. Banks, so this is the second therapeutic supervisor that he's refusing to work with.

MR. KELLY:  Thank you, Mr. Motter.

45

THE COURT:  Thank you, Mr. Motter.  You can step down. And if you would just please close that exhibit book before you step down.  Thank you.

THE WITNESS:  Did you want these?

THE COURT:  No, you can just leave them right there. Thank you.

All right.  And, Mr. Rojas, you're going to call a witness?

MR. ROJAS:  Yes, ma'am.

THE COURT:  All right.

MR. ROJAS:  Can I use your phone?

MR. KELLY:  Your Honor, I would ask, I'm not sure who this witness is --

THE COURT:  Yeah, I thought you had somebody here.

MR. ROJAS:  No.  No.  No.  She's out of town.  I requested at the beginning of this hearing if her testimony, she could testify via telephone.

THE COURT:  Who is that?

MR. ROJAS:  Alex Schwartz.  She used to be formerly Mr. Motter's stepdaughter and she is related to his daughter, Bella, who is 15 years old.  They are both half sisters.

MR. KELLY:  Your Honor, I would object on grounds of relevance.

THE COURT:  What is she going to testify to?

MR. ROJAS:  Today.

46

THE COURT:  No, what is she going to testify about?

MR. ROJAS:  Um, when I contacted her, she shared with me that the child, Bella, has shared with her that Mr. Motter continues to traumatize the girls (not audible) and so forth.

And I believe that he's also engaging in predatory behavior.

MR. KELLY:  And, Your Honor --

MR. ROJAS:  So this is a witness, Your Honor, that cannot be just thrown out.

The reason for my exasperation and concern is that Mr. Motter has a pattern of predatory behavior and abuse, spousal abuse, as well as assault on a minor.

THE COURT:  Mr. Kelly.

MR. KELLY:  Your Honor, so I won't even jump into the inaccuracies of that.  I think I'll just leave it as grounds of relevance.  I don't know what that testimony, and again, it would fly in the face of multiple welfare checks that have come to nothing that have been initiated by Mr. Rojas, but even ignoring the substance of it, I don't know what relevance that would have towards today's hearing.

MR. ROJAS:  The relevance is that we have a direct witness that has spoken with the child, Your Honor, and because nobody has actually taken the time to speak with the children --

THE COURT:  That's not an issue today.  What's at issue is your conduct towards Mr. Motter.

MR. ROJAS:  Well, nowhere in any of those alleged threats did I say I'm going to come and kill you, I'm going to chop you up --

THE COURT:  Okay.  That's argument, if you want to make that argument that you can do.  I don't think the witness would be helpful today.

Do you want to testify, Mr. Rojas?

MR. ROJAS:  Yes.

THE COURT:  All right.  Come on up.  Raise your right hand.

ALBERTO ROJAS, JR.

was called as a witness on behalf of respondent Rojas and having been sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROJAS:

THE COURT:  Have a seat.  State your name for the record.

THE WITNESS:  Alberto Rojas, Jr. I'm the father (not audible) --

THE COURT:  And what would you like to tell the Court today about your position on making the temporary protection order a permanent protection order?

THE WITNESS:  Your Honor, based on law enforcement records and reports, Mr. Motter's assaulted a minor and his continuous engagement in domestic violence and abuse as per

48

witnesses, my concern is obviously for the safety of my daughter.

According to his own statement through Talking Parents, he said that my daughter stated that she does not want to see me anymore, basically, I'm the least person that she wants to see, that in itself is what is called parental alienation syndrome.

I have not seen my daughter since February 4th of 2018, Your Honor.

MR. KELLY:  I'm going to object on grounds of relevance as to when Mr. Rojas has seen his daughter.

THE COURT:  Sustained.

THE WITNESS:  Mr. Motter refused to fully cooperate with a PRE investigation that was conducted by Dr. Loizeaux. Dr. Loizeaux indicated to Mr. Motter that he needed --

MR. KELLY:  Your Honor, objection on grounds of relevance again as to the PRE report --

THE COURT:  Yeah, we've gone over all of that in permanent orders.

THE WITNESS:  Well, this is all relevant to the fact that Mr. Motter is disobeying orders.  He's continued to engage in predatory behavior --

THE COURT:  That's not the issue today.  The issue today is whether your conduct towards Mr. Motter constitutes grounds for the issuance of a permanent protection order.

THE WITNESS:  Okay.  At no time have I actually stated to Mr. Motter that I'm going to assault him, that I'm going to

49

kill him, maim him, anything like that except that the only thing that I've done is brought criminal charges against him because he has engaged in criminal activities.

Right now, at this moment, he is engaged in parental kidnapping, as well as witness tampering because he has contacted Ms. Nancy Elliot and warned her to stay out of this case.  And Ms. Nancy Elliot used to be his former wife --

MR. KELLY:  This assumes facts not in evidence.

THE WITNESS:  -- (not audible).

MR. KELLY:  And it's hearsay.

THE COURT:  It's sustained to hearsay.

THE WITNESS:  So in this case, Your Honor, if the Court pleases; I can, we can subpoena those witnesses because this is not a frivolous situation, this is a safety and the life of a child that has been placed at stake.

And, Your Honor, I already asked this Court to (not audible), according to the Office of Child Representatives, they said as soon as this Court knew about the sexual assault on --

MR. KELLY:  Objection on the grounds of hearsay, Your Honor.

THE WITNESS:  I'm making a statement, Your Honor.  As soon as this Court knew about the child sexual assault, the run away incident, the suicidal tendencies that she has, the child was legally, should have legally been appointed a guardian ad litem and you refused to do so.

The only way that we could have avoided all of this ridiculous nonsense is if --

MR. KELLY:  Your Honor, again, I'm going to object on grounds of relevance as to past issues with the PRE or the permanent orders.  Again, I don't see how this has anything to do with the protection order today.

THE COURT:  Anything else, Mr. Rojas?

THE WITNESS:  Well, for the record again, I never stated that I'm going to kill Mr. Motter, that I'm going to maim him, that I'm going to assault him, that I'm going to be at his place of work or at his house to make sure that he pays off for whatever wrongdoings he's engaging in.

The only threat that I made to him, and this is the one that I have pursued, is that I will file criminal charges against him and those are, right now, pending in Denver County Courthouse.

And the charges that were filed with the sheriff's department of Jefferson County are going to be reviewed by the district attorney for corroboration.

THE COURT:  All right.  Thank you.  Wait one minute. Mr. Kelly, did you have any questions on cross-examination?

MR. KELLY:  No, Your Honor.

THE COURT:  All right.  Then I'll give each of you about three minutes to do closing arguments.  Mr. Kelly.

MR. KELLY:  Thank you, Your Honor.  So pursuant to

51

C.R.S. 13-14-106, 1, A, on the return date of the citation, the judge or magistrate shall examine the record and the evidence. If upon such examination, the Judge or magistrate finds by a preponderance of the evidence that the respondent has committed acts constituting grounds for issuance of a civil protection order and that unless restrained, will continue to commit such acts or acts designed to intimidate or retaliate against the protected person, the judge or magistrate shall order the temporary civil protection order to be made permanent.

Your Honor, we have admitted into evidence today Petitioner's Exhibits 1, 2, 3 and 4. And particularly, if you look at Exhibit 3, you know, Mr. Rojas, on November 9th, stated to Mr. Motter, quote, the warning still stands, it would be best if it's not true in relation to Mr. Rojas's apparent belief that Mr. Motter is traumatizing the minor.

And then even more threatening, on November 16th Mr. Rojas sent a message to Mr. Motter that says if I have any, all in caps, confirmation that you have done anything to Roslyn, you will find out who I am. And then he closes that message with you must be feeling like Trump, I am closing in on you.

So certainly, I think we have, under 13-14-104.5, 1, A, 1, A, 1, you know, the issuance of a protection order to prevent assaults and threatened bodily harm.

I think certainly, this is a way that Mr. Rojas is threatening bodily harm to Mr. Motter.

52

And then additionally, Your Honor, under subsection 1, A, 5, the Court can issue a protection order to prevent stalking. And what we heard here today is that Mr. Rojas has gone out of his way to go after Mr. Motter. He's gone to his place of work and, you know, talked with Mr. Motter's branch manager. He's actually even contacted Mr. Motter's minor daughter, who doesn't have any relation to this proceeding and who goes to a different school even than Roslyn. And he contacted her through a school-based account, which itself would have taken some research to find.

And then as far as, you know, making the protection order permanent, certainly, I think we've heard testimony and evidence today that Mr. Rojas has continued to intimidate and retaliate against Mr. Motter. The filing of the civil action in Denver County Court, which Mr. Rojas even admitted today was not proper, and then in addition, literally immediately after we left the courtroom here last week, Mr. Rojas went and filed a police report in Jefferson County, which, you know, caused Mr. Motter to miss significant work time --

MR. ROJAS:  (Not audible).

MR. KELLY:  -- (not audible).

THE COURT:  Don't, Mr. Rojas, please don't interrupt.

MR. KELLY:  It certainly upset Roslyn the following day at school.

And so these are exactly the kinds of grounds that a

53

protection order is supposed to prevent. It's supposed to discourage somebody from these kind of intimidation and retaliatory practices.

So I do think we have grounds here for issuance of a permanent protection order.

And then with respect to the other requests that Mr. Motter made today regarding the Talking Parents communications, even in the snippet here that we see of Exhibit 2, you know, there's several weekly updates here, Mr. Motter on October 28th, Mr. Motter on November 2nd, Mr. Motter on November 9th, which were not, you know, responded to, at least not directly, they were only responded to via threats, so there's not a whole lot of use, I don't think, for those weekly updates at this point.

And I think as Mr. Motter testified to on the stand, it really has just operated as an avenue for further attacks.

And you can see from, you know, there's literally a statement here where Mr. Motter says Roslyn is doing great, her school did a tribute for Veteran's Day and she played the military themes in the orchestra, finished the semester with all As except for one B. And Mr. Rojas's response to that is quote, it runs in the genes. I heard you continue traumatizing her and your daughter, the warning still stands. It would be best if it's not true. Clearly, this, the Talking Parents communications have absolutely nothing to do with Roslyn. Mr. Rojas is not

54

using them to find out about how his daughter is doing.  He's using it as a tool of harassment.

So I think if we limit that to simply monthly updates where again, you know, they might be more substantive in that way because it's not just the day-to-day, Mr. Motter will have more to report.

With respect to the no-contact order with Bella, again, I think obviously that wouldn't be made necessarily a part of the protection order, but I would certainly be happy to file a proposed order.  Mr. Motter testified that he is concerned about, obviously, Mr. Rojas directly contacting his 15-year-old daughter and it would be nice for the school to have a physical copy of an order where they know that Mr. Rojas is not allowed to make contact with her.

And then finally, the request to restrict the parenting time and to make it, you know, no contact for at least now, we heard testimony today that Mr. Rojas has not used any of the parenting time that the Court gave him and instead, you know, he has filed multiple, as you can see, exhibits here today, multiple pleadings with the Court and has filed a sheriff's, you know, complaint, criminal complaint, regarding Mr. Motter violating that order when today we heard testimony that in fact Mr. Motter --

MR. ROJAS:  He's already used up his three minutes.

THE COURT:  I'll give you an equal amount of time.

MR. KELLY:  Mr. Motter contacted all three of those supervised therapists, only one was able to do the work and Mr. Rojas has not done the intake to actually set that up.

And the problem here, you know, Mr. Rojas has a pattern of not taking advantage of his visitations, so it's not necessarily a problem that he has the ability to do it if he's not going to exercise it any way, but --

MR. ROJAS:  Objection, he's speculating.

MR. KELLY:  -- the issue that we have here is now Mr. Rojas is actually using that court order as a weapon to further harass and intimidate Mr. Motter because what happened here is he took it to a sheriff's deputy who looked at it and said, well, Mr. Motter has to schedule these visitations or he has to pick the therapist and so that initiated the, you know, investigation and that's what lead to kind of, you know, the harassment and that's what lead to upsetting Roslyn in school because there wasn't something that the officer could clearly look at and say, oh, I know this person isn't right because the order right here says he's not supposed to have any contact.  So he's using it as a weapon.

And then I think, as Mr. Motter testified to, you know, given this escalating behavior here over the past month or more, it's becoming less and less safe, even the idea of Mr. Rojas being able to visit with the minor even in a supervised therapeutic visitation.

So we would ask that the Court make the temporary protection order permanent, order that the Talking Parents communications be limited to just monthly updates, order that, ask the Court to order a no-contact order regarding Mr. Rojas contacting Bella and order that Mr. Rojas shall not have any contact with the minor, Roslyn.

THE COURT:  Okay.  Mr. Rojas.

MR. ROJAS:  Your Honor, again, I testify here under oath that I've never, and the plaintiff or the petitioner does not have any proof that I have threatened him physically, that I can come to his house and actually assault him or cause any harm to him or his daughter.  He has not been able to prove that or corroborate, all he does is bring in speculations, which obviously should not stand in the court of law.

Secondly, this is the seventh, no, actually, the eighth time that this Court has engaged in violation of C.R.C.P. 97.  In Colorado, the motions for a change of judge for cause in civil proceedings are governed primarily by Colorado Rule of Civil Procedure 97.1.  This Court has refused, on several occasions, which violates such rule, and in this respect echoes cannon 3, C, 1, A of the Colorado Code of Judicial Conduct, which states that the duties of judicial office take precedence over all activities.

In performing the duties prescribed by law, the judge shall adhere to the following standards, a judge shall disqualify

57

himself or herself in a proceeding in which the judge's impartiality might be reasonably questioned, including, but not limited to, instances in which the judge has a personal bias or prejudice concerning a party, a persona, a personal knowledge of disputed evidentiary facts concerning the procedure.

This Court ruled over Magistrate Shelley Rodriguez, who was originally appointed to preside over this case.  The Court has had direct knowledge and involvement eliciting enough reason to conduct, to conclude, I'm sorry, that it has a bias towards a party, in this case, me.

The purpose of disqualification requirement is to prevent the party from being forced to litigate before a judge with a bent of mind.  This is supported by Johnson versus District Court, 674 P.2d 952, 956, Colorado 1984, in that a judge may be convinced of his own impartiality, nonetheless may so act to lead a party to reasonably conclude that he is biased or prejudice in the pending litigation.

This Court has manifested an attitude of hostility or (not audible) toward a party and the child and that the trial judge's impartiality in this case can be reasonably questioned.

I've been informed by my current students, actually, that they have sent letters to you, I'm not aware if they actually submitted them or not, but this Court has fallen into total disrepute.  This Court has been already, your name, at least, has been disseminated through the Colorado Judicial

58

Disciplinary Committee, to the Board of Judicial Evaluation, Performance Evaluation, the news media has covered this case and so, Your Honor, I find it incredibly, how should I say it, I find it very hard for me to believe that you are not, that you do not have a bias and you're not prejudiced.

The fact that you are dismissing the law enforcement reports, which are direct evidence in this case about the sexual assault that was committed against my daughter, and that went unreported by the mother and Mr. Motter, the fact that she is suicidal as reported by her school therapist, the fact that she ran away from Mr. Motter's home without his knowledge and him not even being able to find her and the fact that she's suicidal again, once again, engaging in self-harming behavior, it is alarming and I do not find a logical explanation as to why this Court continues to endorse a criminal in placing my daughter in the hands of an admitted domestic violence perpetrator and a person that assaulted a minor.

At no time have I meant any disrespect to this Court other than my intense attempt to protect my daughter from this individual.

It's been seven long years and those cases, you know, reported by law enforcement are not in vein.  Those are situations that this child is in severe trauma, emotional, physical and this Court has allowed it by not appointing a guardian ad litem, by not appointing a legal representation or a

59

CASA representative.

This situation could be easily solved if the child had a representative, a voice to speak for her in this courtroom.

And if at any time you think, Your Honor, that I was disrespectful to you, I sincerely apologize, but this is now a desperate call on your sincere and true judgment about my character, as it has completely destroyed my profession, my career, even my health.

Mr. Motter has a pattern of disruptive behavior, again, assault on a minor and yet continues to get away with it, Your Honor.

Secondly and most, well, lastly --

THE COURT:  This is your last 30 seconds --

MR. ROJAS:  Yes.

THE COURT:  -- I've given you as much time as I gave Mr. Kelly, so please wrap it up.

MR. ROJAS:  Mr. Motter engaged in victim tampering.  I was going to present Nancy Elliot, who used to be his former wife, to testify and Mr. Motter contacted her and said you better stay off this case.  Unfortunately, Ms. Elliot fears Mr. Motter and she fears for her daughter's safety as she, Bella, who is 15 years old, is also suicidal and engaging in self-destructive behavior.

THE COURT:  All right.  Thank you.  The Court will enter the following findings and orders.  We are here today on

60

Mr. Motter's petition for a permanent protection order.  The Court heard the, okay, the hearing for the temporary protection order, which was an ex parte proceeding, and found the statutory criteria for issuance of a temporary protective order had been met. Mr. Rojas was served with that order.

We set originally for December 6th, I believe it was, for the first permanent protection order and the Court granted a continuance to Mr. Rojas for him to secure counsel.

Today, the Court will find, pursuant to 13-14-106, having reviewed the record and the evidence, the Court will find by a preponderance of the evidence that the respondent has committed acts constituting grounds for issuance of a civil protection order and that unless restrained, will continue to commit such acts or acts designed to intimidate or retaliate against the protected person, the judge shall order the temporary civil protection order to be made permanent.

And I do find that this behavior by Mr. Rojas has unfortunately continued and has escalated.  The Court is greatly concerned about the messages sent through Talking Parents as highlighted in Exhibit 2.  I think that Mr. Motter has reasonably interpreted them as threatening.

It is also concerning that Mr. Rojas has found where Mr. Motter works, which is evidently not a large place or one that is easily accessible by the public, and has entered that area.  This is, does constitute grounds for making this

protection order permanent.

I am most concerned about Mr. Rojas communicating with a child who is not a subject of this proceeding or this case, however, the Court does not believe that I have, I don't think I have jurisdiction to enter any orders concerning this child, but I would certainly say to Mr. Motter that you have, you and her mother, and I don't know anything about that circumstance, but as a parent, you have the right to let the school know who can and cannot have contact with your daughter.

MR. ROJAS:  If I may add to my statement.

THE COURT:  What, Mr. Rojas?

MR. ROJAS:  With this order, Your Honor, you are continuing committing a crime.  You're declaring a war against the United States --

THE COURT:  Enough.

MR. ROJAS:  -- Constitution.

THE COURT:  Enough.

MR. ROJAS:  Very well.

THE COURT:  I've made the protection order permanent. You need to stay here.  We're going to issue that order.  I'm going to ask, Mr. Kelly and Mr. Motter to wait outside while we're doing the paperwork to issue the permanent protection order.

I am reluctant to further restrict parenting time, but I am going to order that you need only supply an update once a

62

month.  That update is to be factual only.  The one Mr. Kelly read about Roslyn participating in this consent, Roslyn got these grades, those are factual, don't put any commentary in.  And, Mr. Rojas, your part is to respond appropriately and not make unnecessary comments.  I want you to know that your daughter is well and healthy and how she's doing in school, what activities she might be participating in, but that's it.

MR. ROJAS:  So are you forbidding me from visiting my daughter?

THE COURT:  I am not going to change the order at this time on therapeutic supervised.  I mean the fact is there's no contact at this time because Mr. Rojas hasn't done what he needs to do to see her --

MR. ROJAS:  Okay.

THE COURT:  If there are further concerns, I would expect either party to file a motion to modify, I would hold it for response.  And I know this case so well, I'm quite likely to be able to resolve things without a hearing.

MR. ROJAS:  Since you just stated that you would allow us to file a motion to modify, does that mean that I am permitted to --

THE COURT:  You would first have to go through the procedure that you're ordered to use.

MR. ROJAS:  Okay.  On another note, as I try to enforce your orders through law enforcement, both Denver Police

63

Department and Sheriff's Department dismissed it because this Court was not clear enough as to when the visitation should start. And again, you gave us three names to supervise us --

THE COURT: Mr. Rojas, I'm not certain even what you're talking about at this point, but I need to conclude the proceeding. I allowed an hour and it's been almost and hour and 20 minutes.

So did I address everything needed, Mr. Kelly?

MR. KELLY: Yes, Your Honor.

THE COURT: And the respondent is restricted from both the work and the home place.

MR. KELLY: Yes, Your Honor. Thank you.

THE COURT: All right. Mr. Rojas, anything else.

MR. ROJAS: You have not addressed as to when the visitations are going to start --

THE COURT: I'm not addressing that today.

MR. ROJAS: -- who is going to supervise.

THE COURT: I'm only asking if you have any questions about the terms of the protection order.

MR. ROJAS: Well, how am I supposed to enforce your orders then?

THE COURT: Do you have any questions about the protection order?

MR. ROJAS: No. I'm just asking how am I supposed to enforce your orders.

64

THE COURT:  All right.  The Court will be in recess. Mr. Kelly, Mr. Motter, if you'll just sit outside the courtroom, we'll bring the paperwork out to you.  Mr. Rojas, you can sit in here until served.

MR. KELLY:  Thank you, Your Honor.

(WHEREUPON, the digitally recorded proceeding concluded.)

65

TRANSCRIPTIONIST'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

DATED this 24th day of May, 2019.

/s/*Kristie R. Karol-Chik*
Kristie R. Karol-Chik
Court Transcriber

**Loizeaux Andrew <loizeauxa@klfs.net>**          Mon, Apr 16,
2018, 10:59 AM

to me, Eric, Casey

Alberto Rojas,

I have attached your testing results for the MMPI-2. I was unable to score your testing because you scored over 80 on the L (Lie) scale. I am not permitted to provide the questions that make up the MMPI-2 to clients or attorneys. The test questions themselves are copyrighted, and psychology standards of care prohibit distributions of test materials to non-professionals.

I have attached the Karlis Center document you want, from the first Tab of your notebook that you submitted to me.

As a courtesy, there is no charge for scanning and providing these documents to you.

Dr. Loizeaux

Andrew Loizeaux, Psy.D., P.C.

**2 Attachments**

**alrojas759 <alrojas759@gmail.com>**          Mon, Apr 16,
2018, 12:22 PM

to Loizeaux, Eric, Casey

So are you saying that you did not complete the test score in its entirety?

**Loizeaux Andrew <loizeauxa@klfs.net>**          Mon, Apr 16,
2018, 12:41 PM

to me, Eric, Casey

The entire test was scored by computer. It would've been clearer if I stated, "I was unable to interpret your testing ..." Apologies for any confusion.

*EXHIBIT N*

**Alberto Rojas <alrojas759@gmail.com>**                                    May 23

to craigeades

Mr. Eades.

This morning a Status Hearing was held at Jeffco Court House. Judge Meinster stated that she had spoken with you after I appealed her order. The mother of my child stated she had spoken with you and you responded that you were not available to render your services.

As per our conversation via telephone on March 15, 2017, you stated you were on vacation and that your hourly rate for supervised visitations was $100.00/hr.

Also, will you kindly offer a brief explanation on the attached documents, and is the court aware of such opinions and admonishment? Based on such information, what would make you the best candidate to supervise my visitations?

Thank you.

Alberto Rojas Jr. MSCR
303-868-6501
alrojas759@gmail.com
**2 Attachments**

**Craig Eades <craigeades@gmail.com>**                                    May 23

to me

On May 23, 2017 3:35 PM, "Alberto Rojas" <alrojas759@gmail.com> wrote:
Mr. Eades.

This morning a Status Hearing was held at Jeffco Court House. Judge Meinster stated that she had spoken with you after I appealed her order. **NO CONTACT WITH THE COURT**

The mother of my child stated she had spoken with you and you responded that you were not available to render your services. I INFORMED HER THAT I AM NIT ON YOUR CASE UNTIL I RECEIVE MY RETAINER OF $1000. AS I EXPLAINED TO YOU, THERE IS AN INTAKE PROCESS THAT INVOLVES REVIEWING ALL RELEVANT DOCUMENTS, INTERVIEWING PARENTS AND OTHERS I DEEM APPROPRIATE, INTERVIEWING THE CHILD, AND DETERMINING AN APPROPRIATE CASE PLAN!

As per our conversation via telephone on March 15, 2017, you stated you were on vacation and that your hourly rate for supervised visitations was $100.00/hr. CORRECT

Also, will you kindly offer a brief explanation on the attached documents, and is the court aware of such opinions and admonishment? PAPERWORK ISSUE

IN DOING DOMESTIC RELATIONS WORK I ENCOUNTER PEOPLE WHO ARE MENTALLY ILL AND HAVE TOXIC ANGER. ALL THOSE ALLEGATIONS ARE COMPLETE FABRICATIONS

Based on such information, what would make you the best candidate to supervise my visitations?

MY TRAINING AND EXPERIENCE IN PROVIDING THIS SPECIALIZED SERVICE. AND, THE COURT HAS APPOINTED ME BY ORDER!

LET ME KNOW WHEN YOU ARE READY TO PROCEED!

*EXHIBIT  L*                                                    *P.1*

Craig Eades <craigeades@gmail.com>
Thu, Aug 10, 2017, 7:42 AM
to me

i can offer an hourly rate of $80. a retainer of $500 must be paid and replenished upon billing. i would need cogan's entire report. i can proceed upon receipt of the retainer.

Craig Eades <craigeades@gmail.com>
Thu, Aug 10, 2017, 7:43 AM
to me

i need the cfi report as well.

Alberto Rojas <alrojas759@gmail.com>
Thu, Aug 10, 2017, 9:56 AM
to Craig

Draw a bill for the $500 on 5 separate bills of $100 each. I will send you the address later on. I also need to know if you had spoken with the judge lately and when was the date you did so. Lastly I need a written detailed explanation on your admonishment by DORA before we move forward.

Get Outlook for Android

Alberto Rojas <alrojas759@gmail.com>
Thu, Aug 10, 2017, 9:56 AM
to Craig

Let me get legal advice on this request. From today's communication and on, I do not authorize you to disclose any information to another party unless the court demands it. What I have shared with you is confidential and in disclosing any information on me and my child will be a violation.
I am not at home but once I get legal advice I will respond accordingly.

Get Outlook for Android

Craig Eades <craigeades@gmail.com>
Thu, Aug 10, 2017, 9:57 AM
to me

i will not be able to help you. good luck

EXHIBIT L

P. 2

April 27, 2019

To whom it may concern:

Alberto Rojas asked me to attend a court hearing on April 26, 2019 at the Jefferson County Court for the purpose of observation and note taking. The following are my notes of the hearing.

Judge Meinster read Alberto his Miranda rights.

Judge Meinster asked the lawyer representing Eric Motter what would be an appropriate jail term for the defendant. The lawyer stated a six month jail term. The judge noted that a jury trial would not be necessary for a term of the length.

Alberto asked if he could screen potential public councils before someone was assigned to the case. The judged did not think that was necessary due to the quality of the attorney on staff. Alberto stated that the previous public councils were not acceptable.

The judge asked if Alberto was asked for a State appointed council. Alberto replied yes.

The judge asked Alberto how he pled to the charge. Alberto replied not guilty for contempt.

A court date will be set pending the appointment of council.

Alberto asked the Judge to recuse herself. She refused. Alberto asked if she can be unbiased knowing she had been reported to the U.S. Department of Justice Civil Rights Division, Criminal Section. She replied yes.

My observation of the brief hearing:

There is certainly tension between the judge and Alberto. The judge was adamant that no additional paperwork would be accepted by the court. The clerk in the courtroom directed Alberto to submit any paperwork to the county clerk.

I thought Alberto was well prepared and conducted himself in a calm and professional manner.


Respectfully,

Dick Feuerborn

(303) 808-9397


*EXHIBIT M*